UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

CARLOS MORALES FELICIANO, .
et al,

    Plaintiffs,

       v.

PEDRO ROSSELLÓ GONZÁLEZ,
et al.,

    Defendants.

CIVIL NO. 79-4 (PG)

RECEIVED & FILED
CLERK'S OFFICE
U.S. DISTRICT COURT
SAN JUAN, P.R.
'00 JAN 25 PM 3:31

OPINION AND ORDER

On September 5, 1980, after a lengthy hearing, this court
issued a preliminary injunction and an opinion which detailed
systemic infliction of cruel and unusual punishment on the
plaintiff class by the defendants. Feliciano v. Barceló, 497 F.
Supp. 14 (D.P.R. [1980]).[1] This court found that the defendants
had committed constitutional violations in virtually all areas of
correctional operations, including health care, use of force,
classification, population control, security, inmate supervision,
and environmental health and sanitation. In the nearly two decades
that have followed, under the close supervision of the court, the
parties have made repeated, often energetic attempts to resolve

---

[1] The reported opinion is incorrectly dated January 3, 1979, the
true date is September 5, 1980.

Civil No. 79-4 (PG)                                               2.

the constitutional violations described in the 1980 Opinion and

Order.

     As the record in this case shows, the remedial efforts in

this case have gone from simple, broadly worded orders to

agreements willingly executed by defendants that delve into the

administrative heart of the Administration of Corrections, and

other relevant government agencies. In recent years the court has

given defendants ample opportunity and encouragement to develop

and implement their own plans to achieve compliance with

constitutional standards. The process of litigation, stipulation

and remedial order, noncompliance, and further negotiation and

stipulation, described below, has led only to minimal or short

lived and, in some cases, cosmetic improvements of the conditions

described in the court's 1980 Opinion and Order. In the court's

experienced view, the progress achieved has been unsatisfactory.

Thus, a closer look at the situation was needed.

     In March 1997, after determining that the record in this case

required updating, the Court appointed an expert witness under

F.R.E. 706. The court selected Vincent M. Nathan, Esq., who at

that time had been designated by the parties as a "Joint

Compliance Consultant." See Order Granting Joint Motion

Requesting Vacation of Order of Reference, etc. (Docket No. 6234).

Civil No. 79-4 (PG)                                                3.

     The court directed Mr. Nathan to produce two reports.  The
first was to assess the current state of affairs with respect to
correctional health care.  Mr. Nathan filed his health care report
the spring of 1997, and hearings in August and September of 1997
led to an Opinion and Order regarding health care matters.  <u>See</u>
<u>Morales Feliciano v. Rosselló González</u>, 13 F. Supp. 2d 151 (D.
Puerto Rico 1998).

Mr. Nathan also filed, on 15 July 1997, a Comprehensive Report
(Docket No. 6604; the entire report, including exhibits and
attachments, will be referred to below as the "Comprehensive
Report") on the status of conditions of confinement in AOC
facilities.   The Comprehensive Report covered crowding and
population control, environmental conditions, fire safety, the
facilities rehabilitation program, security, staffing, personnel
management, inmate discipline, use of force, classification, and
inmate management.   In the Comprehensive Report, Mr. Nathan
concluded that the defendants do not provide constitutional
conditions of confinement to its penal population.   The
Comprehensive Report pointed out widespread violations in
virtually every area of correctional operations, and Mr. Nathan
concluded that only the appointment of a receiver to oversee and
run the Administration of Correction would be sufficient to remedy
the deficiencies he found.

Civil No. 79-4 (PG)                                                    4.

The court ultimately set for January 1999 a hearing to ascertain current conditions of confinement. Because of the lapse of time since the filing of the Comprehensive Report, at the court's request, Mr. Nathan and his consultants returned to Puerto Rico in late 1998 for a round of site visits to update the Comprehensive Report. Mr. Nathan, his consultants, and a number of assistants made those visits in October, November, and December 1998 (including a brief visit by James Austin, Ph.D. in January 1999), and completed the update. The matter was heard from January 19 through March 18, 1999, including several continuances: twenty-three sessions in all were held.

At the hearing  the Court heard testimony from 21 witnesses, including both expert and fact witnesses.[2]

---

[2] **Expert Witnesses**
    1.  Mr. James D. Henderson is a prison consultant, having retired from the federal Bureau of Prisons after nearly 30 years of experience. Mr. Henderson was qualified to testify as an expert in correctional security and operations, as an expert in correctional staffing with respect to security, and in the direction, supervision, and overall operations of a correctional system.
    2.  Mr. Jerry A. O'Brien is a prison security and operations consultant. Mr. O'Brien was qualified to testify as an expert in correctional security, correctional staffing, and correctional operations.
    3.  Mr. William Dallman is a retired prison warden and a correctional consultant. Mr. Dallman was qualified to testify as an expert on management and administration of correctional facilities; staffing of correctional facilities; training of staff; and correctional security.
    4.  Dr. James Austin, Ph.D. works at George Washington University and is the co-director of the Institute on Crime, Justice and Corrections. Dr. Austin was qualified as an expert in the areas of inmate classification, population projections, and population crowding

Civil No. 79-4 (PG)                                                    5.

_____

analysis.

5.  Dr. Bailus Walker, Ph.D., MPH is a professor of environmental and occupational health at the Howard University College of Medicine in Washington, D.C.  Dr. Walker was qualified to testify as an expert in public health generally and in a correctional setting, as an epidemiologist, as a toxicologist, and as an expert on factors or elements which pose or increase risks of injury.

6.  Dr. Sanford M. Brown, Ph.D. is a professor of public health and health science at California State University, Fresno.  Dr. Brown was qualified to testify as an expert in environmental health, public health, and correctional environmental health, and in training in correctional and institutional systems, as well as in food sanitation.

7.  Mr. Thomas W. Jaeger, P.E. is president of Gage Babcock and Associates, a consulting engineering firm that specializes in fire protection and security.  Mr. Jaeger was qualified as an expert in fire protection, fire safety, life safety analysis, fire protection systems design, and building code analysis as it pertains to fire safety and prevention.

8.  Ashbel T. Wall, Esq. is Assistant Director for Administration for the Rhode Island Department of Corrections.  Mr. Wall was qualified as an expert witness on corrections, correctional administration, and inmate management, including security, classification, and inmate organizations.

9.  Mr. George A. Vose is the Director of the Department of Corrections for the State of Rhode Island.  Mr. Vose was qualified as an expert on corrections, correctional administration, inmate management, as well as riot control, training, and compliance with court orders in prison litigation cases.

10.  Vincent M. Nathan, Esq. is a partner in the Toledo, Ohio firm of Nathan & Roberts.  Mr. Nathan is a consultant in correctional reform and conditions in correctional facilities, as well as in correctional operations.  Mr. Nathan has served as a court monitor or special master in a number of prison reform cases besides Morales Feliciano, including the Ruiz v. Estelle case in Texas and the Duran v. King case in New Mexico, both of which involved system-wide correctional reform.  Mr. Nathan also has acted as an expert witness for the court in a number of other correctional reform cases.  Mr. Nathan was qualified to testify as an expert in monitoring and formulating remedies in prison conditions litigation and as an expert in correctional administration and operations.

11.  Ingrid Fernández Milián, M.D. is a health monitor for the Chief Health Care Coordinator; she monitors all correctional health services, including chronic diseases.  Dr. Fernández was qualified as an expert in infectious diseases, the control of infectious diseases, auditing of infectious disease, epidemiology, and medicine generally.

12.  Mr. Manuel D. Romero is the Deputy Cabinet Secretary for the Corrections Department in the State of New Mexico.  Mr. Romero testified

Civil No. 79-4 (PG)                                                                6.

as a fact witness regarding his experience in directing the Ponce Pilot Project. Although not formally offered as an expert, Mr. Romero testified, without objection, as to his opinions regarding correctional operations, correctional administration, and remedial efforts.

13.   Mr. Randolph W. Tucker is a consultant in fire protection engineering. Mr. Tucker was qualified to testify as an expert witness in the field of fire safety in public facilities generally, and with respect to correctional facilities in particular.

14.   Steve J. Martin, Esq. is an attorney whose principal work is as a correctional consultant. Mr. Martin has quite substantial experience in prison reform litigation, both as a consultant and as an attorney. In addition, Mr. Martin has had extensive experience with the Puerto Rico prison system through his involvement in the Morales Feliciano litigation. Mr. Martin was qualified to testify as an expert in corrections administration, correctional operations, prison reform litigation and reform processes (excluding mental and medical health, and environmental and fire safety).

15.   Mr. James T. Garvey, Jr. is a corrections consultant and 30-year veteran of the New York City Department of Corrections. Mr. Garvey was qualified to testify as an expert in correctional operations generally, including prison security, personnel management and staffing, professional personnel discipline, inmate discipline, classification, key control, tool control, armories, perimeter security, transportation of inmates, gangs, inmate programs, and use of force.

**Fact Witnesses**

1.   The Hon. Zoe Laboy Alvarado is the Secretary of the Department of Correction and Rehabilitation and the current Administrator of Correction. In her official capacities as Secretary of the DCR and as Administrator of Correction, she is one of the defendants in this action.

2.   Ruth Colón de González is a former Director of Operations at the AOC's Río Piedras Complex and a consultant for the Civil Action and Education Corporation. Although she testified primarily as a fact witness, based on her decades of experience in operations of AOC facilities, she also testified as to her opinions regarding sociopenal services and the implementation of a classification system at the AOC.

3.   Gloria E. Ortiz Martínez, Esq. is the director of the staff discipline unit at the Administration of Correction. Ms. Ortiz testified as a fact witness regarding disciplinary regulations and actions against AOC staff.

4.   Capt. Luis Aponte Ramos is the Director of Security for the AOC's Bayamón Region. Capt. Aponte testified as a fact witness regarding security practices at Bayamón institutions.

5.   Nuria Rivera, Esq. is the Sub-Administrator of Correction; she testified regarding certain measures taken by AOC administrators over the past year and a half or planned for the future, and regarding record keeping and information management at the AOC.

Civil No. 79-4 (PG)                                    7.

The court files this opinion and order pursuant to Rule 52 of the Federal Rules of Civil Procedure in lieu of separate findings of fact and conclusions of law.  The facts and the law as set out clearly support the court's conclusion that the defendants have subjected the members of the plaintiff class to serious harm or an unreasonable risk of serious harm, with deliberate indifference. The court also holds that the defendants will continue to subject members of the plaintiff class to serious harm, or the risk of serious harm, unless the court continues in effect the injunctive relief, however modified, previously provided by the court.

## CONSTITUTIONAL STANDARDS

The Constitution does not permit inhumane prisons. <u>Farmer v. Brennan</u>, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994). It is well-settled law that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." <u>Helling v. McKinney</u>, 509 U.S. 25, 31, 113 S.Ct. 2475, 2480 (1993). In its prohibition of "cruel and unusual punishments," the Eighth Amendment imposes duties on prison officials who must provide humane conditions of confinement, must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable

---

6. Mr. Ramón Mellado is the current Director of the FRP.  Mr. Mellado testified regarding the Facilities Rehabilitation Program.

Civil No. 79-4 (PG)                                                    8.

measures to guarantee the safety of the inmates." <u>Hudson v.</u>
<u>Palmer</u>, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984). See
<u>Helling, supra</u>, 509 U.S. at 31-32, 113 S.Ct. At 2480; <u>Washington</u>
<u>v. Harper</u>, 494 U.S. 210, 225, 110 S.Ct. 1028, 1038-1039 (1990);
<u>Estelle v. Gamble</u>, 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976).

It is not, however, every injury suffered by a prisoner that
translates into constitutional liability for prison officials
responsible for his or her custody. Supreme Court cases hold that
a prison official violates the Eighth Amendment only when two
requirements are met. First, the deprivation alleged must be,
objectively, "sufficiently serious." <u>Farmer</u>, 114 S.Ct., at 1977;
<u>Wilson v. Seiter</u>, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991).
To be constitutionally actionable, a prison official's act or
omission must result in the denial of "'the minimal civilized
measure of life's necessities.'" <u>Farmer</u>, 511 U.S., at 834, 114
S.Ct., at 1977, <u>quoting from</u> <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347,
101 S.Ct. 2392, 2399 (1981). To meet this objective requirement,
plaintiff must show that he or she is incarcerated under
conditions posing a substantial risk of serious harm. See,
<u>Helling</u>, 509 U.S., at 35, 113 S.Ct., at 2481; <u>Farmer</u>, 511 U.S., at
834, 114 S.Ct., at 1977. The second requirement that must be met
follows from the principle that "only the unnecessary and wanton
infliction of pain implicates the Eighth Amendment." <u>Farmer</u>, 511

Civil No. 79-4 (PG)                                                    9.

U.S., at 834, 114 S.Ct., at 1977, <u>quoting from</u> <u>Wilson</u>, 501 U.S.,

at 297, 111 S.Ct., at 2323 (internal quotation marks, emphasis,

and citation omitted). To violate the Cruel and Unusual

Punishments Clause, a defendant must have a "sufficiently culpable

state of mind." In a prison-conditions case such as the present

one, that state of mind that must be shown is one of "deliberate

indifference" to inmate health and safety. <u>Farmer</u>, 511 U.S., at

834, 114 S.Ct, at 1977.

The Supreme Court in <u>Farmer</u>, points out that "deliberate

indifference" entails something more than mere negligence, but it

is satisfied by something less than acts or omissions for the

purpose of causing harm or with the knowledge that harm will

result. Accordingly, the Court held that a defendant may be found

liable under the Eighth Amendment for denying an inmate humane

conditions of confinement when defendant knows of and disregards

an excessive risk to inmate health and safety; when the defendant

is both aware of facts from which the inference could be drawn

that a substantial risk of serious harms exists, and defendant

must draw the inference. <u>Farmer</u>, 511 U.S., at 837, 114 S.Ct., at

1979. In sum, acting or failing to act with deliberate

indifference to a substantial risk of serious harm to an inmate is

the equivalent of recklessly disregarding that risk, because the

person is consciously disregarding a substantial risk of serious

Civil No. 79-4 (PG)                                              10.

harm. Ibid., at 1980.  In order to satisfy the subjective standard

explained above, it is enough to show that the defendant acted or

failed to act despite his or her knowledge of a substantial risk

of serious harm. Farmer, 511 U.S., at 842, 114 S.Ct., at 1981.

"Whether a prison official had the requisite knowledge of a

substantial risk is a question of fact subject to demonstration in

the usual ways, including inference from circumstantial evidence,

. . . , and a fact finder may conclude that a prison official knew

of a substantial risk from the very fact that the risk was

obvious." Ibid. Thus, the question under the Eighth Amendment is

"whether prison officials, acting with deliberate indifference,

exposed a prisoner to sufficiently substantial 'risk of serious

damage to his future health.'" Farmer, 511 U.S., at 843, 114

S.Ct., at 1982, quoting from Helling, 509 U.S., at 35, 113 S.Ct.,

at 2481.  When the risk to inmate health or safety is obvious,

defendants may only escape liability if they were to prove that

they were unaware even of such obvious risk. Farmer, 511 U.S., at

844, 114 S.Ct., at 1982. In addition, defendants who actually knew

of a substantial risk to inmate health or safety may be found free

from liability if they responded reasonably to the risk, taking

reasonable measures to abate it. Ibid.

   The testimony and other evidence presented at the hearing

amply proves that defendants have violated plaintiff class rights

Civil No. 79-4 (PG)                                                      11.

under the Eighth Amendment. The detailed findings that follow show
that defendants have subjected the plaintiff class to harm and to
a substantial risk of serious harm with deliberate indifference.
Throughout this litigation, defendants have been well aware of
the substantial risk of serious harm faced by the plaintiff class.
In numerous instances such risk has been egregiously obvious to
all defendants. Yet, defendants have either disregarded that risk
outright or have failed to take reasonable measures to abate it.
In sum, the Court concludes that the record before it shows that
both the objective and the subjective requirements of defendants'
constitutional liability have been clearly satisfied in this case.

The continuation and extent of the equitable remedy to be
imposed upon the defendants requires a determination of whether
they have, with deliberate indifference, harmed plaintiffs or
exposed them to an unreasonable risk of serious harm. Helling v.
McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 2481 (1993). The
court's evaluation of the objective conditions of confinement must
be informed by "evolving standards of decency that mark the
progress of a maturing society." Rhodes v. Chapman, 452 U.S. 337,
346, 101 S. Ct. 2392, 2399 (1981). Objective facts should
underlie that determination to the extent possible. Conditions
that, alone or in combination, deprive inmates of the minimal
civilized measures of life's necessities are unconstitutional.

Civil No. 79-4 (PG)                                                      12.

452 U.S. at 347, 101 S. Ct. at 2399; <u>see</u> <u>also</u>    <u>Helling v.</u>
<u>McKinney</u>, 509 U.S. 25 (1993).  The Court finds that inmates in the
AOC system suffer from both actual, serious harm and from a
substantial risk of serious harm of constitutional import.

The court finds that the defendants have deprived the
plaintiff class members of the minimal civilized measures of
life's necessities in three principal ways: by failing to provide
even minimal personal security to inmates incarcerated in AOC
prisons, thus causing and increasing the risk of death, as well as
creating an unreasonable risk of danger from assault; by exposing
inmates to unreasonable and unnecessary risk of illness through
unhealthy environmental conditions, including in overcrowded
facilities;  and  by failing to provide adequate fire safety for
the inmates held in its prisons.

The most serious harm and threat of harm occur in the area of
security.   Defendants have  not  challenged  testimony  by
correctional experts that inmates in the custody of the AOC live
virtually unsupervised by correctional staff.  Once an inmate is
locked into a housing unit, he is at the mercy, and dependent upon
the protection of fellow inmates.

> "[W]hen the State takes a person into its custody and
> holds him there against his will, the Constitution
> imposes upon it a corresponding <u>duty to assume some</u>
> <u>responsibility for his safety and general well-being</u>. .
> . . The rationale for this principle is simple enough:

Civil No. 79-4 (PG)                                            13.

> when the State by the affirmative exercise of its power
> so restrains an individual's liberty that it renders him
> unable to care for himself, and at the same time fails
> to provide for his basic human needs -, e.g., food,
> clothing, shelter, medical care, and reasonable safety -
> it transgresses the substantive limits on state action
> set by the Eighth Amendment. . . .   Contemporary
> standards of decency require no less.

Helling v. McKinney, 509 U.S. 25, 32 (1993) (emphasis added)

(quoting DeShaney v. Winnebago County Dept. of Social Services,

489 U.S. 189, 199-200 (1989) and Estelle v. Gamble, 429 U.S. 97,

103-104 (1976)).  Defendants' abandonment of these most basic of

correctional    responsibilities,    in    and    of    itself,    violates

contemporary standards of decency and is sufficient to permit the

court to impose an equitable remedy.

The harm suffered by the plaintiff class from the failures in

security, as well as the pervasive threat of future harm, are

certainly of substantial dimensions, and are illustrated by the

unacceptably high number of violent deaths that have occurred over

the past two years.    There has been an alarming number of

homicides  and  suicides  during  the  last  two  years  in  AOC

facilities.   The numbers have increased from 1997 through 1998.

In 1997, there were at least five homicides and four suicides in

AOC facilities.   In 1998 those numbers surged to at least eight

homicides and seven suicides.[3]   The gravity of this situation is

---

[3] Plaintiffs' correctional consultant, Mr. Steve Martin, testified
that the AOC's information gathering and reporting practices are so

Civil No. 79-4 (PG)                                                    14.

compounded by the lack of a formal suicide prevention policy at the agency, and by a failure to deploy staff where they can best deter illicit behavior and detect suicide attempts, assaults, and homicide attempts.

The numbers of homicides and suicides in AOC institutions are minimum numbers, established by defendants themselves; no one can conclude with any reasonable degree of certainty whether those are the only homicides and suicides, or even whether some of the suicides were actually homicides, because of deficiencies in the AOC's record keeping and information gathering practices. After reviewing investigative reports on inmate deaths provided by AOC personnel, Mr. Martin concluded that in virtually no instance was there a death that had been properly investigated, nor was there documentation that permitted a reviewer to conclude with any degree of certainty what happened in that instance. The failure to monitor and produce well-informed, complete, and comprehensive investigative reports of inmate deaths evidences fatalistic and indifferent acceptance on the part of administrators that homicides and suicides, while not desirable, simply are unavoidable facets of the AOC system.

---

deficient that it cannot be stated with absolute certainty how many suicides and homicides have occurred in AOC facilities. Nevertheless, in making this finding, the court accepts the testimony of Sub-Administrator Nuria Rivera and the exhibits introduced by defendants in drawing this conclusion regarding the number of homicides and suicides.

Civil No. 79-4 (PG)                                                      15.

Of course, violent deaths are not the only indicia of the pervasiveness of violence in a prison system.   Inmate-on-inmate assaults, including sexual assaults, extortion, and intimidation tend to be more common and also tell a great deal about the level of safety in a prison system.   Unfortunately, in the AOC system, the failure to deploy staff in a manner that permits supervision of inmates makes it impossible to garner accurate and complete information about the level of inmate-on-inmate assaults, as even Administrator Laboy acknowledges.   As Mr. O'Brien testified:

> "When we talk about assaults, well, you have no officers working in the housing units and what assaults are, the only way assaults get reported in the AOC is the inmate stumbles in the front door and hollers for an officer because the officer is not inside the housing unit to see it.[4]   I think that the reporting of assaults is probably understated. . . ."

This sentiment was echoed by plaintiffs' correctional expert, Mr. Steve Martin,   as well as by another of the Expert Witness' consultants, Mr. William Dallman.   Mr. George Vose concluded that the level of violence in AOC facilities was unacceptably high, and referred to incidents in which an inmate was "expelled" by other inmates in his housing unit, often after suffering violence at their hands.   Mr. Vose then noted that the amount of inmate

---

[4]   This testimony is ominously resonant of the Court's finding in 1986 that "[a]n inmate's protection against inmate violence may often depend on how fast he can run to a locked gate to call a guard." Morales Feliciano v. Romero Barceló, 672 F. Supp. 591, 603 (D. Puerto Rico 1986).

Civil No. 79-4 (PG)                                                    16.

control over other inmates gives custodial officers reason to fear

for their own safety inside housing units; the result is that both

inmates and staff are harmed.  The lack of adequate security also

results in relatively minor incidents quickly escalating into

dangerous ones.   The inability to secure doors, to isolate

segments of population from each other, and generally to control

the area around which a fight starts, allows a small altercation

to evolve quickly into a disturbance.  The inability to identify

assaults and other violent behavior is exacerbated by an

inadequate system for collecting and reporting that type of

information.  At the very least, the data that are available

indicate an extremely high risk of harm to inmates.     As

illustrated in Section VIII of these findings, the AOC does not

adequately classify or separate inmates, further adding to the

threat of violence.

    Violence among inmates (and a substantial risk of violence)

is a deprivation of an essential human need, and constitutes a

condition intolerable for prison confinement.  Fisher v. Koehler,

692 F. Supp. 1519 (S.D.N.Y. 1988) (citing Rhodes v. Chapman, 452

U.S. at 348, 101 S. Ct. at 2400, and Inmates of Occoquan v. Barry,

844 F. 2d 828, 836 (D.C. Cir. 1988)).  "Having incarcerated the

individuals, stripped them of all means of self-protection, and

foreclosed access to private aid, the state is constitutionally

Civil No. 79-4 (PG)                                                    17.

required to provide prisoners with some protection from the
dangers to which they are exposed." Morgan v. District of
Columbia, 824 F. 2d 1049, 1057 (D.C. Cir. 1987). Although some
violence may be inevitable in some prisons, the Constitution
requires prison officials to protect inmates from unreasonable
threat of violence from other inmates. The risk of violence must
be a serious problem of "substantial dimensions," although it need
not be rampant. Fisher v. Koehler, 692 F. Supp. 1519, 1560
(S.D.N.Y. 1988); Withers v. Levine, 615 F.2d 158, 161 (4th Cir.),
cert. denied, 449 U.S. 849, 101 S. Ct. 136 (1980), implicitly
overruled on other grounds by Rhodes v. Chapman, supra.[5] A single
incident may not suffice to show an unreasonable risk of harm, but
it need not be shown that a "reign of violence and terror"
prevails. Fisher v. Koehler, 692 F. Supp. at 1560. Inmates also
have been harmed and are subject to unreasonable risk of harm from
substandard environmental conditions and from overcrowding.

The court holds that defendants' inadequate attention to
environmental health matters has resulted in the outbreak of
disease in institutional populations, in the exacerbation of such
outbreaks, and in an unacceptable risk of disease. The failures
in environmental health and population control pose an immediate

---

[5]   See Moore v. Winebrenner, 927 F. 2d 1312, 1315-1316 (4th Cir.
1991), cert. denied, 502 U.S. 828, 112 S. Ct. 97 (1991).

Civil No. 79-4 (PG)                                        18.

threat to the health and safety of the inmate population and

require the continuation of remedial relief in this case.   The

court further holds that defendants' lackadaisical approach to

fire safety, poses an immediate threat to the health and safety of

the AOC population.   The mere fact that serious fires have not

harmed inmates does not, in itself, relieve defendants from

equitable liability in this area.   See Helling v. McKinney, 502

U.S. 25 (1993).   The Constitution does not require that an inmate

be harmed or killed before a court may intervene to address

inadequate fire safety.   As Mr. Jaeger noted during his testimony:

> [I]f you asked the people in the Dupont Plaza the day
> before the fire did they feel they were at risk, they'd
> probably say "No, we don't."   Dupont Plaza did not have
> a major fire in that building the day before the fire.
> But on the day of the fire, it was a major disaster.

In the ways described above, therefore, the defendants have

subjected plaintiffs to  serious harm and a substantial risk of

serious harm that violates inmates' rights under the United States

Constitution.   The court is convinced that the objective component

of defendants constitutional liability has been clearly proved by

the evidence before it.

### DELIBERATE INDIFFERENCE

In order to be found liable for violating the Cruel and

Unusual Punishments Clause, defendants must have a "sufficiently

culpable state of mind."  Defendants must be deliberately

Civil No. 79-4 (PG)                                                        19.

indifferent to an unreasonable risk of serious harm; to be deliberately indifferent, the defendants must act with conscious disregard of a substantial risk of serious harm. <u>Farmer v. Brennan</u>, 551 U.S. 825, 838-842, 114 S. Ct. 1970, 1980-81 (1994).

Plaintiffs need not show that defendants acted or failed to act believing that harm actually would befall an inmate; it is enough that they acted or failed to act despite their knowledge of a substantial risk of serious harm. <u>Farmer v. Brennan</u>, 551 U.S. at 842, 114 S. Ct. at 1981. Moreover, the inquiry is whether an administrator has knowledge about the substantial risk of serious harm to a particular class of persons, not whether she knows who the particular victim might be. <u>Taylor v. Michigan Dept. of Corrections</u>, 69 F. 3d 76, 81 (6th Cir. 1995). A fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. <u>Farmer v. Brennan</u>, 551 U.S. at 842, 114 S. Ct. At 1981. An injury or risk thereof may be so obvious that a fact finder could conclude that the administrator did know of it because she could not have failed to know of it. <u>Brice v. Virginia Beach Correctional Center</u>, 58 F. 3d 101, 105 (4th Cir. 1995).

Where a risk is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant official being sued had

Civil No. 79-4 (PG)                                                        20.

been exposed to information concerning the risk and thus 'must have known' about it, then such evidence" can be sufficient to conclude actual knowledge.  <u>Farmer v. Brennan</u>, 511 U.S. at 842-843, 114 S. Ct. at 1981-1982.  Finally, while the obviousness of a risk is not conclusive, a prison official cannot escape liability by merely refusing to verify underlying facts.  <u>See Id.</u>, 511 U.S. 843 n. 8, 114 S. Ct. 1982 n. 8.  The knowledge that is required is not, however, the knowledge that the risk of a specific event or harm will befall a specific person.  511 U.S. at 843-844, 114 S. Ct. at 1982.  Thus, it is not necessary that a supervisory official be aware of the precise consequences of a deficiency in conditions of confinement, but rather, the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists.  <u>Smith v. Brenoettsy</u>, 158 F. 3d 908, 912 (5th Cir. 1998).  For example, Administrator Laboy and other defendants need not be aware that overcrowded cells create a risk of contracting conjunctivitis; it is sufficient that she be aware that overcrowding increase substantially the risk of suffering serious health problems.  The fact that overcrowding increases the risk of spreading contagious diseases is obvious to any layperson, let alone a prison administrator who deals with these issues every day.

Civil No. 79-4 (PG)                                                    21.

The risks inherent in the AOC system are pervasive, long-standing, and well-documented.  These problems have been described in and were the subject of numerous reports and opinions issued throughout this case.  See, e.g., Morales Feliciano v. Romero Barceló, 497 F. Supp. 14 (D. Puerto Rico [1980]); Morales Feliciano v. Hernández Colón, 672 F. Supp. 591 (D. Puerto Rico 1986); Morales Feliciano v. Rosselló González, 13 F. Supp. 2d 151 (D. Puerto Rico 1998); 159th Report of the Court Monitor — Report Pursuant to the Court's November 30, 1987 Order, (Docket No. 3000); 299th Report of the Court Monitor — Report on Defendants' Compliance with the Revised Stipulation, (Docket No. 5749); 93rd Report of the Court Monitor — Report on Environmental Conditions, (Docket No. 2009); 137th Report of the Court Monitor — First Report on Defendants' State of Compliance with the Court's March 30, 1990 Order (Docket No. 2559); 302nd Report of the Court Monitor — Report on Compliance with the Stipulation Regarding the Facilities Rehabilitation Program, (Docket No. 5992); 290th Report of the Court Monitor — Report Explaining Defendants' Selected Roster Management System and Submitting the Court Monitor's Recommendations, (Docket No. 5365); 293rd Report of the Court Monitor — Report on Compliance with the September 1, 1994 Stipulation Regarding Custodial and Sociopenal Staffing, (Docket No. 5502); 303rd Report of the Court Monitor — Second Report on

Civil No. 79-4 (PG)                                                    22.

<u>Compliance with the Stipulation Regarding Custodial and Sociopenal</u>

<u>Staffing</u>, (Docket No. 5939); <u>304th Report of the Court Monitor —</u>

<u>Report on Defendants' State of Compliance with the Stipulation</u>

<u>Regarding Classification</u>, (Docket No. 5891); <u>113th Report of the</u>

<u>Court Monitor — Report on Security and Life Safety</u>, (Docket No.

2255); <u>148th Report of the Court Monitor — Report Enclosing</u>

<u>Experts' Report on Security and Life Safety</u>, (Docket No. 3003);

<u>233rd Report of the Court Monitor — Report Enclosing Security and</u>

<u>Staffing Consultants' Report of the October 26-29, 1992 Security</u>

<u>and Staffing Audit at Bayamón 292, Bayamón 1072, Arecibo, Camp La</u>

<u>Pica, and the Ponce Complex</u>, (Docket No. 4726); <u>270th Report of</u>

<u>the Court Monitor — Report Enclosing Security and Staffing</u>

<u>Consultants' Report</u>, (Docket No. 4813); <u>297th Report of the Court</u>

<u>Monitor — Report on Compliance with the Stipulation Regarding</u>

<u>Security</u>, (Docket No. 5772); <u>152nd Report of the Court Monitor —</u>

<u>Inmate Discipline</u>, (Docket No. 2916).

     In addition, the risks in the AOC system are widespread.  For

example, more than half the facilities visited by plaintiffs' and

defendants' fire safety experts violated local and/or national

fire safety norms.  Housing units were overcrowded in at least

five institutions.  The system is replete with security lapses

throughout.  All of these deficiencies represent unreasonable

dangers to the health and safety of the inmate population.

Civil No. 79-4 (PG)                                                    23.

The evidence presented during the hearing has demonstrated amply the continued need for remedial relief, imposed by the court upon defendants. The picture that emerged from those hearings is one of administrative chaos. The AOC's current deficiencies are far-ranging and serious. Mr. Jerry O'Brien articulated the depth of the AOC's problems as follows:

> [T]he AOC's total operation is broken, badly broken and
> it doesn't require, you know, I have been involved
> personally and know about other systems that had major
> problems and you can go in there and do some minor
> surgery so to speak and maybe move a few people around,
> change leadership and reinforce new policies and maybe
> do things a little differently and gain control back but
> I don't think that you are going to be able to do that
> in this particular setting. You have got to almost
> rebuild the system from the ground up. You just can't
> go in there and surgically, you can't just go in there
> and do a few things and expect the system is going to
> change[,] because it is not. I do not sense that there
> is any outrage, any people who are or that concerned
> with the amount of violence that is going on inside the
> institutions.

Mr. Martin indicated that the AOC as an agency simply lacks the type of correctional administrative expertise necessary to run a safe and secure system, and AOC supervisors do not require institutional personnel to adhere to basic correctional standards. This is reflective of a deeply flawed scheme of management: managers are simply not trained to operate these prisons. Defendants insist, and experts familiar with the AOC institutions agree **that** by and large AOC personnel are decent and kind. That

Civil No. 79-4 (PG)                                                      24.

is not the issue: they are not trained to carry out their managerial and supervisory tasks: there are no guidelines, training programs, or audits.  Time and again the court has insisted on the defendants' failure to provide an administrative structure that will provide for uniform and enduring conditions that will provide the plaintiffs with constitutional protection they are entitled to.  Time and again the court has found bad administration as the source of constitutional wrongs.

The failure of defendants to act despite their knowledge of the serious harm and the substantial risk of serious harm to plaintiff class cannot come as a surprise to any person familiar with the conditions at AOC facilities, even to those minimally familiar with them. The record in this case is replete with examples of defendants see-sawing cyclical behavior. Their conduct has followed a cyclical pattern that generally can be described as follows: A particular problem or deficiency is identified. Defendants and plaintiffs execute a stipulation in which defendants agree to remedy the deficiency.  Almost invariably, defendants would fail to comply with the stipulation.  Defendants and plaintiffs would execute yet a further stipulation to resolve the noncompliance, but the later stipulation would be even more detailed and prescriptive than the earlier ones. Yet, defendants would also fail to comply with what they have agreed to do.

Civil No. 79-4 (PG)                                                        25.

    Illustrative of this cycle are the proceedings related to

crowding.   In 1980, the Court found gross overcrowding at AOC

facilities,   which   contributed   directly   to   unconstitutional

conditions; the court ordered defendants to provide a minimal

level of living and sleeping space to each inmate.   See Feliciano

v. Barceló, 497 F. Supp. 14 (D. Puerto Rico 1980).   In 1986, after

further   extended   litigation,   the   court   found   the   extent   of

crowding little changed from that found in 1980. Morales Feliciano

v. Romero Barceló, 672 F. Supp. 591 (D. Puerto Rico 1986).   In

that same Order, the court appointed a special master to monitor

defendants' compliance with the Court's orders.   The defendants

then agreed, in a 10 September 1986 Stipulation (Docket No. 910),

to reduce crowding and eventually to provide a prescribed amount

of living and sleeping space to each inmate; the court enjoined

defendants to implement the stipulation in its 26 January 1987

Order   (Docket No. 948).   Soon thereafter, the newly-appointed

court monitor filed a report indicating that severe overcrowding

persisted,   in   spite   of   the   stipulation,   and   plaintiffs

subsequently sought contempt against defendants.   See Morales

Feliciano v. Hernandez Colon, 672 F. Supp. 627, 629-630 (D. Puerto

Rico 1987).   Within six months following the January 1987 Order,

defendants still had not made substantial progress in reducing

crowding, and the court found defendants in contempt and imposed

Civil No. 79-4 (PG)                                                    26.

fines for that contempt. <u>Morales Feliciano v. Hernández Colon</u>,
697 F. Supp. 26 (D. Puerto Rico 1987). Over the next four years,
the court raised the amount of fines for overcrowding
considerably. <u>See</u>, <u>e.g.</u>, Memorandum and Opinion dated 15 August
1988 (Docket No. 1343); Order dated 10 January 1991 (Docket No.
2586). The imposition of the fines was confirmed by the Court of
Appeals. <u>Morales Feliciano v. Parole Board of P.R.</u>, 887 F. 2d 1
(1st Cir. 1989).

After another round of litigation in 1991, defendants and
plaintiffs entered into the <u>Stipulation Regarding Population</u>
<u>Management and a Pilot Project at Ponce</u> (Docket No. 3413; referred
to below as the "Ponce Pilot Project Stipulation"). The Ponce
Pilot Project Stipulation went beyond limiting the number of
inmates at particular institutions, but required the AOC to take
several administrative planning measures to control crowding.
After yet another round of litigation in 1993 and 1994, defendants
agreed to the <u>Revised Stipulation</u> (Docket No. 5094), which went
further into the AOC's management structure, obligating defendants
to create a new office within the AOC and even addressing the
Governor's plans for reorganizing the agency.[6]

----

[6]     The <u>Revised Stipulation</u> did not modify prior crowding
stipulations, but added a layer of mechanisms that should have been a
foundation for defendants' efforts to comply with the prior stipulations
and orders.

Civil No. 79-4 (PG)                                                    27.

Thus, the remedial efforts in this case have gone from simple, broadly worded orders (e.g., "55 square feet of living and sleeping space per inmate") to agreements *willingly executed by defendants* that delve into the administrative heart of the AOC. The efforts to relieve crowding described above are typical within this litigation. To varying degrees, efforts at improving security, staff supervision, and classification have followed similar paths.[7] The detailed findings in this opinion demonstrate that the process of litigation, stipulation and remedial order, noncompliance, and further stipulation has led only to minimal and, in some cases, cosmetic improvements of the conditions described in the court's 1980 Opinion and Order.

The court concludes that the risks to plaintiffs in AOC institutions are so obvious to a prison administrator, are so widespread, have been so thoroughly documented (including through this litigation), and are so pervasive, that defendants were aware of the risks and cannot claim to have been unaware of them.

Administrator Laboy herself testified about her knowledge. The AOC's problems were described in great detail in the

---

[7] At least, in the case of crowding, some results belatedly have been achieved. The severe degree of overcrowding detailed in the opinions listed above has abated somewhat, but disturbing levels of crowding still remains in the system nearly twenty years after the Court's original opinion and preliminary injunction. See Section VI of these proposed findings, *infra*.

Civil No. 79-4 (PG)                                            28.

Comprehensive Report, see generally, Ex. 2, 20, 28, 30, 34, 35,

36, 37, which was filed and delivered to counsel for Administrator

Laboy and other defendants in July of 1997, approximately three

months after she assumed her post as administrator.[8]  Ms. Laboy

testified that she was well aware of the problems discussed in the

Comprehensive Report, because they were essentially the same

problems that constituted the subjects of her weekly staff

meetings.   The issues Administrator Laboy discussed with her

staff have included, as well, those issues included in the court's

Partial Final Judgment entered on 24 January 1996.  Administrator

Laboy has known about the Morales Feliciano litigation since long

before she was appointed administrator.   Ms. Laboy therefore has

been aware of the deficiencies identified in the Comprehensive

Report since at least the beginning of her tenure.

     Defendants, however, can escape liability if they demonstrate

that they took reasonable actions to abate a risk.   Farmer v.

Brennan, 511 U.S. at 847, 114 S. Ct. at 1984.  The reasonableness

of a defendant's response to a risk is a question for the trier of

fact.  Smith v. Brenoettsy, 158 F. 3d at 912.  The court finds

that defendants did not take such reasonable measures.

_____

     [8]   Secretary Laboy, however, did not receive the copy of the
Comprehensive Report until September or October of 1997, yet another
instance of miscommunication among defendants and of their indifference
to court processes and where to obtain necessary information.

Civil No. 79-4 (PG)                                          29.

Most of the initiatives of defendants over the past two years fall into two categories: planned or recently initiated projects, many of which require approval of other government agencies but none of which have been completed; and ineffectual palliatives that do not address the fundamental problems identified by the Expert Witness and his consultants, or else which are minor efforts that are undermined by the manner in which they are carried out or which are not accompanied by corresponding efforts necessary to make them effective.   In no instance, however, did defendants describe any action they took that arose out of their obligations under the orders issued by the court in this case. Administrator Laboy and her witnesses provided a long list of projects, some of which she has begun, many which she has not, few of which are completed or even anywhere close to completion, and some of which are unfunded.   (facility mission inventory); (access to inmates' criminal records);  (formal staff discipline system);       (regionalization  plan);  (formal  creation  of classification  office,  population  management  office,  and compliance office); (replacement of defective fencing); (revisions to  employee  classification  and  compensation  system);  (making compliance  office  more  effective);   (reforming maintenance and engineering  department);   (seeking ACA  accreditation);   (adding new beds);  (measures  to  address  staff  training);  (information

Civil No. 79-4 (PG)                                                    30.

automation); (inmate tracking system); (systematizing information about inmate deaths). Even the process of educating AOC administrators about the court's orders consists of a plan barely begun. The incipient nature of these projects, most of which are only tenuously related and insufficient to remedying unconstitutional conditions of confinement, renders the projects of little relevance to constitutional requirements and the court's orders.

Efforts described by Administrator Laboy and her staff that have been completed amount to very little, or else their value is thwarted by the manner of implementation. Defendants have purchased radios for officers, which is a commendable, but minor effort. But they also have purchased "anti-shank" vests to wear as part of their everyday uniform. These vests have done little more than provide officers a false sense of security, as they do not provide much protection, are less effective than solving the many other security deficiencies that exist in AOC facilities, and simply attest to how dangerous AOC facilities have become. Moreover, that gear is typically used only in very high security situations, and thus would have little relevance to day-to-day operations in safely run medium and low-security institutions. These and other AOC actions described by Administrator Laboy during her testimony are at best misguided efforts that have

Civil No. 79-4 (PG)                                                    31.

little to do with resolving the actual problems described at

length by the experts heard by the court.

Defendants have taken a number of other *ad hoc* measures,

including purchases of equipment for officers, such as batons,

work boots, and uniforms, and of vans for transporting inmates,

and have raised the salaries of AOC employees.   Although these

efforts may be a necessary part of administering the AOC, there is

no explanation of how these initiatives will resolve the problems

that result in unconstitutional conditions of confinement.   Their

effect may help obtain support for Administrator Laboy from her

line officers, but unless that support is translated into a more

professional corps of officers who actually provide efficient

supervision and protection to inmates--and so far it has not--, it

is irrelevant to the issues in this lawsuit.

Defendants' principal response to the problems pointed out at

the hearing, and underlying all of the plans for the future, is

the regionalization of the AOC.   Although Administrator Laboy

described a number of functions that are going to be regionalized,

she provided no explanation as to how regionalization itself would

improve conditions of confinement.   The most that can be said is

that regionalization will physically locate some supervisory

personnel closer to the institutions.   She did anticipate that AOC

officials will become more actively engaged in monitoring and

Civil No. 79-4 (PG)                                                    32.

visiting institutions, but that only begs the question as to why

AOC officials are not more actively engaged now — as they have not

been actively engaged in supervision for years.  Likewise, the

closer supervision she hopes to achieve by reducing the ratio of

supervisors to institutional personnel, could be achieved simply

by increasing the number of supervisors currently available.

Administrator Laboy hopes that placing purchasing decisions within

the regional offices will make it simpler for institutional

personnel to obtain supplies, but, of course, simply providing

institutional personnel with their own budget could accomplish the

same goal.   In short, regionalization may provide some

administrative benefits to the AOC, but defendants presented no

evidence that regionalization will actually do anything that could

not already have been done to solve any constitutional

deficiencies in the AOC facilities.  Moreover, the regionalization

plans, as well as a number of the other proposed changes in the

AOC's operations, all depend on future and uncertain approval by

one or more other government agencies.

     Most importantly, defendants have never  developed a written

blueprint for carrying out regionalization plans; the most that

Administrator Laboy could submit to the court was a list of

personnel positions that would be in place within each of the

regions into which the AOC system may be divided.

Civil No. 79-4 (PG)                                         33.

Defendants seized upon the decentralization aspect of the Ponce Pilot Project as support for the regionalization plan.[9] Nevertheless, the experience of the Ponce Pilot Project illustrates a marked contrast with the defendants performance; in approximately 18 months, Mr. Romero managed to accomplish a great deal toward compliance with the court's orders, whereas in two years, Administrator Laboy has mostly initiated a range of uncompleted, disparate projects, none of which appear to have grown out of defendants' obligations under the court's orders.

Beginning in 1991, Mr. Manuel Romero was appointed as complex administrator for the Ponce Pilot Project. That project was also aimed at decentralizing many aspects of correctional operations at the institutions within the Ponce Complex. But the objective of the project was not simply decentralization for the sake of decentralization; the ultimate aim was compliance with the constitutionally required remedial orders and stipulations in this litigation. ("Because part of the other stipulation — and again, this was in essence what our road map — or Bible, as we call it. . . ."). This motivation is conspicuously absent from Administrator Laboy's testimony about her plans to regionalize the AOC. Moreover, Mr. Romero's testimony demonstrates that the

_____

[9]   See, e.g., Testimony of Mr. Manuel Romero, Deputy Cabinet Secretary for the Corrections Department in the State of New Mexico.

Civil No. 79-4 (PG)                                                    34.

success of the Pilot Project was attributed not so much to decentralization, but to innovative initiatives adapted to the very real problems involved in running a prison system. For example, because the AOC unnecessarily delayed processing of psychological evaluation for newly recruited correctional officers, Mr. Romero undertook to contract with a local agency to expedite the process; he also established innovative training programs for officers (and used the stipulation as a training instrument). Mr. Romero implemented initiatives with respect to use of force, a topic left completely out of Administrator Laboy's testimony regarding her plans. He also developed a specific set of policies and procedures regarding cell searches: not only that they must be done, but how to do them, when to do them, and how to report them. The emergency response unit at Ponce, rather than consisting of officers dedicated almost exclusively to disturbance control, were actually part of the line staff, but with special training who could be called off-line in the event of an emergency. Training efforts at Ponce included civilian as well as custodial personnel.

        After two years, defendants have completed very little of relevance to this lawsuit and the constitutional problems out of which it has grown. The Court has before it, therefore, a record that is not favorable to defendants. Moreover, the future plans

Civil No. 79-4 (PG)                                                    35.

described by both Administrator Laboy and the Sub-Administrator
Rivera simply do not assure the Court that effective change is
forthcoming.  Well-intentioned plans by AOC administrators have
been all too common themes in this case.

    Defendants' efforts at reducing the effect of the gangs on
the AOC system also are of little significance and other related
actions have diminished their import.  The most important action
was to dismantle the "Comisión para Mejorar la Calidad de la Vida
de los Confinados", but the Court questions how effective this
action has been, given the evidence of gang influence that
remains.  Administrator Laboy claims to have ended the practice of
negotiating with gang members, but continues to meet with them,
which essentially negates the value of her refusal to negotiate
with them.  Defendants' other principal response to the gangs, the
transfer of several purported leaders to the United States and the
transfer of an inmate from Zarzal to another institution, do not
address the reasons why gangs are so prevalent and powerful in AOC
institutions: the vacuum of power resulting from the lack of a
disciplinary system and from the lack of direct supervision of
inmates.  Without addressing these root causes, the transfers will
merely result in other gang members' taking the leaders' place —
and at Bayamón 1072, for example, the leader already has been
replaced.  At best, defendants have succeeded in driving the gangs

Civil No. 79-4 (PG)                                                    36.

underground, as admitted by the defendants' expert consultant, Mr. James T. Garvey, but more probably, their efforts have had little if any lasting effect.  For example, at Ponce Maximum, housing units are still segregated according to inmates' gang affiliations.  Gang rules still are posted at Sabana Hoyos, and the inmates there still control access to the commissary.

Problems in personnel administration continue.  Administrator Laboy has disciplined a number of employees for chronic absenteeism, yet that problem has not abated.  Administrator Laboy claims to have reduced the number of officers on the special shifts so that there are more officers available to provide direct supervision of inmates; nevertheless, officers still are not deployed within housing areas.  Administrator Laboy has procured a design for a training center, but does not have funds to build it, nor is she aware whether her budget includes moneys for training.

Defendants' efforts in formulating and implementing crucial policies and procedures have been ineffectual.  Administrator Laboy testified that the AOC now has a policies and procedures unit, but that unit has completed only a few manuals of policies and procedures, including inmate correspondence, management of inmates with HIV and other infectious diseases, the use of the "Ion scan" for drug detection, an inmate drug testing manual; it

Civil No. 79-4 (PG)                                                  37.

has also begun drafting an orientation manual for inmates. With
the exception of the correspondence regulations, which are alleged
to have reduced the introduction of contraband, defendants
provided no evidence regarding the effects of these regulations on
any of the problems described by the Expert Witness' consultants;
in addition, the orientation manual has not even been finalized.
Efforts at improving programming opportunities consist mostly of
one-shot events, such as an art exhibit and a Christmas concert.[10]
On the other hand, Administrator Laboy was not aware of how much
had been requested by the Office of Management Budget ("OMB") in
the AOC's budget proposal for inmate programming during the
1999/2000 fiscal year. Some of the significant changes
anticipated by Administrator Laboy, but not yet implemented,
involve simply privatizing crucial services and administrative
activities. Although Ms. Laboy testified that she anticipates
these privatization efforts will improve maintenance, commissary,
and other services to inmates, she provided no explanation how

---

[10]     Administrator Laboy also claims credit for a vocational
training program established by the Instituto de Banca y Comercio, but,
of course, the AOC and the Rosselló Administration are not committed
enough to this program to provide funding or budget for its
continuation. Instead it is being paid for by the Court through fines
the Commonwealth paid for its own malfeasance, even though Administrator
Laboy asserts that the director of the Commonwealth's Office of
Management and Budget stands ready to provide her with additional funds,
if he agrees they are necessary. The court finds that the Administrator
has little or no control over the preparation and use of the agency's
budget and that this lack of control further contributes to managerial
and administrative incapacity.

Civil No. 79-4 (PG)                                                    38.

simply privatizing these elements of prison operations will necessarily ensure that they are carried out responsibly.

    This is not to say that all of defendants' efforts are irrelevant to the issues addressed by the Expert Witness and his consultants.  Administrator Laboy has procured some unspecified additional training for officers assigned to special security units.  She undertook a long-needed audit of where her personnel are located.[11]    She also has begun to attempt to weed out employees who have been on workers' compensation leave for long periods of time, yet who remain on the institutional rolls of employees.  Nevertheless, many of the consultants who evaluated the staff of the AOC's institutions, including defendants' own consultant, agree that there continue to be the same problems with tardiness and absenteeism.  And defendants presented no evidence indicating that staff are being disciplined for failure to assume their posts inside housing units.  Administrator Laboy also has begun to require regular housing unit inspections, but these are still done on an infrequent basis by large groups of officers, rather than on a daily basis by officers regularly deployed in the housing units:  these searches are either ineffective, or are rendered ineffective by lax security practices that allow inmates

---

[11] The Administrator could not obtain information in the agency's records of another such exercise conducted in 1994.

Civil No. 79-4 (PG)                                                    39.

to continue to obtain contraband.  In addition, they are performed

in a manner that is unnecessarily antagonistic to the inmate

population.

     In short, defendants have not undertaken a comprehensive and

effective approach to remedying the constitutional deficits of the

AOC.     Such    an    approach    is    necessary,    because    of    the

interrelatedness of those problems.  The AOC does not apply the

core elements of prison operations uniformly, systematically, or

consistently to protect inmates from inmate-on-inmate violence, to

protect staff, or to minimize disturbances and fatalities.  The

AOC is running a quite dangerous operation by any measure.

Unless a plan is devised to address the core elements of a safe

and secure operation in an integrated way, any attempts to address

isolated areas will be at best a temporary quick fix.

     The evidence also demonstrates that defendants are, at best,

indifferent to the role of the Court in the process of reforming

the AOC and at worst, contemptuous.  First, defendants' actions

with respect to the Comprehensive Report itself evidence their

lack of concern for the Court's orders.  Despite the sweeping

breadth of the Comprehensive Report, Administrator Laboy did not

read it when brought to her attention, and read only the cover

report written by Mr. Nathan several months later.  Nor did

Secretary Laboy instruct her staff to review the Comprehensive

Civil No. 79-4 (PG)                                                    40.

Report.  Apart from the cover report, the only other section of the report that Administrator Laboy claims to have read was the section involving inmate management, authored by Messrs. George Vose and A.T. Wall.  That section, however, she did not read until just before the January 1999 hearing.  Defendants should have used the Comprehensive Report to diagnose the problems in the system under their charge.  The Comprehensive Report's scope encompassed not only the administrative problems of the AOC, but also the harm resulting from those problems.  That Administrator Laboy did not consider it necessary to familiarize herself with the Comprehensive Report, whether by reading it or by asking her staff to review and respond to it for her indicates that defendants had little concern for this lawsuit or for their obligations as an equitable defendant in this lawsuit.  That fact in itself demonstrates indifference to present constitutional infirmities and the harm they have caused and will continue to cause to plaintiffs.

    Other evidence demonstrates that defendants have avoided concerning themselves with the risks of harm to which AOC inmates are subjected.  Administrator Laboy, rather than reduce the overcrowding in her institutions, preferred to define that problem away.  She could not identify any substantial initiatives she had taken to identify the lack of fire safety in her institutions, the

Civil No. 79-4 (PG)                                                      41.

abominable    environmental    conditions,    the    lack    of    inmate

discipline,  or  even  the  alarming  number  of  violent  deaths  and

suicides in facilities operated by defendants.

In short, although defendants may have been very busy making

changes  to  implement  a  new  vision  for  the  AOC,  they  have  not

concerned  themselves  with  the  core  problems  that  create  the

widespread and dramatic risks to inmates' health and safety even

less  with  this  court's  orders.   The  extensive  testimony  of

Administrator  Laboy,  in  addition  to  the  testimony  of  the

correctional   consultants,   demonstrate   that   defendants   were

actually  aware  of  the  harm  or  risk  of  harm  to  inmates  in  the  AOC

system,  and  that  they  have  not  taken  reasonable  steps  to  remedy

the  constitutional  deficiencies  that  pervade  the  AOC.   The  court

must,  therefore,  continue  to  impose  an  equitable  remedy  to  conform

practices which violate the plaintiffs' rights to the requirements

of the Constitution and laws of the United States.


### SECURITY AND STAFFING

**Legal Standards**

In 1980 and again in 1986, this court found that security and

staffing  deficiencies  throughout  the  AOC  system  violated  the

plaintiffs'  constitutional  rights.   See  Morales  Feliciano  v.

Romero Barceló, 497 F. Supp. 14 (D.P.R. 1979);  Morales Feliciano

Civil No. 79-4 (PG)                                                    42.

v. Romero Barceló, 672 F. Supp. 591 (D.P.R. 1986).  In 1986, six

years after the court's 1980 decision, the court found that

defendants continued to deprive plaintiffs of adequate protection

from the constant threat of violence and physical aggressions

existing inside the institutions; the court also found that AOC

officials and employees had "abdicate[d] the governance of prison

life into the hands of island-wide gangs." Id., at 619.  Today,

thirteen years later, the court again concludes that the totality

of conditions in AOC institutions deprives inmates of basic human

needs, including their need to be protected from wanton and

unnecessary infliction of pain at the hands of other inmates.

        Reasonable protection from the constant threat of violence,

terror, physical aggression, and sexual assaults is required by

the Constitution.  Morales Feliciano v. Romero Barceló, 672 F.

Supp. at 619 (citations omitted).  "[I]t is well established that

prison officials have the constitutional duty 'to protect

prisoners from violence at the hands of other prisoners.'" Ayala

Serrano v. Lebrón González, 909 F. 2d 8, 14 (1st Cir. 1990)

(citing Cortés Quiñónez v. Jiménez-Nettleship, 842 F. 2d 556, 558

(1st Cir.) cert. denied, 488 U.S. 823 (1988)); see also Farmer v.

Brennan, 511 U. S. at 833, 114 S. Ct. at 1976 (also citing Cortés

Quiñónez v. Jiménez-Nettleship, 842 F. 2d at 558;  Giroux v.

Somerset County, 178 F 3d 28 (1st Cir. 1999).  When a correctional

Civil No. 79-4 (PG)                                              43.

officer or prison official intentionally exposes a prisoner to a

known risk of violence at the hands of another prisoner, he

breaches the duty imposed upon him and deprives the victim of the

security to which he is constitutionally entitled. <u>Goka v.</u>

<u>Bobbitt</u>, 862 F. 2d 646, 649-50 (7th Cir. 1988) (citations

omitted).

**Security Failures at the Institutions**

During April and May of 1997, the Court's Expert Witness and

his security consultants audited the degree of compliance with

basic security procedures.  The audit findings of the experts are

part of the Comprehensive Report.  Messrs. William Dallman, James

Henderson and Jerry O'Brien, security consultants contracted by

the Court's Expert Witness, visited 18 AOC facilities and three

privatized facilities during April and May 1997.  The security

experts returned to Puerto Rico in 1998 and visited several

institutions to update the findings made in their April-May 1997

report and to determine if the security conditions inside the

institutions had improved.

Mr. Martin visited a number of AOC and privately-run

facilities during mid-1998 and early 1999.  In addition, over the

past 9 years, Mr. Martin has made more than 100 visits to AOC

facilities.  During those visits, he inspected the institutions

and met with prison personnel.  In May 1998, Mr. Martin visited a

Civil No. 79-4 (PG)                                                    44.

series of facilities including the Guayama Complex, Ponce Main and

Ponce Maximum, Bayamón 1072 and 308 and the State Penitentiary.

Mr. Martin returned in January of 1999 and visited Bayamón 1072

and 308, the State Penitentiary, Annex 352, Las Malvinas, Ponce

Main, Ponce Classification and Ponce Women and Young Adults.

Mr. Garvey also visited several institutions, including,

among others,   the State Penitentiary, Río Piedras Institution

448, Bayamón 1072 and 292, Ponce Main and Ponce Maximum, Guerrero,

Camp Zarzal,   and testified as to his observations during his

visits.  The effect of Mr. Garvey's testimony, the court notes,

was undercut by the defendants' own failure to keep records and

present evidence beyond his observations made during visits

shortly before the hearing.

The experts' testimony establishes that, although the AOC has

improved in some  security areas, the AOC is still far from being

in compliance with basic standards for safe and secure prisons.

Virtually all the experts agree that the plaintiff class' physical

and emotional integrity is jeopardized by a lack of security and

supervision.  The   levels of violence, assaults and homicides

inside the institutions are alarmingly high and, notwithstanding

the posture adopted by the Administration, prison gangs continue

to be in control of services provided to the plaintiff class, as

well as their security and their discipline.

Civil No. 79-4 (PG)                                                    45.

**Lack of Supervision**

Perhaps the most distressing area of the experts' testimony during these hearings was the lack of supervision provided to the plaintiff class throughout the system.  All of the correctional consultants agreed that inmates in AOC facilities live virtually unsupervised.

Defendants have continuously failed to deploy correctional officers inside prison housing areas.  In fact, from the rosters reviewed by the experts, it appears that virtually no officers are assigned to posts inside living areas. The inevitable consequence of not deploying officers inside housing units is the elevated level of violence that exists in most institutions. The rate of violence, homicides and suicides among the plaintiff class is extremely high.  The AOC's own statistics reflect there were eight violent deaths and eight suicides during the period of July 1997 through August 1998.  However,  the AOC statistics are far from complete, and there are deaths that AOC officials cannot explain.[12]   The chart produced by the AOC included thirty-six deaths which were unaccounted for, and for which the AOC's Sub-Administrator, Ms. Nuria Rivera, had to perform an additional investigation to try to determine the cause of death.  There are

_____

[12] For instance, the cause of death of inmate David Sanchez, #13 on Exhibit J, had yet to be determined, even though his death occurred on November 17, 1997, that is, more than a year before the hearing.

Civil No. 79-4 (PG)                                          46.

still unexplained deaths.    This lack of knowledge about the
causes of death evidences the lack of control the Administration
has over its own facilities and its reckless disregard and willful
blindness to violence in the AOC institutions.  The AOC lacks the
procedures to follow-up on deaths and other violent incidents
inside its prisons  and it also lacks the mechanisms to make its
employees accountable for not following those procedures.

     The lack of supervision inside the housing units has an
impact on the number of escapes, vandalism and the defendants'
increasing lack of control.  During a one year period, there were
175 escapes from penal institutions and 75 from community programs
such as halfway houses.   The lack of supervision also provides
more opportunity for contraband to be collected and hid by the
inmates, contraband that could be used to inflict harm to other
members of the plaintiff class.   Inmate safety requires that
officers be posted inside housing units to perform security
inspections, conduct searches, perform counts, and generally
maintain order.  No officers are deployed inside the housing areas
to provide security to the plaintiffs, however.  In Bayamón 292,
for instance, Mr. Henderson found that the inmates were totally
unsupervised and there was only one officer in a control center
and no one on the floor to supervise the inmates.  Bayamón 308 was
basically unsupervised except for Sections C and Q, which are

Civil No. 79-4 (PG)                                                     47.

recently reopened sections.   In Section D of Bayamón 308, there
were no officers inside the housing units and only two officers
were assigned to supervise seven housing units.   In this regard,
Bill Dallman testified that inmates were in complete control of
Section D.  Mr. O'Brien testified that, at the State Penitentiary,
there was almost no lighting and the inmates were totally
unsupervised.    This  lack  of  supervision  is  particularly
distressing in institutions such as the State Penitentiary and
Bayamón 308, since they house pretrial detainees.   Additionally,
Mr. Martin testified that in Guayama Main only three officers were
assigned to four housing units during the day, and only two were
assigned at night.

     One  officer  at  a  building's  control  room  has  proven
insufficient to provide adequate security and supervision, because
there is no way to really know what goes on in housing areas if
there is no staff assigned to work inside them.   As Mr. Dallman
testified:   "[y]ou only find the tip of the iceberg.   I would
contend that if you know of one assault, there may have been ten
or fifteen you don't know about so I don't know that we even know
how deep this problem is but I do believe that the violence that
we see and the homicide rate and the threat to staff safety is
related to that . . ."   "If you don't regulate the inmates, they
regulate each other but what happens is the most domineering, the

Civil No. 79-4 (PG)                                              48.

most predatory, the most vicious, they're fellows who set the standards, they're the ones that regulate."[13]   This lack of staff supervision inside the housing units reflects, in the words of Mr. Dallman: "the inadequacy of the system ..." The defendants' failure to supervise and control inmates therefor contributes to maintain the authority of the gangs inside the institutions.  The gangs have benefitted from this lack of supervision because they have been able to enact their code of discipline as the code of conduct for the inmates.  The gangs are also able to enforce their own disciplinary rules and inflict corporal punishments.  As Mr. George Vose noted, inmates are victimized from day to day by the operation of the system.

Inmates are locked in many housing units with padlocks.  The levels of violence inside the housing units are so high that the officers themselves are afraid to go inside them alone. Captain Luis Aponte testified that, if an officer has to go inside a housing unit at night, he waits until he receives some backup. The officer does not go inside the unit alone.  Administrator Laboy herself admitted that officers avoid going inside the

---

[13]   It should be noted that there appears to be a direct correlation between gang control and lack of supervision.  If the AOC does not control the prisons, the gangs will control them, as they are in effect doing.

Civil No. 79-4 (PG)                                                    49.

housing units.  The lack of supervision creates a security problem
for both inmates and staff.

Defendants'  witnesses  testified  at  length  about  the
improvement at some institutions in areas such as key control and
tool control and brought photos taken shortly before the hearing
to evidence such improvement.  However, the real impact on the
security of both staff and inmates that this apparent improvement
may have is irrelevant when, the evidence shows that groups of
inmates are locked up without supervision because the defendants
do not provide enough officers to supervise them.  The court finds
that the plaintiffs'  security is constantly at risk due to
defendants' disregard and indifference toward their safety and
well-being: inmates must each provide for their security or rely
on other inmates for safety.

Inmate programing has an important impact on security.
Inmates  should  be  provided  with  programs  to  keep  them
constructively occupied all the time. Organized, meaningful
programming reaches  a very small percentage of the inmate
population in the AOC.  Consequently, the majority of the members
of the plaintiff class remain not only unsupervised but also
unoccupied by constructive activities.

Civil No. 79-4 (PG)                                                     50.

**Counts**

The performance of adequate counts is fundamental for the
security of the penal institutions. It is important to know where
plaintiffs are all the time to be able to protect them from
assaults and other dangers. Although there has been some
improvement in this area, count procedures at the AOC are still
inadequate and insufficient. In fact, at some institutions,
counts are useless. Inmates should be kept stationary during
counts to ensure that no inmate is counted twice and that all
inmates are accounted for. At the majority of AOC institutions,
however, staff do not require the inmates to be stationary during
counts and, even if they try to do so, the inmates simply do not
obey their requests. In Ponce Main, Mr. Martin observed counts
where the inmates were moving among the housing units. Likewise,
in Ponce Maximum, for instance, Mr. O'Brien saw the "most
disorganized count" he has ever witnessed, where inmates were
moving around and where there was "no way possible for the officer
to insure [sic] accurate count."

At the AOC, counts are conducted by a group of four or five
officers that moves from one housing unit to another without any
assurance that the inmates are not also moving around. There are
simply no out-counts to ensure that the staff knows where the
inmates missing from the unit are at the time of the count. Based

Civil No. 79-4 (PG)                                                51.

on these facts, it can be concluded that this lack of control over

counts also threatens the plaintiff class' security inasmuch as it

creates greater opportunities for assaults and murders.

**Rosters and Absenteeism**

Appropriate management of staff scheduling and posting is

crucial for security and is closely linked to the level of

supervision in a prison. The roster is the record used for the

assignment of posts and shifts. There is a master roster (which

is prepared monthly) and a daily roster. Both are important

inasmuch as they determine the assignment of posts and the number

of officers present and absent on each shift. In spite of their

importance, rosters at AOC prisons usually are not accurate. One

of the main reasons for the inadequate preparation of rosters is

the high level of absenteeism among correctional officers. Because

of absenteeism in the AOC, the daily rosters are prepared as the

staff shows up (if at all). In addition, many times the officers

show up for work well after the shift has already begun. Many

posts remain unassigned and the roster lists either are not

accurate or simply are not prepared. It is common for an officer

to cover a post that is different from the one assigned to him on

the roster. The improper administration of rosters prevailing

at the AOC has a negative impact upon inmate supervision and,

consequently, upon the amount of violence inside the institutions.

Civil No. 79-4 (PG)                                              52.

**Searches**

Searches of housing areas in AOC facilities are ineffective
and improper. To be effective, searches should be performed
throughout each day. Because no officers are deployed inside the
housing areas, however, searches are not performed this way.
Searches at the AOC are performed infrequently. The sheer amount
of cellular phones, shanks and other contraband uncovered by
searches at AOC facilities is an indication that they should be
performed more regularly.

Mr. Martin watched one of these searches at Bayamón 292: he
noted that the correctional officers treated the inmates' property
poorly, tossing inmates' personal belongings on the ground. Not
only is that unprofessional, but it does not improve the
effectiveness of the search. A month earlier, officers had
conducted one full-scale search at the same institution;
nevertheless, they found five cellular phones during the search
observed by Mr. Martin. Somehow, between the two searches, five
cellular phones were smuggled into a maximum security institution,
which Mr. Martin labeled as "unprecedented."

**Perimeter security**

Mr. William Dallman conducted an extensive evaluation of the
perimeter security at the AOC. In his words: "[t]he perimeter
security of nearly all AOC facilities is very, very bad. The

AO 72A
(Rev. 8/82)

Civil No. 79-4 (PG)                                          53.

worst I have seen." It suffers from numerous deficiencies. For

instance, Mr. Dallman did not find any documentation whatsoever to

show that AOC officers are performing daily checks on the

conditions of the perimeter fence.    Almost none of the motion

detection alarm systems were functioning.    Many towers were

unmanned and many of the officers who were working the towers had

to work double shifts.    In Ponce Main and Ponce Maximum, the

experts observed that the tower officers had been working double

shifts because their replacements had not shown up. This practice

affects their efficiency and, therefore, the security of the

institution.  Moreover, tower officers are placed in the towers

without specific instructions or training as to how and when use

their weapons.  Many towers were observed without post orders,

radios or chairs.   Many towers have poor visibility.

     Perimeter fences are not properly maintained and many of them

have been poorly designed.   Razor wire had been improperly placed

and, on occasions, located on the wrong side of the fence.

Defendants' expert witness, Mr. James Garvey, testified that

approximately 75% of the AOC's perimeter fencing needs to be

replaced.    As a result, inmates have been able to escape by

simply climbing over the fence.   At Sabana Hoyos, for instance,

inmates were able to escape by climbing over the fence in 1997 and

1998.

Civil No. 79-4 (PG)                                                54.

**Key control**

Although there has been some improvement in the key control
area, key control is still far short of acceptable.  There is no
uniform policy for key control throughout the AOC and there are
varying degrees of compliance throughout the institutions.[14]  In
most institutions, the experts were not able to get into the
institution with the emergency keys.  In addition, many
institutions are without emergency or back up keys.

Emergency key control is a problem throughout the AOC.  Most
of the institutions do not regularly test their emergency keys and
exits.  Defendants' expert witness, Mr. Garvey, testified that at
Bayamón 1072 an officer told him that the personnel did not know
how to use the emergency keys as a justification for their failure
in opening the gates with the emergency keys.  Although this may
explain some of the instances where officers where not able to
open gates with the emergency keys, it does not excuse this major
security breach.  Mr. Garvey also testified that when he tested
some emergency keys, he found that they worked.  The usefulness of
this testimony is doubtful, however; Mr. Garvey did not simulate
the situation that would arise in an actual emergency, in which
staff would need to locate a key to a specific lock.  This is the

---

[14]   According to the testimony of defendants' own expert, the
degree of compliance may even vary from shift to shift inasmuch as not
all the officers have adequate training in key control.

Civil No. 79-4 (PG)                                                          55.

type of test performed by the Expert Witness' security experts,
however, and they almost invariably found that staff could not
immediately locate emergency keys.

Mr. O'Brien testified that, with the exception of Ponce 246,
he found faulty emergency key management at all institutions.
This creates a security hazard for the inmates, for instance, in
the case of a fire or some similar emergency.  Emergency keys are
also of vital importance in case of a disturbance.  In sum, having
emergency or back up keys prevents people from dying.  Moreover,
many locks throughout the institutions did not work and have been
substituted with common padlocks.  Padlocks should never be used
on security and emergency doors.  In an emergency, people tend to
push against the door, making it difficult to extract the lock
from its hasp.  Common padlocks are also easy to pull apart
providing no security at all.  Additionally, the padlocks used by
the AOC are common padlocks, thus, it is easy to obtain a master
key to open them.

Misused and dysfunctional locks are a problem throughout the
AOC.  The cells at Ponce Main are in poor condition.  Most of the
cell doors at Ponce Main are broken and, consequently, staff have
padlocked the doors.  At Bayamón 1072, there are also cell locks
that need to be repaired.  At Camp Zarzal the dormitories' doors
are never locked.  Not all institutions have adopted the color

Civil No. 79-4 (PG)                                                      56.

coded system for keys and locks.  Lock shops lack materials and

equipment.   For instance, in Rio Piedras, the lock shop had no

locks, no key blanks, and no supplies.  At Mayaguez, staff still

have not received any materials for their lock shop.  At Ponce,

staff lacked equipment, and the inventory of tools and keys was

not adequate.  In Guayama, the key control area was both unsecured

and unattended when visited by Mr. Martin.  At Bayamón 308, the

keys were not labeled and there was no check out system.

On the other hand, the AOC did provide all officers with a

key clip to fasten the keys to their belts. The Río Piedras Annex

504 also appears to have good key control practices.   However,

many institutions are still far away from being in compliance with

the 1994 Security Stipulation, evidencing the lack of a uniform

system.

**Tool control**

As with key control, the AOC still lacks a good tool control

system although there has been some improvement at some

institutions; others, however, have not improved at all.  There is

no uniform system to perform inventories and keep the tools.   In

fact, some institutions keep handwritten tool inventories, which

is not a sound correctional practice; an inventory should be kept

in documents that cannot easily be altered.  The Expert Witness'

consultants found that there was no tool inventory at Bayamón 1072

Civil No. 79-4 (PG)                                                    57.

and Guayama Main.  In Sabana Hoyos, even though they had shadow
boards and inventories, staff allowed inmates to work alone in the
tool control room.  Tools were found throughout the prison that
were not included in the inventory, thus thwarting any effort to
keep track of them.  Mr. Dallman testified that he saw the worst
tool control he has ever seen in his career at Sabana Hoyos.  In
Mayaguez, even though the tool control officer was doing a good
job in the tool control area, the kitchen tools were completely
forgotten and there were no inventory or shadow boards for them.
At Ponce Main, for instance, not all of the tools were shadowed
and they did not use the chit system.  As testified by Jerry
O'Brien: "[t]hey were just not in any compliance with the
stipulations of the tool control."  At Ponce Maximum, they had a
tool box that the tool control officer could not unlock.  Mr.
O'Brien found a key ring, unaccounted for in the key control area,
which turned out to fit the tool box.  At Ponce Young Adults,
there was no tool inventory and staff left numerous tools off the
shadow board.

In the State Penitentiary, Annex 504, there was a hacksaw on
the shadow board but the tool control officer claimed he did not
have a hacksaw; thus, it was unaccounted for.  Annex 504 staff did
not use chits to check out tools.  In the woodworking shop, the
last inventory had been conducted in 1995, that is, two years

Civil No. 79-4 (PG)                                                 100.

Although staff are completing the initial classification and re-classification forms properly, meaning according to instructions, they lack the basic information necessary to ensure that the information utilized to fill out the form is accurate, including rap sheets, disciplinary data, pre-sentence investigation reports. The basic failure to access that information results in under-classification, meaning that inmates are classified at a lower level than the inmate actually represents. Of course, this undermines the purpose of a classification system. Another result of the basic lack of different kinds of information is that an individual inmate's classification is almost solely determined on the basis of the severity of current charge and what prior criminal history if any, is available. There should be more balance, especially in the reclassification instruments, where classification should be driven primarily by recent institutional behavior.

**Need for Automated Information System:**

It is impossible for a correctional system the size of Puerto Rico to operate a properly functioning classification system without automation because of the large volume of inmates that move through the system. Certain inmate information that must be automated includes offense, prior record, previous classification information, disciplinary data, physical location within the

Civil No. 79-4 (PG)                                          101.

system, and gang affiliation.  Classification information should

be kept along with other data in a central information system

which permits information to be entered directly from each

facility.  It is necessary that, at the central office level,

there be a timely and accurate automated system which allows staff

to monitor how classification is being conducted, where inmates

are, and who are they housed with.

Prior to 1995 the AOC was implementing an automated system to

maintain inmate information, known as the IDMS system, which was

a customized system developed by a professional programmer for the

AOC.  The IDMS system was intended to be comprehensive in terms of

the scope of inmate information it would cover.  When

Administrator Joseph Colón assumed leadership in December of 1994

he terminated the IDMS project and implemented a different system,

known as "AIMS," which was a pre-written program that could be

modified to fit the AOC's needs.  The AIMS system is capable of

covering all areas of correctional systems operation; however, the

AOC did not pay for the classification module, and therefore, the

AIMS system does not include classification data. In 1996 another

information system was created on a temporary basis for

classification information.  The system is known as SPSS

(Statistical Package for Social Sciences) which is a stand-alone

Civil No. 79-4 (PG)                                                    102.

information system into which the classification forms that reach

the central office are entered.

The AIMS and SPSS systems have not been integrated and do not

communicate with each other.    AOC line staff responsible for

classification of inmates do not have access to either of these

systems and have not been trained to use them.   The AIMS system is

utilized as a count of all inmates currently in the AOC system,

whereas the SPSS system is a historic accounting of classification

forms.    Due to the nature of these programs, as well as to the

lack of consolidation of these two systems, the information

contained therein cannot be manipulated or effectively utilized.

For purposes of his evaluation Dr. Austin had to request that the

AIMS company assist him in reconstructing a stock population and

extracting raw data of that population from AIMS system to merge

with the SPSS information system.

After reviewing the AIMS and SPSS data, Dr. Austin found that

in 1997 43% of inmates had no classification record in the SPSS

system.   Of that 43% some do have classification forms which were

never entered into the system.   When inmates are missing from the

automated system it is difficult to monitor the system to ensure

that classification is properly carried out and that inmates are

managed according to their classification.   Another notable point

is that only 13 inmates out of 6,523 were flagged as having gang

Civil No. 79-4 (PG)                                          103.

affiliations, which is an extremely low number for the AOC.
There are a significant number of inmates for whom classification
information has not been entered into SPSS system.   Out of 500
inmate names taken from the AIMS system only 151 had
classification forms which had been entered into the SPSS system
and 153 had classification forms which had not been entered into
the system.   In addition, the AIMS system is not accurate.   On
October 30, 1998 the AIMS system showed 19,321 inmates in the
system, whereas the manual count for that day indicates that the
inmate population was 16,197.   This discrepancy is caused by the
fact that the system, is not always updated when a person is
released, due to the practice of depending on line staff calling
or faxing in information, as opposed to requiring that the
information be entered directly into the system.

The AOC also has significant problems preserving hard-copy
classification forms.  Out of the 461 inmate names randomly
selected from the AIMS system, 157 classification forms could not
be located.   Out of two hundred randomly selected names from the
SPSS system, there were no classification forms for 130.
Twenty-two hard copy classification forms were neither at the
central office nor at the facility in which the inmate was
located, even though it was in the SPSS system.   The AIMS and SPSS
information systems should be integrated and AOC socio-penal

Civil No. 79-4 (PG)                                                    104.

technicians should have direct electronic access to this
information and should enter information directly into the system
from the facilities where they work.  In order for the information
systems to be accurate, staff decisions must be driven by these
computerized systems: for example, a correctional officer should
not be able to transfer or release an inmate unless the movement
is processed on the computer.

**Overrides**

Although the purpose of an objective classification system is
to classify all inmates in essentially the same way, it is also
important that some level of discretion be retained by
classification personnel.  To accomplish this, classification
systems have "overrides," which allow staff to move an inmate to
a higher or lower level of custody than that which the inmate
scored, based on professional judgment or agency policy.
Overrides are provided for in the basic "initial classification"
or "reclassification" form.  The sociopenal technician filling out
the classification form will check items that could be used for an
override and then transfer the form to his or her supervisor.  The
supervisor makes a determination based on a meeting with the
technician and/or supporting documentation. For certain override
factors there should be documentation or other backup evidence
(e.g. gang affiliation).  In a properly functioning classification

Civil No. 79-4 (PG)                                                105.

system personnel should be using overrides 5% to 15% of the time.
If there are too few overrides, this means that staff is not
making any decisions or trusting its own judgment, whereas if
overrides are being used too often, staff is second guessing the
classification forms and scores, and the process becomes more
subjective and less objective.

     In 1997 Dr. Austin observed very little difference between
scored and final custody level, indicating that overrides were
being used too little.  This result is not uncommon when a new
instrument is implemented because staff unfamiliar with the system
will tend to refrain from second guessing the instrument; however,
it means that staff needs more training on to how to use
overrides. As of late 1998 and early 1999, however, there were too
many overrides to a higher custody level from an initial custody
level.  In addition, overrides were being improperly documented
and a sizeable number of inmates were being overridden for reasons
that are unclear.  Such a high override rate indicates that
something is either wrong with the instrument or with the way the
instrument is being utilized. It is likely that this surge in the
use of overrides is the result of the classification department's
efforts to compensate for the outrageous lack of information
regarding inmates previous offenses, prior institutional behavior,
prior escapes, etc.  Even though this may not be an irrational

Civil No. 79-4 (PG)                                                    106.

response to such a deficiency, it is an improper way to manage a classification program, because it ultimately results in what is essentially subjective classification and defeats the whole purpose of a carefully studied and meticulously designed objective classification system.

## Sociopenal Staffing

Another deficiency which affects classification is the lack of sufficient sociopenal staff to adequately operate and manage the classification system. Among a number of responsibilities associated with inmate management, AOC sociopenal technicians play an important role in classification. Considering the work that is performed by sociopenal technicians, the AOC is sorely understaffed both with respect to direct service sociopenal staff and with respect to supervisory staff. This affects the provision of sociopenal services generally and of classification specifically.

## Central Office Classification Unit

For a classification system to properly function there must be a team of central office staff with expertise who will be responsible for auditing and monitoring the classification system, reviewing and modifying classification when it is done inappropriately, revising classification policies when necessary, and coordinating periodic training of sociopenal staff and

Civil No. 79-4 (PG)                                          107.

providing any other classification training that is determined to
be necessary.  Training and auditing are critical in order that
uniformity be maintained throughout the system.  All new staff
(including officers and central office staff) should go through
initial classification training and should have annual training to
keep current.

The AOC's failure to properly automate classification
information and manipulate what little computerized information it
does have, makes the task of auditing and/or monitoring their
classification system virtually impossible.  The AOC central
office classification staff are not properly monitoring
classification and as a result fail to discover significant
deficiencies in the system.  The classification unit also fails
to adequately train staff in classification procedure.

**Use of Classification Information**

The whole purpose of designing, testing, training staff,
implementing, and monitoring a classification system that
accurately and consistently classifies inmates is to utilize that
classification information to manage the inmate population,
specifically, to place inmates in institutions which meet their
programming needs and to minimize the risk of each inmate's escape
and violence by or against that inmate. The information collected
in the regular course of classification can be useful in making

Civil No. 79-4 (PG)                                                    108.

population predictions and in long term planning for the correctional system.  However, because of the incompleteness or outright inaccuracy of the data accumulated in the process of classification, as well as the difficulty associated in consolidating this information in a meaningful way, such population predictions and long term planning cannot be done at the AOC.

A critical element of any properly functioning correctional system is the separation of inmates according to their custody level.  Although certain limited mixing of custody levels may be necessary under extreme circumstances, it should be done very cautiously because it can create an opportunity for institutional disruptions and acts of violence.  In order to separate inmates appropriately, it is necessary that the classification unit staff have absolute control over the transfer of inmates or, at least, that the classification model be taken into account when inmates are moved.

None of this occurs at the AOC.  The AOC central office classification unit has no authority over transfers and no evidence was presented indicating that the unit is consulted or that classification otherwise plays a role in the transfer or placement of inmates.  AOC inmates are not separated according to their designated classification level and almost all institutions

Civil No. 79-4 (PG)                                                              109.

contain minimum, medium and maximum security inmates.  The only
rule of placement or separation which seems to be actively
enforced at the AOC is the separation of inmates according to gang
affiliation enforced at the insistence of the gangs.

The AOC counts on a class of employees titled "socio-penal
technicians" to perform a number of tasks that are crucial to
providing inmates with services necessary to assist in their
rehabilitative efforts and to properly classify inmates, as well
as to prepare inmates for eventual integration back into the free
community.  In addition to performing many of the core elements of
the AOC's incipient classification system, socio-penal technicians
are involved in developing inmates' "institutional plans", through
which prisoners are assigned to programming; in preparing parole
applications; in referring inmates to appropriate social services;
in processing good time awards; and in counseling inmates.  A
minimum ratio of technicians to inmates is necessary to provide
adequate sociopenal services. This ratio varies according to the
type of inmate; certain classes of inmates require greater
attention than others.  For example, minimum custody inmates
require a much richer technician-to-inmate ratio than other
classifications, because minimum custody inmates are more likely
to be eligible for early release programs, preparation for which
requires more of an individual technician's time.  Thus, if

Civil No. 79-4 (PG)                                                     110.

technician-inmate ratios are not at adequate levels, the AOC
cannot provide inmates with the full range of services they
require.  In fact, the AOC does not have a sufficient number of
socio-penal technicians to provide an adequate level of services
to inmates. System wide, and based on its population, the AOC
requires 260 socio-penal technicians and an additional 53
supervisors; the AOC has only 165 technicians and 31 supervisors,
however.  In addition, some technicians, who should be providing
direct services to inmates, are assigned to supervisory tasks,
which further reduces the number available for providing services
to inmates.

One serious result of shortages in socio-penal technicians is
the inability to assist inmates in preparing discharge plans in
anticipation of parole hearings; without an adequate discharge
plan, inmates will be denied parole.  In addition, the inability
to pay close attention and collect adequate information for
classification purposes hinders an inmate's ability to qualify for
downward modifications in their custody levels, which in turn
makes it harder for them to obtain early release programs.
Pursuant to Commonwealth law, the Administrator is required to
conduct periodic evaluations of all inmates for the purpose of
classifying them and determining a plan of individualized
treatment for each inmates. Law No. 116 of July 22, 1974, P.R.

Civil No. 79-4 (PG)                                                           111.

Laws Ann. tit 4, §1121.  In addition, under certain circumstances,

inmates may earn good time awards for work or studies.  P.R. Laws

Ann. tit. 4, §1162.  The provision of these aspects of confinement

are coordinated through the socio-penal services area in the AOC.

    To the extent that the AOC lacks sufficient socio-penal

personnel, inmates' rights to individualized treatment plans are

jeopardized, because staff are unable to provide inmates with the

attention they need.  Moreover, if socio-penal staff are so

overworked that they cannot assist inmates in qualifying for early

release programs, such as parole, or in qualifying for programs

that will earn them good time, then inmates will spend more time

in prison than they would if there were sufficient personnel to

assist them.    Thus,  irregularities caused by, *inter alia*,

shortages  in  socio-penal  staff  results  in  violations  of

plaintiffs' due process rights.  See Vitek v. Jones, 445 U.S. 480,

489, 110 S. Ct. 1254, 1261 (1980); Montanye v. Haymes, 427 U.S.

236, 244, 96 S. Ct. 2543, 2547 (1976); Meachum v. Fano, 427 U.S.

215,  226-227,  96  S.  Ct.  2532-2539-2540  (1976);  García  v.  De

Batista,  642  F.  2d  11,  14  (1st  Cir.  1981);  see  also  Morales

Feliciano v. Romero Barceló, 672 F. Supp. 591, 620 (D.P.R. 1986),

and cases cited therein.  The same due process analysis can be

used to examine the deprivation of plaintiffs' expectation to be

heard by the Parole Board to determine their eligibility for

Civil No. 79-4 (PG)                                      112.

parole.  When interests created by Commonwealth law are denied

solely  because  of  defendants'  own  mismanagement,  inmates  are

denied their due process rights for reasons wholly unrelated to

their qualifications to obtain the benefits.  The court concludes,

therefore,  that  the  inability  of  socio-penal  technicians  to

provide adequate attention to inmates' institutional plans, and to

assist inmates in preparing applications for parole or other early

release programs,  as well  as  to participate  in programs  that

shorten  inmates'  sentences  through  good  time  awards,  violates

inmates' due process rights.

     Although the AOC has a well-designed classification system,

it has not been formally nor fully implemented,  and sociopenal

technicians who classify inmates do not have access to reliable

and accurate sources of information to fill out classification

forms.  Central office classification unit staff do not have the

resources  to  adequately  monitor  compliance  with  proper

classification procedures and as a result significant deficiencies

in the classification system go undetected.  Inmates are not

separated by custody level, in part because the central office

classification unit exercises no authority over inmate movement.

In short, for all intents and purposes there seems to be little

change from the state of affairs as they existed in 1994 when Dr.

Austin  first  became  involved  with  the  AOC  system.  The  AOC

Civil No. 79-4 (PG)                                                    113.

continues to operate with the veneer of a classification system,
but once the surface is scratched, the system used by the AOC is
revealed to be inoperative.

Defendants actively participated in the development of a
classification manual, agreed to set up the system described in
that manual, the court has ordered them to do so, and they have
failed to comply.  But their failure extends to the most basic and
necessary classification needs in correctional institutions.
Beyond any argument or expert opinion is the fact that defendants
cannot and do not separate violent, aggressive prisoners from the
weak and vulnerable.  That failure to segregate inmates according
to their habits and needs contributes significantly to the
predation and violence which permeate the AOC's institutions: the
basics are missing.

### CROWDING AND POPULATION CONTROL

Although progress has been made in reducing crowding during
the 20-year history of this case, it took the imposition of
millions of dollars in fines to accomplish that achievement.
Moreover, while defendants have managed to reduce the sheer
density of inmates inside some institutions, they have done very
little with respect to the larger issue of population control.
Primarily, the AOC has attempted to build its way out of the
levels of crowding experienced earlier in the history of this

Civil No. 79-4 (PG)                                          114.

case. Unfortunately, the rate of new additions has failed to keep pace with the increase in population.

In spite of progress, the defendants currently are overcrowding a number of its institutions or areas within institutions. Although the Court does not have before it detailed population figures, evidence at trial demonstrated that Bayamón 308, Ponce Fase III (also known as Ponce Classification or the Southern Detention Center), Ponce Young Adults, the State Penitentiary, and the Sabana Hoyos Correctional Institution are all overcrowded.[27] In addition, in spite of intense litigation over the issue of admission cells in 1998, the AOC continues to crowd inmates into admission cells and to hold them there for extended periods of time. While the crowding is not present throughout the system, or even within any one institution, it has reached quite serious proportions where it does occur.

Defendants have attempted to minimize this crowding by labeling it "excess." According to Administrator Laboy, "excess" occurs when a particular housing unit's or particular institution's capacity is exceeded, while "crowding" exists only

---

[27]   Randolph Tucker, defendants' fire safety expert, testified regarding the overcrowding at Modules A and B at the Sabana Hoyos Correctional Institution. Mr. Tucker referred to that institution as "Camp Sabana Hoyos," but was clearly describing the Correctional Institution, rather than the minimum custody camp, which he referred to as the "penal camp" to distinguish it from the prison.

Civil No. 79-4 (PG)                                        115.

when the agency as a whole has more inmates than it has beds.  The

only coherent explanation given at the hearings for distinguishing

"excess" population and "overcrowding" was that given by the

security director at the Bayamón Complex, Capt. Luis Aponte: he

testified that overcrowding occurs when inmates in crowded units

are not provided with a bed, a mattress, or suitable living

conditions, while excess capacity is simply exceeding the

technical limit on the number of inmates in a housing unit. Capt.

Aponte's distinction does not reflect the policy of Administrator

Laboy, however: according to her, no matter how bad conditions are

in a cell or housing unit, it is not overcrowded unless the

capacity of the system as a whole is exceeded.  This specious

interpretation, in addition to demonstrating the Administrator's

deliberate   indifference   to   overcrowding   and   its   attendant

problems, ignores the fact that crowding at the AOC results in

conditions that impose cruel and unusual punishment on members of

the plaintiff class.

     Inmates in regular housing units and in admission cells at

Bayamón 308 and Ponce Fase III, as well as at the Sabana Hoyos

Correctional Institution, are sleeping in overcrowded conditions,

on the floor, without beds.  Where overcrowding is severe enough

to cause inmates to come in constant physical contact with each

other, the risk of the spread of disease is increased.  The types

Civil No. 79-4 (PG)                                                    116.

of diseases that can be spread through body-to-body contact include chicken pox, scabiosis, pediculosis, conjunctivitis, and impetigo. Overcrowding also exacerbates the spread of airborne diseases. Correctional health personnel have determined a high incidence in the AOC population of diseases that are spread through the type of contact that would be indicated by a high level of crowding.

Crowding at AOC facilities has been correlated with outbreaks of scabiosis, particularly at the Bayamón institutions and can be correlated with outbreaks of conjunctivitis as well. The Correctional Health Program's health services monitor concluded that "Overcrowding is translating through all the [infectious disease] data as an important factor to deal with" at Bayamón. Overcrowding at the Ponce admission cells also increases the risk of fecal/oral transmission of disease. Lack of organization in the movement of inmates from institution to institution can frustrate efforts of Correctional Health personnel to monitor and treat disease.. On the other hand, lower levels of crowding, as well as the ability to get out and be exposed to fresh air, would reduce the risk or spread of disease. Crowding in and of itself can increase the risk of death and harm from outbreaks of fire, especially where the AOC fails to provide adequate fire security.

Civil No. 79-4 (PG)                                          117.

Severe overcrowding also has security implications.  Severe overcrowding makes it more difficult to supervise inmates, causes tension in the inmate population, and exacerbates all other problems that may exist in a prison.

The court finds that defendants have overcrowded housing units at least at the State Penitentiary, Ponce Young Adults, Ponce Fase III, at Bayamón 308, and at the Sabana Hoyos Correctional Institution.  The overcrowding that exists at the AOC is overcrowding in all senses of the term.  Whether there is an "excess" of inmates, or whether inmates are being housed without the amenities that make incarceration humane, defendants have unnecessarily exposed inmates to unreasonable risks to their security and health.  The extent of overcrowding that exists now is in danger of increasing if the AOC does not begin immediately to comply with its obligations under the Revised Stipulation — and under simple common sense — to develop a capability to make population projections and impact statements for the agency's own use and use by the Legislature, the courts and other agencies.

Conditions of confinement that place inmates in unreasonable risk of serious harm to their lives or safety violate the Eighth Amendment of the United States Constitution, if imposed with deliberate indifference.  Helling v. McKinney, 509 U.S. 25, 113 S. Ct. 2475 (1993).  Overcrowding accompanied and causing unsanitary

Civil No. 79-4 (PG)                                                          118.

and dangerous conditions constitutes an Eighth Amendment

violation, where the combination of conditions deprive inmates of

an identifiable human need. Williams v. Griffin, 952 F. 2d 820

(4th Cir. 1991). The overcrowding described above places inmates

in unreasonable risk of harm to their lives and safety, by

increasing the risk of contracting disease and exacerbating the

lack of security in AOC facilities. See Helling v. McKinney, 509

U.S. at 33, 113 S. Ct. at 2480 (conditions that are "sure or very

likely to cause serious illness and needless suffering" in the

future violate the Eighth Amendment); Farmer v. Brennan, 511 U.S.

825, 844-845, 114 S. Ct. 1970, 1982-1983 (1994) (prison officials

must ensure reasonably safe conditions); Santana v. Collazo, 714

F.2d 1172, 1183 (1st Cir. 1983), cert. denied, 466 U.S. 974, 107

S, Ct. 2352 (1984), Tillery v. Owens, 719 F. Supp. 1256, 1277-1279

(W.D. Pa. 1989), aff'd 907 F.2d 418 (3rd Cir. 1990) (incarcerated

persons entitled to safety from fire). In addition, prisoners

have a right to beds and reasonably sanitary bedding. Making

prisoners sleep on the floor deprives them of a basic human need.

See Benjamin v. Sielaff, 752 F. Supp. 140, 141 n. 3 (S.D.N.Y.

1990) and cases cited therein; Thompson v. City of Los Angeles,

885 F.2d 1439, 1448-49; see also Lyons v. Powell, 838 F.2d 28, 31

(1st Cir. 1988); Union County Jail Inmates v. Dibuono, 713 F.2d

Civil No. 79-4 (PG)                                                          119.

984, 994 (3rd Cir. 1983), <u>cert. denied</u>, 465 U.S. 1102, 104 S. Ct.

1600 (1984).

### FIRE SAFETY

In 1997 Mr. Tom Jaeger conducted site tours of AOC facilities

during April through May 1st.   During that time he visited the

Ponce complex, including, Ponce Maximum, CCA Adult Facility, CCA

Young Adult Facility, Ponce Women and Young Adults, Annex 246 at

Ponce, Ponce Classification, Ponce Main and Ponce Minimum; the

Bayamon complex, including Bayamon 308, Bayamon Annex 448, Bayamon

292, the Wackenhut facility at Bayamon, Río Piedras Annex 352,

Camp Zarzal and Zarzal Prison.   Each visit included a physical

tour of the institution concentrating on housing units and

assembly areas.   Mr. Jaeger also interviewed inmates and staff,

including the institution's superintendent, its fire safety

officer and other correctional officers. During those interviews

he covered subjects such as fire safety training, familiarity with

evacuation plans for the facility, participation in fire drills,

past fires in the facility, procedure for unlocking doors in case

of an emergency, familiarity with location of keys, extinguishing

systems, etc.   He also interviewed persons in charge of

maintenance and inquired about water supply, locking systems, how

these are maintained, whether they had spare parts, who maintained

them, how often they were down or inoperative, fire alarm systems,

Civil No. 79-4 (PG)                                                      120.

smoke detector systems, any extinguishing systems (such as sprinkler systems, stand pipe systems), and the procedures for getting things fixed. Site visits also included spot testing of fire protection systems, such as manual fire alarm systems and sprinkler systems, as well as operation of the electronic locking systems and secondary or back up locking systems. In addition certain documents were requested such as fire incident reports, fire evacuation plan, fire drill plan, evidence of fire drills, any policies that related to fire safety such as the amount of personal belongings an individual could have.

Prior to testifying in the hearings in this case Mr. Jaeger returned to Puerto Rico in November of 1998 to visit a number of AOC institutions in order to update the findings made in his report. At that time Mr. Jaeger visited Ponce Maximum; Ponce Minimum; CCA Adults Ponce; Sabana Hoyos Prison and Sabana Hoyos Annex 384; Bayamon 308; Bayamon 392; and Vega Alta Prison. During these visits Mr. Jaeger utilized the same methodology employed in his 1997 visits.

In anticipation of his testimony, Mr. Randolph Tucker, defendants' fire safety expert, reviewed various litigation documents including Mr. Jaeger's report, Jaeger's deposition, and the Puerto Rico Fire Code and standards as they apply to detention facilities. He then put together an inspection format to follow

Civil No. 79-4 (PG)                                          121.

for reviewing the facilities.  Mr. Tucker conducted a full day of

inspections together with a team of assistants, and afterwards the

group divided into two teams to cover a number of institutions.

All together, twenty-two facilities were evaluated for fire

safety: Bayamón Annex 292, Bayamón Annex 308, Bayamón Annex 448,

Bayamón Wackenhut, Guerrero Annex 304, new building, Guerrero

Annex 304 buildings 6, 7 and 8, Ponce Annex 246, Ponce CCA Adults,

Ponce CCA Young Adults, Ponce Classification, Ponce Main, Ponce

Maximum, Ponce Minimum, Ponce Women and Young Adults, Rio Piedras

Annex 352, Rio Piedras Annex 504 (known as "Malvinas"), Sabana

Hoyos Annex 384, Sabana Hoyos Camp and Sabana Hoyos Penal Camp,

Vega Alta, Zarzal Camp, and Zarzal Prison.  These inspections were

conducted in February of 1999.  At each facility Mr. Tucker's

staff held a brief meeting with the superintendent or the head of

the facility explaining the information that was needed, and

requesting that they be escorted through the institutions with the

facility's fire safety officer so they could interview the officer

as to their understanding of fire safety issues and collect

information on the facility's fire safety plans and/or systems.

Mr. Tucker also met with AOC central office staff to discuss their

plans for fire safety.  From the information collected Mr. Tucker

put together a spread sheet form for documenting the information

that had been gathered during the surveys.

Civil No. 79-4 (PG)                                                122.

     Both Mr. Jaeger and Mr. Tucker evaluated AOC institutions in

terms of their compliance with "good fire protection practice."

The institutions were also evaluated under the Puerto Rico Fire

Code which applies to buildings built after the enactment of the

fire code, buildings which underwent major renovations after

enactment of the fire code, and buildings whose occupancies change

after enactment of the fire code, meaning when the overall use of

the building is changed (not number of people in building). "Good

fire protection practice," may or may not require more than the

Puerto Rico Fire Code.[28]

     Mr. Jaeger's 1997 visits revealed wide-spread fire safety

deficiencies at AOC facilities including deficiencies in training,

the failure to conduct fire drills, poor fire alarm and smoke

detection systems, the lack of personnel in housing units,

insufficient water supply, inappropriate evacuation plans, and

fire hazards.  He characterized one AOC facility as a "disaster

waiting to happen," and described another as the "worst housing

_____

     [28]  The court notes the NFPA's Life Safety Code for Correction and
Detention Facilities was not used by either expert to measure the
adequacy of the level of fire safety provided within these institutions.
This standard is much higher and more stringent than the Puerto Rico
Fire Code.   However, contrary to Mr. Tucker's assertion at these
hearings, the Life Safety Code does in fact apply to AOC facilities
built or rehabilitated since 1987; this is because the Environmental
Health Plan requires that all new construction and renovations by the
AOC comply with American Correctional Association standards.  The ACA,
in turn, adopts by reference the NFPA Life Safety Code.

Civil No. 79-4 (PG)                                                    123.

units [he had] ever seen in any detention or correctional facility

in [his] entire life." Mr. Jaeger reached the conclusion that

generally Puerto Rico's Administration of Corrections provides a

poor level of fire safety to inmates and that inmates are

subjected to an unreasonable risk of harm from fires.   These

findings were documented in a full report which was filed in this

case in July 15, 1997, as an Exhibit to the Comprehensive Report.

Nevertheless, upon returning in 1998 to update his findings, Mr.

Jaeger found that the situation had not improved; if anything it

had deteriorated.

   Although Mr. Tucker was more generous in his broad

characterizations of the level of fire safety provided at the

various AOC institutions visited, he admitted that the majority of

AOC operated institutions visited did not provide an adequate

level of fire safety.   Out of the sites visited, well over 3,000

inmates are currently living in facilities which do not provide an

adequate level of safety and are therefore placed at an

unreasonable risk of harm.   Although Mr. Tucker purported to reach

his conclusions on whether particular facilities meet minimally

acceptable standards primarily by applying the Puerto Rico Fire

Code, many of the institutions which he found to provide an

acceptable level of fire safety were in violation of some of the

Puerto Rico requirements.   Mr. Tucker also corroborated, through

Civil No. 79-4 (PG)                                                124.

his February 1999 visits, fire safety deficiencies observed by Mr.
Jaeger during the latter's April 1997 visits.   In other words,
deficiencies documented in the Comprehensive Report, which had
been provided to the AOC in July of 1997, had not been addressed
or corrected nineteen months later.   Mr. Tucker also agreed with
Mr. Jaeger that many of the facilities which do not currently meet
an adequate level of fire safety could easily be brought up to an
acceptable   standard   with   only   a   few   minor   corrections.
Nevertheless, it appears that in the last nineteen months, and in
some  cases  for  much  longer  than  that,  defendants  have  been
unwilling to make these minor improvements.

**Fire Safety Training**

     It is essential that fire safety officers, correctional staff
specifically designated to be primarily responsible of fire safety
at  each  institution,  have  continuous  special  training  in  fire
safety  and  dealing  with  fire  emergencies.    Such  fire  safety
officers should receive specialized training for the performance
of their job.   However, at the AOC fire safety officers are given
*de minimis* or no special training or training materials.   There
appears  to  be  no  plan  or  policy  detailing  the  frequency  of
continued fire safety officer training.   At most, some minimal
initial training is offered, but there is no policy regarding such
continual   training.      Other   correctional   staff   are   also

Civil No. 79-4 (PG)                                                125.

inadequately trained.  Despite the importance of on-site fire-safety training of all correctional officers, correctional staff had received no training at the facilities they staffed.  This general lack of training indicates a lack of commitment to provide necessary fire safety training on the part of the defendants.  The privately-run facilities, on the other hand, do appear to have adequate fire safety training.

**Fire Hazards and Fire Prevention**

Many AOC facilities are equipped with some type of smoke detecting systems; unfortunately the vast majority of these systems are inoperative due to inadequate maintenance.  Virtually all the smoke detection systems examined by Mr. Tucker and Mr. Jaeger were inoperative, with the exception of the systems at privately-run facilities and at one AOC operated facility.  Specifically, problems with smoke detection systems were observed at the following facilities: Ponce Maximum, Ponce Minimum, Ponce Women and Young Adults, Ponce Annex 246, Ponce Classification Temporary Housing Units, Ponce Main, Rio Piedras Annex 352, Bayamon 292, Bayamón 308, D building, Bayamón 308, C Building, Bayamon 308, Q block, Sabana Hoyos "Old Prison," Building 4, Sabana Hoyos Annex 384, Vega Alta Prison, Guerrero, Annex 304, and Guerrero, Buildings 6, 7 and 8.  Even in facilities that would be considered residential occupancies, standard fire safety practice

Civil No. 79-4 (PG)                                     126.

dictates that a properly operating smoke detector be installed.
There were no operable detectors in such facilities.

Smoke detector systems require maintenance by qualified
specialists because these systems are susceptible to dust and
particles in the air. Many facilities had systems known as "VESDA
systems" which use an air sampling mechanism that extracts air out
of one area through a "head," and the air is transported to a
control panel where the quality of the air is evaluated. This
system has clearly become the system of choice at AOC
institutions. Unfortunately, there is no VESDA maintenance
company on the island of Puerto Rico, and the closest office
available to service the equipment is in Atlanta. As a result,
none of the AOC's VESDA smoke detector systems are working. Other
facilities are equipped with ionization or photoelectric smoke
detectors, which consist of detector heads spread throughout a
facility where smoke is detected right at the detector head inside
the housing unit.

The detention and correctional environment is a very harsh
facility for such electronic systems because these facilities tend
not to be very clean, have a lot of concrete dust, are
historically known to poorly maintain electronic systems, and
because these systems are vulnerable to inmate vandalism. In
fact, both fire safety experts agreed that such smoke detecting

Civil No. 79-4 (PG)                                              127.

systems are inappropriate for a number of the facilities in which

they had been installed because of the open-air environment, which

makes these systems particularly vulnerable to dust and other

particles in the environment.

   More troubling than the fact that these systems were not

functioning is the fact that some of them had not been functioning

for long periods of time (e.g., four years), in spite of the fact

that outside contractors are supposedly responsible for

maintaining these systems.  Perhaps most troubling of all is the

fact that brand new smoke detection systems were not operational

in new or recently rehabilitated facilities such as Sabana Hoyos,

Annex 384, Bayamón 308, C Building and Q Block, Bayamon 292, Ponce

Minimum.  Some of the systems had never operated since the day

they were installed.

   An inoperable smoke detecting system is the equivalent of

having no smoke detection system at all.  In fact, it can be worse

because the system provides a false sense of security.  It is

unclear why defendants have been unable to maintain these systems;

this failure in fact it defies all logic.  What is clear is that

there is a major operational flaw in the AOC that prevents the

agency from fulfilling its basic duty to ensure that these systems

function once they are installed or to repair those systems once

it becomes clear that they are not operating.

Civil No. 79-4 (PG)                                              128.

## Surveillance By Correctional Officers

The detention and correctional context creates special fire safety challenges that do not exist in most other settings. Because inmates must be confined, they are generally incapable of self preservation, meaning that on their own they cannot take all the actions necessary to evacuate away from or extinguish a fire. They therefore depend on others to take action on their behalf to provide for their safety in case of an emergency. The day to day management of a detention and correctional facility, i.e. the correctional officers inside the housing units or facility, must therefore be responsible for assisting in the evacuation of the occupants. In fact, the requirements of the life safety code standard for detention and correctional buildings require and assume that correctional officers will be present inside the facility twenty four hours a day to release the inmates in case of an emergency.

In addition to the need for the manpower to manage an evacuation and other fire emergency plans should such an emergency arise, in the absence of properly operating smoke detection systems, constant surveillance may well be the only adequate means for detecting a fire emergency. Although it may not be strictly necessary for this purpose that correctional officers be physically present inside the housing unit, they must be either in

Civil No. 79-4 (PG)                                          129.

the housing unit or in visual/audio contact with the housing unit
to be able to evaluate an emergency situation and enter the area
to release inmates if a fire emergency should occur.   Another
major fire safety deficiency in AOC institutions, which is noted
elsewhere, is the absence of correctional officer surveillance
within housing units, particularly during the nighttime hours.
Coupled with other factors such as no fire detection, no fire
suppression, and no means to communicate outside the building, the
lack of surveillance heightens the risks associated with a fire
emergency should one occur.   Further, it is important to note that
although, obviously, a fire emergency can occur at any time, fire
safety officers work only one shift, the day shift, from Monday to
Friday.   As defendant's expert agreed, there should be a fire
safety officer on duty during each and every shift.

**Fire Alarm and Evacuation**

The ability to communicate effectively during a fire
emergency at AOC facilities is inadequate.   Correctional officers
charged with the safety of inmates housed at AOC institutions must
have an efficient and effective mechanism for communicating with
other staff about the existence of a fire emergency.   Manual fire
alarms are required by Puerto Rico's Fire Prevention Code, and are
ideal for this purpose since they are more effective than radios

Civil No. 79-4 (PG)                                                    130.

or telephones.  Such systems must be supervised twenty four hours

a day to ensure that they are in operational mode.

     As with smoke detectors, the vast majority of fire alarms

installed at AOC operated facilities are inoperative due to lack

of maintenance.  Specifically there are no operating fire alarms

at Ponce Maximum, Ponce Minimum, Ponce Women and Young Adults,

Ponce Annex 246,   Ponce Classification, Ponce Main, Rio Piedras

Annex 352, Bayamon 292, Bayamon 308, Bayamón Annex 448, Vega Alta,

Sabana Hoyos "Old Prison", Sabana Hoyos, Annex 384, or Zarzal

Camp.  Again, many of these systems have been inoperative for long

periods of time; for example, Ponce Classification's fire alarm

system reportedly had not worked for 12 years before Mr. Tucker's

team found it to be operating in 1999. Many fire alarm systems had

not been operable from the moment they had been installed, or had

not been repaired at the time the building was rehabilitated.  No

staff at the AOC appear to be qualified to maintain these fire

protection systems, and contractors who are responsible for

maintaining these systems are either not notified of these

problems or are not able to maintain them.  Because these systems

are the primary line of defense in a fire emergency, their failure

to operate constitutes a major fire safety deficiency and renders

these institutions unsafe from a fire safety perspective.  Again,

Civil No. 79-4 (PG)                                           131.

the AOC's failure to keep these systems in operable condition is symptomatic of a major operational deficiency within the agency.

In addition to the virtual non-existence of actual manual fire alarm systems, several control centers do not have properly functioning radios or telephones, nor do they have any other method by which a control center officer can communicate the existence of a fire emergency to other line officers without leaving the control center, which would be highly unusual during an emergency.

**Fire Drills**

Adequate fire safety requires regular fire drills. The purpose of conducting fire drills is twofold: to test the effectiveness of an existing emergency plan, and to detect flaws in that emergency plan in order to correct them prior to an actual emergency. Drills also serve as training exercises for staff and inmates. Fire drills are particularly important in the detention and correctional context because inmates must depend on the assistance of correctional staff during an emergency, and because the evacuation of a considerable numbers of prisoners from a secured area will require a significant amount of coordination. Fire drills should be conducted fairly frequently. The Puerto Rico Fire Code requires two fire drills a year, and the Life Safety Code requires twelve drills a year, four drills per shift.

Civil No. 79-4 (PG)                                             132.

It is also important to vary the emergency circumstances of the fire drill such as time of day, type of emergency, evacuation route.  In particular it is standard practice for fire drills to be conducted over all three shifts so that staff on duty during different shifts all have the opportunity to participate in a fire drill.

It also is important to document fire drills, to ensure that they are conducted properly.  It is also very important to have such a record so that fire emergency plans can be evaluated and critiqued.  Moreover, the Puerto Rico Fire Code requires that documentation on fire drills be compiled and maintained.  Despite the claim that some drills are conducted at a few AOC institutions, no corroborating documentation to this effect was produced by the defendants.  In fact, observations at AOC institutions show that fire drills are not being conducted adequately, if at all.  This has led to clear flaws in evacuation plans.  For example, in Río Piedras staff were asked to unlock a rear door of a housing unit, yet it took them thirty minutes to realize they did not have a key to that door.  In the facilities that had mixed populations or protective custody populations, evacuation plans did not address how to deal with the mixing of the population in case of an emergency.  The privately run facilities, on the other hand, were conducting drills.

Civil No. 79-4 (PG)                                          58.

before the consultants visited, and some existing tools were not
inventoried.   In addition, staff had sixteen machetes on the
inventory but could only account for fifteen.[15]   At Annex 504,
staff were missing three hacksaw blades out of the eighty-nine
that were supposed to be present.   At the State Penitentiary,
however, staff had improved in the tool control area.  Wackenhut-
Bayamón, one of the private institutions, also had an effective
tool control system.

     Another failure in the tool control area is that there is
virtually no inventory of the tools brought into the institutions
by construction workers..   As stated by Mr. O'Brien, regarding
tool control at the Ponce complex: "[o]verall tool control is not
taken seriously.   No excuse why cannot be in full compliance . .
.  [a]bsence of good and effective tool control procedures allow
tools to be used in acts of violence and escape."   Another
important observation made by the Expert Witness' consultants was
that the AOC provides inadequate training in tool control.

**Armories**

     Control of armories is also a critical part of security.   In
this regard, control of armories stands in the same position as
tool and key control.   Although some armories have improved, the

--------------------------------------------------

     [15]   Mr. O'Brien was told at the institution that an inmate walked
away from the institution and took the machete with him.

Civil No. 79-4 (PG)                                                    59.

AOC still has no uniform policy on armories. There is no standardized use of weapons and institutions store many different kinds of handguns. The consequence of this lack of standardization is improper training in the use of firearms since one cannot adequately train officers in the use of firearms if it is not known what kind of firearms are present in an institution's armory. Ammunition inventories were excessively large at some institutions and when the amount of ammunition kept in the armory is too high, the accuracy of the inventory cannot be verified. Another deficiency is the existence of weapons that are not needed and are dangerous in a correctional institution, for instance automatic weapons found at some facilities  Armories should be located outside the institutions, however, the armory at Bayamón 1072 is located inside the institution. The experts agreed that armories at Ponce Maximum, Guayama, Guerrero and Wackenhut appeared to be in good condition.[16]

**Inmate Discipline**

An inmate disciplinary system is a crucial component of a correctional system. A disciplinary system can deter illicit behavior by representing the threat of swift punishment. As important, a well-implemented disciplinary system assists proper

---

[16]   However, Mr. Martin found the armory at Guayama to be unsecured, which could allow an inmate to obtain access to weapons.

Civil No. 79-4 (PG)                                    60.

classification of inmates by identifying those who consistently
engage in disruptive or dangerous behavior.  Finally, collection
of statistics on incidences of disciplinary infractions across the
system allows administrators to assess the level of violence in
the system as a whole and to concentrate efforts on those
institutions that require more attention.  The AOC lacks a uniform
and effective inmate discipline system.  In fact, it appears that
the only disciplinary measure applied throughout the AOC is what
is known as "Rule 22," under which staff simply transfer a
troublesome inmate to another institution.  The defendants have
not published  uniform rules and regulations for inmates to
follow.  In a well-run system, the inmates should know the
institution's rules and regulations.  Moreover, it would be a
better corrections practice to hold an orientation meeting with
newly-admitted inmates and staff where the rules are explained.
Nevertheless, the only set of rules which the consultants found
the inmates to be familiar with throughout the AOC are those
promulgated by inmate gangs.  From the experts' testimony, it is
evident that the gangs are in control of  behavior inside the
institutions and they are the ones who perform disciplinary
proceedings and, on many occasions, even inflict corporal
punishment.  As stated by Mr. Martin, "somebody is running,  .  .
.  a de facto disciplinary system but it's not the staff . . . "

Civil No. 79-4 (PG)                                                        61.

It was also made clear by the experts that the absence of a sound disciplinary process at the AOC contributes to the gang problem inasmuch as violent or insubordinate inmates do not have to fear being submitted to any kind of disciplinary action by AOC authorities, and their victims cannot rely on the defendants' vigilance or protection.

**Entrance Procedures and Control of Contraband**

There is no uniform policy on entrance inspections procedures in the AOC.  In most institutions, the metal detectors were turned off or simply not used by the officers.  Most of the institutions have, indeed, abandoned the use of metal detectors to screen visitors and staff coming into the institution.   In Mayaguez and Guerrero the metal detectors did not work.   At Sabana Hoyos they did not even have a metal detector.   At Ponce Main the officer executed a good search on the security consultant, but at the same time allowed other people into the institution without searching them.   The procedure to check people entering the institutions is inadequate. In some instances no entrance security check was performed, i.e., State Penitentiary.   Many institutions, i.e., Bayamón 1072 and 308, do not use the metal detectors.   Other institutions, such as Ponce Main, use metal detectors.   These disparities in the entrance procedures show that there are severe

Civil No. 79-4 (PG)                                                62.

deficiencies   in   the   system   in   terms   of   communication,

accountability and training of the staff.

Visitors are allowed to bring packages to prisoners, making

it virtually impossible to keep contraband such as drugs, weapons,

money and cell phones out of AOC institutions.   "There is no way

that   they   can   stop   contraband   coming   in   with   the   existing

practices."   Hence, even though the AOC has installed "Ion Scan

400",   a   drug   detection   machine,   at   virtually   all   of   its

institutions, drug contraband is still a problem.   Additionally,

staff   are   usually   not   searched   when   they   enter   an   institution,

although they may be a source of contraband, and even though some

superintendents   believe   that   most   of   the   cellular   phones   in

possession of inmates were introduced to the institution by the

staff.   In addition, staff could also be introducing controlled

substances into the institutions, inasmuch as the "Ion Scan 400"

is not used on the staff.

**Vehicle Entrance**

Compliance with appropriate vehicle sally port procedures is

of extreme importance.   Noncompliance defeats the purpose of a

secure perimeter.   A sally port is a double gate; when someone is

entering an institution, only one of the gates should be opened at

any one time, thus ensuring that the perimeter of the facility is

never broken.   However, most vehicle entrance procedures are

Civil No. 79-4 (PG)                                                        63.

inadequate  throughout  the  AOC  and,   generally,  sally  port

procedures are not followed.[17]    On many occasions, both gates

would be open to let vehicles inside and outside the institution.

In addition, frequently the gates cannot be closed because they

are broken.   In Bayamón 308, for instance, the vehicle gate motor

has been broken for quite some time and has not been repaired.

Vehicles drive in and out of many facilities while both gates

would be opened and without being searched.  No equipment, such as

mirrors, is available to search the vehicles.   CCA Young Adults

and the Mayaguez Institution operated their sally ports in a

proper manner.   Sabana Hoyos, Guerrero, Guayama, and in Ponce

Maximum let the vehicles leave without searching them.   Generally

inadequate procedures are followed.

     As Mr. O'Brien testified: "[s]ome of the most poor procedures

that I have ever witnessed in my 35 years in the correctional

business that, the entrance procedures that I have seen in AOC."

Adequate entrance procedures, both on pedestrians and vehicles are

fundamental   for   the   security   inside   the   institution.

Noncompliance with such procedures defeats the whole purpose of

having a secure perimeter and jeopardizes the security inside the

_____

     [17]   Defendants' expert witness, Mr. Garvey, testified that he
observed  adequate  sally  port  procedures  at  Ponce  Maximum  and  Río
Piedras.    Mr. Garvey also observed sally ports broken but found that
the procedures were adequate.  However, there was abundant testimony to
the contrary.

Civil No. 79-4 (PG)                                                    64.

institutions.  The failure to perform adequate searches both on

pedestrians and vehicles allows contraband of  drugs and weapons

to get inside the institutions, creating a security hazard for the

inmates who could be assaulted or killed with such weapons.  AOC's

entrance procedures have proven to be inadequate and insufficient

and contraband drugs and weapons continue to be introduced into

the institutions, aggravating the lack of security inside them.[18]

**Staffing**

Shortage of staff and officer absenteeism are critical

problems in the AOC.[19]   The recurrent lack of personnel severely

compromises the security of both staff and the inmates.   Many

times, officers have to work double shifts because their

replacement does not show up to work.   In the Bayamón complex,

there is a staff shortage of approximately 200 officers.  This

staffing shortage has a major impact upon the frequency of acts of

violence inside the institutions.

Staff do not receive enough training:   "the AOC needs to

invest more in training, more in training for the correction

officers and lot more training for the middle managers and the

_____

[18] Mr. George Vose produced photographs of paddles found inside the
institutions which are used by the gangs as part of their disciplinary
proceedings.   These paddles evidently came from the outside.

[19]  In the State Penitentiary the situation is so critical that the
shift sergeant or some other sergeant literally goes to officers' houses
asking them to come to work.

Civil No. 79-4 (PG)                                                    65.

superintendents because for a system to operate effectively, they have to manage the correction officers' force."  The AOC does not have a permanent training academy.  Staff lack training in crucial areas such as use of firearms and fire safety.  Mr. Dallman stated:  "[a]n armed officer can be a danger to a civilian, to the prisoner, to himself.  You know, I think we all would be afraid to be around somebody that was armed but was not properly trained with the arms."  This absence of proper training raises levels of violence in a facility.  Even the specialized security units of the AOC lack adequate training.  These units also appear to be inappropriately used throughout the system.  The experts agreed that the personnel assigned to these units should be integrated within the institutional settings to help alleviate the problem of shortage of staff, and only pulled out during an actual emergency.[20]  However, the AOC assigns these officers to completely unnecessary tasks, such as bodyguards for AOC central office personnel.

**Staff Discipline**

The AOC also lacks a uniform and effective staff discipline policy.  This lack of supervision of personnel has an impact upon

---

[20]   Mr. Dallman testified that at the Bayamón Complex they have begun to assign  additional tasks to the UOT unit.

Civil No. 79-4 (PG)                                                    66.

the level of violence inside the institutions since acts committed

by staff many times remain unpunished.

For reasons unclear to the court, it has taken the AOC more

than four years to prepare a plan to officially create a staff

disciplinary unit. As testified by Ms. Gloria Ortiz, the director

of the interim unit, the creation of the unit is of extreme

importance inasmuch as it will allow the assignment of staff to

the unit giving the disciplinary system more stability.   The

disciplinary unit is supposed to deal with all the disciplinary

matters within the AOC that are not referred to the division of

internal affairs.  Notwithstanding this, the unit has been working

with only one investigator, one hearing examiner and one lawyer.

As testified by Ms. Ortiz, the unit has been understaffed during

the last three years, that is, since its creation.   The lack of

adequate resources to deal with staff discipline has contributed

to the inordinate delay in disciplinary actions against the staff.

In this regard, Ms. Ortiz testified that Administrator Laboy

issued disciplinary letters in August and September of 1998

dealing with incidents that occurred in 1995 and 1996.  This delay

in the completion of the disciplinary proceedings negatively

affects personnel management.  Moreover, the disciplinary rules

currently applied to staff do not specify the rules of behavior

and the disciplinary measures that will be applied to the

Civil No. 79-4 (PG)                                                          67.

personnel that violate them   This aggravates problems such as

absenteeism, because there is essentially no discipline imposed to

punish and deter such infractions.

**The Law on Security and Staffing**

The overwhelming evidence presented during the hearings

regarding the lack of security and supervision provided to the

plaintiff class amply supports the conclusion that the defendants'

acts and omissions constitute an unnecessary and wanton infliction

of pain in violation of the Eighth Amendment.   In <u>Rhodes v.</u>

<u>Chapman</u>, 452 U.S. 337, 101 S. Ct. 2392 (1981), the Supreme Court

of the United States included violence among inmates as a

deprivation of essential human needs.   The deliberately

indifferent failure to employ reasonable measures to protect

inmates from violence at the hands of other inmates violates the

constitution.[21] <u>Fisher v. Koehler</u>, 692 F. Supp. 1519, 1559 (S. D.

N.Y. 1988).   In <u>Ruiz v. Estelle</u>, 503 F. Supp. 1265, 1303 (S.D.

Tex. 1980) *affirmed* 679 F. 2d 1164 (citations omitted) the Court

---

[21]   "Having incarcerated the individuals, stripped them of all
means of self-protection, and foreclosed access to private aid, the
state is constitutionally required to provide prisoners with some
protection from the dangers to which they are exposed. <u>Washington v.</u>
<u>District of Columbia</u>, 802 F. 2d 1478, 1481-82 (D.C. Cir. 1986).
Although the state is not obliged to insure an assault-free environment,
a prisoner has a constitutional right to be protected from the
unreasonable threat of violence from his fellow inmates." <u>Morgan v.</u>
<u>District of Columbia</u>, 824 F. 2d 1049, 1057 (D. C. Cir. 1987) (citations
omitted).

Civil No. 79-4 (PG)                                                    68.

stated:  "[a]n unsafe prison environment resulting from the lack

of adequate security staffing and reliance upon inmates as guards

has been repeatedly condemned as unconstitutional by the courts.

Likewise, in <u>La Marca v. Turner</u>, 995 F. 2d 1526, 1539 (7th Cir.

1993), the court found sufficient evidence of acts of violence and

assaults in the record to permit a finding of a causal link

between the intolerable conditions and the plaintiffs' injuries.

In  <u>Alberti v. Klevenhagen</u>, 790 F. 2d 1220 (5th Cir. 1986) the

court affirmed the district court's opinion that the rampant

violence existing inside the prison was caused by the inadequate

staffing, inadequate supervisory techniques, poor sight lines and

an unreliable communications system.   The court agreed with the

district court's conclusion that these inadequate conditions

resulted in "'a continuous pattern of deprivations which clearly

reach constitutional dimensions.'" <u>Id.</u>, (citing <u>Alberti v. Heard</u>,

600 F. Supp. 443 (S.D. Tex. 1984)).

     The lack of adequate supervision and the lack of adequate

custodial staff that exists at the AOC institutions violate the

Eighth Amendment by creating an unsafe and violent environment for

the plaintiff class.   <u>See</u>   <u>Gates v. Collier</u>, 349 F. Supp. 881

(N.D. Miss. 1972) *affirmed* 501 F. 2d 1291 (5th Cir. 1974) (The

lack of adequate supervision and custodial staff can result in an

Eighth Amendment violation); <u>Martin v. White</u>, 742 F. 2d at 475

Civil No. 79-4 (PG)                                                                 69.

(The court found reckless disregard where: the guards were stationed where they could provide little protection to the inmates; a policy for discovering defective cell locks was not developed; the policies failed to deter future rapes or assaults; many assaults were not reported to the prosecutor; and, the policies not only failed to reasonably protect inmates, but may have actually encouraged inmates to attack others with impunity); Free v. Granger, 887 F. 2d 1552, 1554 (11th Cir. 1989) ("Proof of staffing or procedural deficiencies may give rise to a finding of deliberate indifference"); López v. LeMaster, 172 F. 3d 756, 763 (10th Cir. 1999) (Failure to provide adequate staffing and monitoring of inmates could amount to deliberate indifference).

Here, plaintiffs have established that inmate-on-inmate violence inside the institutions is a substantial and common problem.  AOC's own statistics, which are far from complete, reflect there were eight violent deaths and eight suicides during the period of July 1997 up to 31 August 1998.  Moreover, the level of violence inside the housing units probably is much higher than reported, because the lack of supervision means that no one really knows what occurs inside them.  AOC officials know that not all the institutions deploy officers inside the housing units Nonetheless, Administrator Laboy has failed to take reasonable measures to ensure compliance with this requirement.

Civil No. 79-4 (PG)                                              70.

     The lack of enforcement of tool control policies also amounts
to deliberate indifference.  See Goka v. Bobbitt, 862 F. 2d at 652
(The supervisors' knowledge of a systematic lapse in enforcement
of the tool control policy and the risk to inmate safety from
misuse of maintenance and other tools as weapons, where they
failed to enforce the policy, constituted deliberate indifference
rather than careless indifference to inmate safety); Murphy v.
United States, 653 F. 2d 637, 646-648 (D. C. Cir. 1981)
(Deviations in count regulations and noncompliance with the tool
control program could have been found to be the proximate cause of
plaintiff's injuries).  The lack of adequate tool and key control
as well as the failure to perform adequate searches both on
pedestrians and vehicles allow contraband of drugs and weapons to
get inside the institutions creating a security hazard for the
inmates who could be assaulted using such weapons.  Based on the
evidence presented during the hearings, AOC's entrance and search
procedures have proven to be inadequate and insufficient, hence,
drugs and weapons continue to flow into the institutions,
aggravating the lack of security inside them.  Defendants have
failed to implement adequate control and search procedures and the
contraband inside the institutions continue to be a major security
problem.

Civil No. 79-4 (PG)                                              71.

Additionally, defendants have failed to implement adequate disciplinary procedures as to both its staff and the inmates. The lack of an effective staff disciplinary procedure aggravates the problem of absenteeism and lack accountability among the staff since there is essentially no discipline imposed to punish and try to deter the improper conduct. On the other hand, the lack of an effective disciplinary system for inmates allows the gang control of behavior inside the institutions as well as the violence among inmates since they do not have to fear being submitted to a disciplinary action. Twenty years after this complaint was filed, the AOC's systematic deficiencies in staffing, policies and procedures continue to deprive the plaintiff class of the minimal constitutional protections required and constitute a "wanton and unnecessary infliction of pain." AOC officials admitted during the hearing that they knew about the pervasively dangerous conditions inside the institutions but, nonetheless, they have failed to take reasonable measures to improve the situation. The long history of failures to provide efficient staffing patterns, inadequate policies and procedures and defendants' failure to alleviate the problem notwithstanding the orders of the court support the conclusion that defendants have displayed a pattern of deliberate indifference to the level of violence inside its institutions.

Civil No. 79-4 (PG)                                                        72.

## INMATE GANGS

The special problem of inmate gangs at AOC institutions was examined by Mr. George Vose and Mr. Ashbel. T. Wall. Mr. George Vose is currently the Director of Dept of Corrections for State of Rhode Island. He has 26 years of experience in correctional systems. In particular he has been involved with correctional systems which have experienced a surge in inmate gang activity and which have designed and implemented strategies to manage gangs. Mr. Vose first became involved with Puerto Rico's correctional system in 1994. Mr. Vose testified as an expert in the areas of corrections, correctional administration, inmate management, riots, riot control and training, as well as settlement and compliance with court orders in prison litigation cases. Mr. Wall is currently the Assistant Director of the Rhode Island Department of Corrections and also has ample experience in the area of corrections, and has first hand experience in dealing with inmate gangs and testified as an expert witness on corrections, correctional administration, inmate management including security and classification and inmate organizations.

In 1997, Mr. Vose and Mr. Wall were asked by Mr. Vincent Nathan to evaluate the nature and scope of gang intrusion into the daily operation of AOC institutions and the AOC's handling of the inmate gang problem. The AOC's gang problem was evaluated in

Civil No. 79-4 (PG)                                    73.

terms of Mr. Vose's and Mr. Wall's experience of what constitutes acceptable correctional practice and ACA standards.   Although there is no nationally recognized standard for management of inmate gangs, there are an evolving set of practices developed in part by organizations such as the National Major Gang Task Force, the National Institute of Corrections, and the Association of State Correctional Administrators.

In 1997, Mr. Vose and Mr. Wall visited Ponce Max, Ponce Classification, CCA Adult, CCA Young Adult, Zarzal, Guayama 292, Guayama Main, and CCA Guayama, State Penitentiary, Rio Piedras Annex 504, Rio Piedras Annex 352, Bayamón 292, Bayamón 308, Bayamón 1072, Bayamón Wackenhut.  The institutions toured in 1997 were selected by Mr. Vince Nathan and his staff based on which centers held a large number of inmates.  Mr. Vose and Mr. Wall conducted extensive site tours, conducted exhaustive interviews with inmates and staff, and reviewed many documents relating to gangs received from the AOC.   Mr. Vose and Mr. Wall also obtained information from the Expert Witness' security consultants, Messrs. Jerry O'Brien, Jim Henderson and Bill Dallman.  Based on their observations, interviews, and review of documents, Mr. Vose and Mr. Wall compiled a report incorporating their findings and opinions regarding the influence of gangs and the management of gang problems throughout AOC system.   In 1998, Mr. Vose and Mr.

Civil No. 79-4 (PG)                                         74.

Wall returned to Puerto Rico to update their findings.  At that

time they visited Ponce Maximum, Ponce Main, Ponce Classification,

CCA   institutions   at   Ponce,   Ponce   Young   Adults,   Guayama

(rehabilitation portion), State Penitentiary, Annex 504 and Annex

352, Bayamón 308 and Bayamón 1072, Bayamón 1072, Zarzal, Bayamón

Wackenhut. Mr. Wall and Mr. Vose noted only meager improvement

since 1997.

**History and Emergence of Gang Control**

In the early 1980s, the AOC system experienced a rash of

extreme violence among inmates which has been characterized as a

"civil war." This violence finally abated when inmates from rival

groups were separated and placed in different institutions.  The

inmate leaders who emerged from this "civil war," benefitted from

the ailing and ineffective correctional system which existed at

the time, Morales Feliciano et al v. Romero Barceló et al, 497 F.

Supp. 14 (D. Puerto Rico [1980]), and accumulated sufficient power

to insinuate themselves into the daily fabric of institutional

operations at the AOC.  Since early on in this case inmate gangs

and their role as the effective governors of AOC institutions

emerged as a major obstacle to the proper management of these

institutions.  Morales Feliciano et al v. Romero Barceló et al,

627 F. Supp. 591, 603 (D. Puerto Rico 1986)  As has been true

since that time, there are several gangs in the Puerto Rico

Civil No. 79-4 (PG)                                                    75.

correctional system, some having more prominence than others, and
each institution is primarily inhabited by members of one gang.

One of the most notable features of the workings of inmate
gangs within the AOC is the open and notorious way in which gang
activity has been conducted.  As was true in 1986, "the fact of
gang control is accepted everywhere and by all."  Morales
Feliciano, 627 F. Supp. at 603.  The current state of affairs at
the AOC reflects a displacement phenomenon where day to day
control and authority over the daily operations of institutions,
which would normally be in hands of the correctional
administration, is abdicated by that administration and placed in
the hands of inmates in the expectation that those inmates will
help the administration control the correctional system.

The strength and influence of inmate gangs is, in fact, both
a result and a cause of the AOC's utter inability to properly run
its penal institutions.  The day to day administrators of the
various AOC institutions are forced to rely on inmate
organizations to restore order within them, and powerful inmate
leaders eagerly fill the vacuum of control created by the AOC's
deficient security practices, to promote their own personal
objectives of maintaining privileges reserved to a select few
inmates, promoting the entrance of contraband, particularly drugs,

Civil No. 79-4 (PG)                                                76.

into AOC institutions, and amassing and preserving their own power.

**Consolidation of Gang Power Over the Inmate Population**

The process of recruitment into an inmate gang begins immediately upon admission. Newly arrived inmates are asked by gang members to show documentary evidence of the crime of which they have been charged or convicted. The gang members in the intake center then determine whether the inmate's charge and former occupation is acceptable to the gang (e.g. Ñetas will not accept child molesters, former police or correctional officers, etc.). Which gang an inmate will ultimately belong to therefore depends almost exclusively on which intake center an inmate arrives at when he enters the system for the first time. Due to the nature of the recruitment process, inmate gangs in Puerto Rico function in a way significantly different from gangs in other correctional systems because virtually all inmates are gang affiliated unless they have chosen not to affiliate themselves with a gang or are for some reason unacceptable to any gang, in which case the inmate becomes a protective custody, or "security" inmate.[22]  Thereafter the inmate's solidarity with and adherence to the gang is reinforced through mandatory attendance to regular

---

[22]    There is no evidence in the long record of this case that prisons gangs are related to or part of gangs in the free community.

Civil No. 79-4 (PG)                                                    77.

gang meetings, murals painted in institutions, hand signals, tatoos, specific kinds of clothing, and secret meetings. However, there are also other more pernicious ways of cultivating gang adherence and obedience.

Administrative staff, finding themselves unable to provide these inmates with safety or protect them from the threat of violence have acquiesced to gangs' demands, placing inmates in institutions according to their gang affiliation, thereby participating in this practice of separation.[23] Such practice adversely affects the AOC's classification system and housing assignments. Consequently, each institution, with the exception of a couple of protective custody, or "security" institutions, is mostly inhabited by members of one inmate gang. Inmates who are for some reason unacceptable to the gang are weeded out and removed, or rather, forced out, before they even have an opportunity to become fully integrated with the facility's population. Inmates who later defy or do not conform to gang rule

---

[23] At private facilities however, management has attempted to integrate members of different gangs in housing units, common areas, recreation, education and dining, with very limited success. Success has been limited because it is very difficult to separate what is going on in the prisons of the rest of the island from the private institutions, since inmates who arrive from other institutions will already be gang affiliated and have had an opportunity to develop solidarity with the gang. Although, mixing members of different gangs is an objective to be pursued, such mixing should not be implemented immediately, given the current state of the defendants' unability to provide inmate supervision or security.

Civil No. 79-4 (PG)                                              78.

are expelled from the facility, specifically, gang leaders demand that the undesirable inmate be removed from the facility by the administration by threatening harm to the undesirable inmates.

Inmates are aware of the gang rules and disciplinary system. Gang rules are recited to them on the day of their arrival by other inmates and, in addition, gang rules are posted and displayed in institutions.   Violation of gang rules entail sanctions that include restriction of the disciplined inmate's access to programs and services, or beatings administered by gang members.   AOC toleration of the active participation of gang leaders in certain types of management, discipline and security decisions has resulted in it becoming part of the system's institutional culture.   Defendants' acts or omissions have permitted gang leaders to develop a highly sophisticated and well oiled machine which is a force to be reckoned with.

AOC staff have historically negotiated with inmate gang leaders on a variety of topics which affect institutional security and inmate services.   Often these negotiations are characterized by a sense that the administration and the gang "share" responsibility for institutional order.   Other times the tone of these negotiations turns more aggressive and belligerent, involving threats on the part of gang leaders.   Such dealings have allowed inmates to wield influence and power and has caused staff

Civil No. 79-4 (PG)                                                    79.

and facility administrators to be timid in their dealings with gangs. Historically, inmate gang leaders have had access to the highest levels of the AOC administration, including the AOC Administrator, in organized meetings, or "summits." These summit meetings are simply meetings in which inmates are transported from an institution to a central location to meet with AOC officials or the AOC Administrator.

Although Administrator Laboy has adopted a position of not negotiating with gangs, she continues somewhat regularly to hold meetings with inmates, many of whom are gang leaders. This practice is inappropriate, and even if concessions are not made to inmates in these meetings, these meetings appear to conflict with Administrator Laboy's stated policy of not negotiating with inmates. In addition, these meetings appear to staff and to other inmates to legitimize the status or authority of the inmates who attend such meetings. The continuation of the practice of holding meetings with inmate leaders is also likely to provoke confusion and suspicion on the part of staff.

**Effect on Security.**

The physical plants of AOC institutions suffer from extensive deterioration including dismantled locking mechanisms, smashed glass, torn fencing, and missing or inoperative doors or gates which allow for a great deal of freedom of movement by inmates.

AO 72A
(Rev. 8/82)

Civil No. 79-4 (PG)                                                    80.

This deterioration is attributed in part to shoddy construction and lack of maintenance, as well as to deliberate vandalism and disturbances caused by disagreements between gangs and administrators.   Administrators also acquiesce in not taking certain basic security measures as a result of gang negotiations. The AOC generally lacks secured cell space to place inmates, meaning that cells, due to inadequate locking or other defects, are not capable of physically confining inmates to the cell and preventing other inmates from entering.    Gang leaders, unencumbered by such basic security as locked doors and gates or other physical barriers, move freely throughout housing areas and are able to tighten their grip upon the inmate population and freely conduct gang business.   In 1998 the freedom of movement enjoyed by inmates had not been significantly curtailed.

**Drugs and Other Contraband**

Drug contraband and trade commonly occurs in correctional institutions whether gangs exist or not.  However, it is important that correctional agencies keep this particular type of commerce at bay, since it can have such a devastating and destabilizing effect on the operation of the institution.   Many inmates are addicts who will go to great lengths to obtain illegal drugs. As a result, gang leaders who traffic in illegal drugs in the institutional setting are able to amass a great deal of power and

Civil No. 79-4 (PG)                                                    81.

wealth.  At AOC institutions the trafficking in contraband occurs

fairly overtly, compared to other correctional systems.  The

rampant drug trade within AOC institutions serves to consolidate

the power of inmate gang leaders.

Open houses are a tradition at the AOC where inmates are

allowed to host members of their families and perhaps other guests

on certain holidays or special occasions.  Open houses create very

serious security concerns.  These open houses often involve very

large numbers of people, a situation which facilitates the

introduction of contraband, escapes and illicit sex, and creates

a situation in which it is virtually impossible to provide

security for those present.  To make matters worse, open houses

have, at least in the past, included inmates of different

classifications brought together to the same location.

**Level of Sophistication of Gang Structure & Control.**

One of the distinctive features of gang activity in the AOC

system is that it is highly structured and bureaucratically

organized with a system of island-wide control.  In fact, one

experienced AOC official has commented that Ñeta is more organized

than the AOC itself.  Even within institutions, gang organization

is highly bureaucratized; for example, gangs have different

committees, such as conduct committees and drugs committees, which

are charged with specific responsibilities.  The tremendous level

AO 72A
(Rev. 8/82)

Civil No. 79-4 (PG)                                                              82.

of organization and coordination of the gangs serves to perpetuate their power and makes them more resistant to administrative anti-gang initiatives.  As a general matter it is clear that gangs are squarely in control of all activity within an institution, be it authorized, unauthorized, legitimate, or illegitimate.

One of the most clear examples of defendants' failure to deal with gangs is presented by the creation of the Commission to Improve the Quality of Life in Penal Institutions ("Comisión para Mejorar la Calidad de la Vida de los Confinados, " hereinafter the "Comisión").  The Comisión was created as a nonprofit corporation consisting of a group of inmates whose stated purpose was to work towards inmate rehabilitation together with the AOC.   The corporation was supported by the former Secretary of Corrections, authorized by the Puerto Rico Department of State, and funded by the legislature.  In addition, the Comisión received endorsement and support from legislators, mayors, and other high ranking elected or appointed officials.   The Comisión procured and received legislative appropriations for office supplies and other projects, and established an office at the State Penitentiary. In fact, the Comisión functioned as an arm of the Ñeta gang, and the relationship between the two entities was patently obvious to inmates, staff, and administration officials.   The Comisión procured and acquired funding for programs and activities which

Civil No. 79-4 (PG)                                                    83.

were only available to members of Ñeta.  Inmates of other gangs
protested the injustice of this discrimination.  The legitimacy
bestowed on the Comisión by Puerto Rico politicians demoralized
and confused staff who realized that recognition of the Comisión
was detrimental to the AOC and were displeased about cooperating
with the Comisión, but felt that they had to because it was
government sanctioned.  The experts who testified at trial were
unaware of any other such inmate organization having existed in
any correctional system.

The existence of such an organization clearly was extremely
damaging to AOC efforts to assert control over institutional
operations and further expanded inmate leaders' power base.  In
1997 after the filing of Mr. Vose's and Mr. Wall's report the
Comisión suffered a great deal of bad publicity.  The current
Administrator of Correction several months later took active steps
to disband the Comisión.  By 1998 the Comisión had been disbanded
and no longer existed. The fact that the Comisión is no longer in
existence is a positive change.  Nonetheless, the formation and
official recognition of this organization continues to be an
extraordinary testament to the recklessness with which defendants
have dealt with the gang problem.

**Harm to Inmates.**

Civil No. 79-4 (PG)                                                        84.

The high level of inmate on inmate violence resulting from gang activity, as well as the effect that gangs have on programming and services, harms inmates within the AOC system on a daily basis. One of the most fundamental roles of any correctional agency is to provide for the physical security of the inmates in its custody. In order to do so, such an agency must be able to control inmate movement within a facility, dictate what types of property an inmate may own within that facility, enforce disciplinary rules, assert its authority through its presence in areas where inmates are housed or congregate, and generally maintain order. As indicated above, gang activity compromises the level of security at AOC institutions by affecting the deployment of officers to housing areas by promoting the entry of drugs, weapons, or materials that can be made into weapons, and by failing to control or limit the movements of inmates throughout AOC institutions. As conceded by Administrator Laboy herself, the level of violence within AOC institutions is unacceptably high. The violence associated with gang discipline and expulsions is obviously directly attributable to gang activity. In addition, the decrease in security is associated with defendants' acquiescence to high level of violence at AOC institutions. Ultimately it is the inmate population which is most likely to be on the receiving end of the violence.

Civil No. 79-4 (PG)                                                        85.

As the custodian of the 16,000 or so inmates incarcerated in Puerto Rico, the AOC has a monopoly over many services that free citizens are generally able to seek out and secure for themselves such as medical services, food services, jobs, education, mail, visits with family and friends, etc.   In a properly run correctional system, the agency charged with the custody of inmates decides which inmates should receive those services and ensures that these services are in fact administered to inmates and that they are administered in a fair way.  The AOC, however, has abdicated its obligation to ensure that inmate services are administered in a fair manner.  The special concern of inmate gangs affects the services administered to inmates and, often, inmate gang leaders directly control the inmate population's receipt of many services.  For example, at AOC institutions bed assignments are effectively being made by gangs leaders.[24] Normally, a correctional agency will assign an inmate a location in which he is thereafter required to live until the Administration authorizes a transfer.  At AOC facilities, after being assigned a location by administrators, the gang may change

---

[24]   In Bayamón 1072 in 1998, one inmate was in charge of maintaining an elaborate card file of bed assignments in the institution.

Civil No. 79-4 (PG)                                            86.

an inmate to a different bed or even to a different dormitory, and

no action is taken to prevent this practice.[25]

Since the beginning of her tenure,  Administrator Laboy has

taken  some  steps  to  curb  inmate  gang  activities.   As already

mentioned,  the Administrator played a role in the dissolution of

the Comisión.   In addition the Administrator has created an

intelligence  unit  to  gather  information  on  gang  activities.

However, as of December 1998, the director of this unit had not

even read the report by expert's Vose and Wall on inmate gangs and

no evidence was presented regarding any of the accomplishments

achieved by this unit.  Two recently enacted policies on searches

and  reading  of  mail  are  positive  developments,  but  may be of

limited use depending on how they are administered and whether

they are enforced.

The  Administrator  has  also  adopted  a  position  of  not

negotiating  with  inmate  gang  leaders  or  giving  in  to  their

demands. Her approach has reportedly contributed to an improvement

in staff morale and a decrease in staff intimidation in their

encounters  with  inmate  leaders.    Nonetheless,  her  position  is

compromised by her continued practice of meeting with inmates,

which reinforces the prestige and power of gangs and gang leaders,

---

[25]   At one institution it was found that the administration
adjusted its records to reflect certain room changes after these had
already been implemented by the gangs.

Civil No. 79-4 (PG)                                                    87.

and demoralizes staff.  In addition her position of not personally

negotiating with inmates in her official capacity as Administrator

does not appear to have significantly affected the practice of

negotiation between inmates and institutional staff in dialogue

committee meetings.  Such meetings continue to be conducted, and

they continue to involve compromises on security issues.  There is

no evidence that AOC security practices which permit gangs to

conduct activity harmful to inmates have been improved since

Administrator Laboy publically adopted this position.  Any recent

improvement in security practices has been scattered and

inconsistent at best.

        As another anti-gang measure, Administrator Laboy transferred

six Ñeta leaders out of the AOC system to federal facilities at

some point between 1997 and 1998.   Although, following the

transfer of those Ñeta leaders, the gang appears to be momentarily

less powerful, the long term effect of such measure is

questionable.   Likewise, Administrator Laboy claims to have

dismantled Zarzal as the Ñeta communications hub by transporting

Ñeta's "general secretary" from Zarzal to another institution.

Again, the effectiveness of such measure in the long run is

doubtful, as there was evidence presented that Zarzal was still

being referred to as the Ñeta communications hub even in 1998.

Such minimal efforts are wholly insufficient and no doubt do not

Civil No. 79-4 (PG)                                              88.

represent proper ways to effectively deal with the complex problem

of inmate gangs.

     Although the recent measures described above are positive

initial steps for a change, they are paltry in proportion to the

undertaking.  With few exceptions, the inmate management report in

evidence continues to present a fairly accurate picture of AOC's

operation of inmate management problems.   Gangs continue to

operate much as before, and the few changes that have been made

are insubstantial and have not translated into an operational

difference in the way in which the gang problem is managed.

Administrator Laboy became aware of the magnitude and importance

of the gang problem as soon as she commenced as Administrator at

the AOC in March of 1997.  Nevertheless, she did not read the

Inmate Management Report produced by A.T. Wall and George Vose,

which had been available to her since July of 1997, until December

of 1998. Administrator Laboy suggested during her testimony that

upon reading the report she was amazed to read about all the

aspects of the gang problem which she had had to find out for

herself since the time she became Administrator.

**Legal Standard - Gangs.**

     Defendants for a long time have had knowledge of the gang

activities and the risk of assault by gang members upon inmates,

and yet they continue to operate an ineffective security system

Civil No. 79-4 (PG)                                        89.

which ignores that risk.  Moreover, defendants know that the gangs

inflict corporal punishment on inmates and have failed to take any

measures to end this practice.  The failure to take measures to

protect the inmates from physical assault by gangs has been found

to violate the Eighth Amendment.  Walsh v. Mellas, 837 F. 2d 789,

797 (7th Cir. 1988).

     Correctional agency officials have an obligation to provide

for the physical safety and basic needs of inmates within their

custody.  Helling v. McKinney, 509 U.S. 25 (1993).  The

deliberately indifferent failure to protect inmates from gang

violence is clearly an Eighth Amendment violation.  Walsh v.

Mellas, 837 F.2d at 797.  In addition, an Eight Amendment

violation occurs when a correctional agency allows inmates to

harass, intimidate, physically abuse, or generally exercise

authority over other inmates.  Ruiz v. Estelle, 503 F. Supp. 1265

(S. D. Tx. 1980), aff'd in part and vacated in part on other

grounds 679 F.2d 1115 (5th Cir. 1982), amended in part and vacated

in part on other grounds 688 F.2d 266 (5th Cir. 1982), cert.

denied 460 U.S. 1042 (1983).  The Ruiz case is distinct from our

case in that it involved a state sponsored and orchestrated system

whereby certain inmates, known as "building tenders" exercised

Civil No. 79-4 (PG)                                                          90.

authority over other inmates.[26]   Nonetheless, whether the system

of inmate authority over other inmates is fostered by the

correctional agency, as in the Ruiz case, or the result of the

correctional agency's abdication of authority over the inmate

population, as here, the net result for the majority of inmates is

the same: "The building tenders' puissance . . . extends to

causing the loss of privileges (e.g. the right to go to the

commissary; favorable job or housing assignments) or even the

infliction of physical punishment," which amounts to cruel and

unusual punishment under the U.S. Constitution  Id. at 1296.


## CLASSIFICATION

---

[26]   Although the "building tender" system in Ruiz v. Estelle had
been created and sponsored by the state, there are a number of striking
similarities between that case and the present one which are worth
noting: "[Building tenders have] the opportunity to arrange or influence
job and housing changes, and to sell their influence over such matters
to other inmates," Id. at 1296, through their position of power, the
building tenders gain access to personal information on other inmates
and use the information to exploit these inmates, Id., "building tenders
have the power to punish inmates, " Id., in certain parts of the
correctional system certain makeshift weapons were available to the
building tenders either because of correctional officials' tacit
acceptance and use of weapons, or because of the lax supervision of
these particular inmates, Id. at 1296-7, "[t]he availability of weapons,
as well as the other concomitants of power possessed by building
tenders, allows them to engage in acts of marked brutality toward other
prisoners," Id. at 1297, "[i]n return for their assistance to the prison
authorities, building tenders enjoy certain special privileges[, t]hey
have greater mobility and access to facilities than do other inmates,"
Id. "[i]n many instances, these favored inmates are also permitted their
choice of cell location," Id., "the only order existent in the living
quarters is enforced through the abusive building tender system," Id.
at 1303.

Civil No. 79-4 (PG)                                                      91.

As a constitutional minimum, a prison system must adopt some system of classifying and housing prisoners to assure that a prisoner's propensity for violence as well as an inmate's emotional and physical health be accounted for, so as to minimize the risk of harm from fellow inmates to which the prisoners are exposed. Dawson v. Kendrick, 527 F. Supp. 1252, 1294 (D. W. Va. 1981). Although a classification system is a matter ordinarily left to the expertise and discretion of prison administrators, a court can intervene where proof shows a sufficient connection between an improper classification system and a protected constitutional right, such as the right to be reasonably free from excessive violence. Grubbs v. Bradley, 552 F. Supp. 1052, 1124 (D. Tenn. 1982).

Although it is conceivable that all inmates in a prison system are so peaceful and cooperative that the lack of a classification system does not amount to a constitutional violation, this scenario is hardly realistic and, in any case, does not in any way describe the AOC system. The AOC system, instead, suffers from an unacceptably high incidence of violence. The correctional consultants who testified at the hearing cited the lack of adequate classification and separation of inmates as some of the AOC's many security-related deficiencies. The court concludes that inadequate classification in the AOC system

Civil No. 79-4 (PG)                                                92.

contributes to violence and an unreasonable threat of violence in

the AOC's institutions. But the AOC does not lack a

classification system; rather, defendants have not taken the

necessary steps to make its classification system effective and,

in addition, AOC administrators do not properly separate inmates

even when they are classified.

Classification is the method by which inmates are separated

according to their institutional needs and the risks they present,

such as risk of escape or risk of violence against staff or other

inmates. Typically inmates are first classified into two broad

categories: "general population" inmates, and inmates who present

special management problems. General population inmates must then

be separated again into different custody levels. Once inmates

have been separated into different classifications this

information is utilized to manage the population. To adequately

operate a prison system, central office personnel must coordinate

the institutional location of different types of inmates with a

number of operational decisions such as deployment of staff,

configuration of living area, services and programming, and

planning for emergencies. Administrators and staff at particular

facilities should know what types of inmates are housed at that

facility in order to ensure that their needs are being met.

Furthermore, if an agency is trying to control crowding through

Civil No. 79-4 (PG)                                                93.

release it must have a reliable means of determining which inmates

pose an acceptable risk to public safety.

Dr. James Austin, Ph.D., an expert and consultant on inmate

classification systems first became involved with the AOC system

in 1994.   At that time the AOC had tried to implement a very

complicated classification system based on that used by the

Federal Bureau of Prisons.  The AOC had insufficient staff at the

central office level to monitor classification, and there were no

adequate controls regarding where inmates were being transferred.

Inmates were not being separated according to custody level and

there was no access to criminal history records and certain other

information needed for classification.  Between the years of 1994

and 1996 Mr. Austin collaborated with the AOC in designing,

testing and implementing a classification system which met

industry standards.  The forms and manual that resulted were

specifically tailored to the AOC's needs.  The development of this

system involved the cooperation of both plaintiffs and defendants.

Once the process was completed, Mr. Austin was satisfied that the

tools that had been developed were adequate for the AOC's

classification process.  Mr. Austin held a training for staff on

all aspects of the classification system.   Since the

classification system was drafted in English, efforts were

Civil No. 79-4 (PG)                                                94.

subsequently made to translate the forms, manuals and policies
which make up the system.

Dr. Austin returned to Puerto Rico to evaluate the AOC's
classification system in 1997.  To perform this evaluation, he
retrieved information on a stock population of inmates to
determine the proportion of inmates that were being classified,
the accuracy in the classification scoring, the basis of
information used to fill out form, and the extent to which AOC
classification personnel were using overrides (described below).
After this he submitted a report on his findings, which was filed
with this Court on July 15, 1997;  Docket No. 6604.  Dr. Austin
returned to the AOC in 1998 to update his findings and determine
if they were still accurate. Dr. Austin testified at hearing as an
expert in inmate classification, population projections and
population crowding analysis systems.

**The Objective Classification Model and Classification at the AOC**

Years ago correctional systems used a subjective
classification model in which inmate classification was based on
the individual judgment of staff.  This model has been rejected
and modern classification systems attempt to achieve a more
objective model whereby the needs and risks associated with a
particular inmate are evaluated according to explicit standardized
criteria which have been shown to be associated with misconduct,

Civil No. 79-4 (PG)                                                        95.

escape, and risk of violence against others.    In objective classification systems the factors taken into consideration are clearly stated.    Such models provide a high level of consistency in classification.

An objective classification system must tend to assure two things: (1) reliability and consistency in decision-making, meaning that every classification officer will classify the same inmate in the same way, and (2) validation, meaning that the system is shown to be predictive of behavior.    Typically a classification "system" consists of an initial classification form, a reclassification form, a manual and a policy guide.    Most correctional classification systems also provide for an appeals process and distribute copies of classification policies and manuals to inmates.    An "initial classification" form is designed for use soon after an inmate enters into the system and a "reclassification" form is used some time later once new information has been gathered on the inmate.    These forms assign scores to different inmate characteristics or activities which have been shown to be predictive of an inmate's institutional conduct.

At the "initial classification" level, classification will generally be based more heavily on demographic factors such as marital status, education level, age, etc.    Upon

Civil No. 79-4 (PG)                                              96.

"reclassification" the importance of such demographic factors should diminish, and classification should depend more on the behavior that the inmate has exhibited in the institution such as disciplinary infractions or program participation. The reclassification form generally is the same as the initial classification form except that more recent behavioral data is more heavily weighted. The different scores are then added up for a final score which determines the inmates' custody level. The scores or weights assigned to different characteristics or factors are determined by studying inmates in the system and analyzing which factors are most predictive of misconduct; those items with the strongest correlation will be weighted heavily. Once these factors have been identified, a draft set of forms are generated and tested on a random sample of inmates. Each state has its own customized approach for objective classification. Although each jurisdiction will weigh certain factors differently, all tend to rely upon essentially the same factors such as offense, prior criminal record, institutional conduct (prior incarceration and conduct to date) and demographic factors such as age, residency, drug use.

Although the AOC has had a classification system specifically customized for the agency since the end of 1996, the system has not been formally adopted,   nor did the defendants present any

Civil No. 79-4 (PG)                                                    97.

evidence on current undertakings or plans to formally implement

it.  Although the manual system has been distributed and is being

used informally, staff use only the classification forms, but not

the manual itself, which explains how the classification system

works, and therefore typically do not comply with the procedures

set out in the manual.

At any given time 95% of the population, including pre-trial

inmates, should be classified, the remaining 5% being recently

admitted inmates who are in the process of classification.

However, in 1997 16% -17% of the 95% of inmates who should have

had classification forms did not.  In 1998 no improvement was seen

in the proportion of inmates being classified, in fact, the rate

may have been lower than it was in 1997.  In 1998 classification

forms for 30% of inmates could not be located at the AOC central

office's classification division.

**Sources of Information Used to Complete Form**

In order for a classification system to function properly the

agency utilizing the classification program must have accurate

information regarding the various factors which will be considered

in classifying an inmate.  Personnel who classify inmates should

be able to rely on an inmate's history of arrests and convictions,

a complete personal history, and pre-sentence investigation

reports (which include information on offense, prior record and

Civil No. 79-4 (PG)                                                  98.

social history).  This kind of documentation should be combined

with a thorough inmate interview, because sometimes the records

relied on will not be complete.

When  classification  forms  do  not  contain  complete  and

accurate information there is a risk that dangerous inmates might

be under-classified.  The defendants do not have a system in place

which  makes  such  information  available  to  sociopenal  staff

responsible for filling out classification forms and, therefore,

sociopenal technicians must rely almost exclusively on interviews

with inmates, with no way of verifying this information.  It is

inappropriate, however, for a classification system to rely on

interviews alone to obtain such information.

Typically, a criminal history can be obtained from the

state's automated system which can be accessed directly from the

department  of  corrections.   It  is  indispensable  that  this

electronic system be available to staff responsible for filling

out classification forms.  Although Puerto Rico has such a system,

which  is  known  as  CJIS,  at  the  AOC  access  to  this  system  is

severely limited.  Classification staff at the AOC also do not

have access to inmate rap sheets or pre-sentence investigation

reports.  For institutional conduct, corrections personnel should

be able to rely on an inmate's official disciplinary record.

However, as has been indicated elsewhere in these findings, the

Civil No. 79-4 (PG)                                                99.

AOC has no inmate disciplinary system.   In addition, under-staffing in the socio-penal area affects inmates' ability to participate in programming which can also affect an individual inmate's classification score.

As a result of these deficiencies, the AOC's classification system does not operate properly.   In surveying 2,467 initial classification forms in 1997, Mr. Austin found that 78% of inmates showed no or low prior convictions.   For the AOC population, 78% is inordinately high and is almost certainly caused by the lack of valid information regarding inmates' prior criminal histories. The AOC has no record of prior adult felony convictions for nearly two thirds of its inmates, which is abnormally high.   In addition there is a disproportionately high number of inmates with low or no disciplinary history, demonstrating that the disciplinary data is not available; specifically, only two inmates out of 2,500 had been identified as having a prior institutional disciplinary history in the two years prior to classification.   Virtually the same results were found for the 4,056 reclassification forms which were examined:  73% of the forms examined showed no prior criminal history, 2/3 had no prior felony convictions, 97% had no history of disciplinary actions, and 73% of inmates had no program participation.   No improvements in this area were observed in 1998.

Civil No. 79-4 (PG)                                                      133.

**Evacuation Plans**

Adequate preparation for fire emergencies requires coordination beforehand of the steps which will be taken should such an occasion arise. This coordination requires in turn an efficient, clear, and written evacuation plan: nothing should be done within a detention and correctional facility in the name of fire safety that would downgrade the level of the institution's security. The type of security and separation of inmates which is designed into a building will control the design of emergency evacuation procedures. Certain security requirements may slow down the evacuation of the inmates, nonetheless, evacuation plans should be designed so that the facility's security needs are addressed during evacuation.

Many AOC institutions do not have any evacuation plans. Those that do, have basic flaws that render them inadequate. One major deficiency is that these plans do not contain guidance on handling the evacuation of inmates who require separation for security reasons. Some evacuation plans call for the shift commander to authorize the release of inmates from their housing units. Reserving such a decision to an officer not inside the housing unit during an emergency will significantly delay efforts to handle the emergency. A common deficiency in the AOC's evacuation plans is that they do not provide for different contingencies in

Civil No. 79-4 (PG)                                                134.

fire emergencies, such as different evacuation routes.  Another

major flaw in the emergency plans is that, although the plans

specified the tasks to be executed, they do not specify which

officers will perform those tasks.  Normally such assignments are

given to specific officers according to the post they hold,

because attempting to make such decisions during an emergency will

cause delay and could lead to errors in the execution of an

emergency plan.

     None of the fire evacuation plans furnished by the AOC

operated facilities meet any recognized standard.  The evidence

presented in this regard was uncontested.

     Housing units should generally have at least two exits, so

that there are alternative means for evacuation.  Insufficient

exiting was observed at a variety of institutions, including Ponce

Minimum (which had been recently renovated), Ponce Main,   Rio

Piedras Annex 352, Bayamon 308, Sabana Hoyos, and Vega Alta.   In

some cases adding an additional exit would be easy to arrange, and

yet this simple precaution has not been taken.  At many facilities

emergency exits are welded shut or chained and bolted.   Worse

still, the keys to locks are not always readily available.   At

some facilities, including new or recently renovated facilities,

electronic locking mechanisms were not operational.   At other

institutions manual backup locking systems could not be used for

Civil No. 79-4 (PG)                                          135.

various reasons.   When an institution is controlled by an

electronic locking mechanism, officers should be trained to use a

backup manual locking (or unlocking) mechanism, so that an

electrical malfunction or power failure does not prevent

evacuation.   Various deficiencies were found in both the

maintenance of backup systems and in training of staff in AOC

facilities.

Both experts observed institutions which were overcrowded, a

circumstance which would make evacuation during an emergency

slower and more dangerous.

**Sprinkler Systems**

Sprinkler systems have an excellent record for providing fire

safety and are considered extremely reliable fire safety systems;

in fact, there has never been a multiple death in a sprinklered

building.   Another advantage of sprinkler systems is that they

require very little maintenance.   Despite the obvious advantages

of utilizing sprinkler systems to increase the level of fire

safety at AOC facilities, the AOC does not appear to have

incorporated sprinkler systems into its overall fire safety

strategy in areas where inmates are housed or congregate, nor has

it ensured that those sprinkler systems which do exist have an

Civil No. 79-4 (PG)                                                        136.

ample and reliable water supply to back them up.[29]  Furthermore,
the AOC has been unable to provide what little maintenance or
supervision these systems do require.  Sprinkler systems must be
supervised to ensure that they will be operable in an emergency.
Officers must supervise the water supply valve to ensure that it
remains open. Valves should be "indicating valves," which means
that it should be immediately obvious from just looking at the
valve whether it is open or closed; otherwise, the sprinkler
system is potentially impaired.   In at least one of the
institutions that had a sprinkler system, indicating valves were
not being used.

        Sprinkler systems should be regularly tested.  These tests
are simple and don't require any special equipment. Fire safety
officers at each facility should be able to perform those first
echelon sprinkler tests.  Nonetheless, Mr. Jaeger found that fire
safety officers did not know how to perform these basic tests and
had to show fire safety officers how to conduct them.

---

        [29]  A sprinkler system requires an ample and reliable water source.
An inadequate water supply renders the system useless.   Many of the
AOC's facilities have long-standing water supply problems which
compromise the fire safety of the institutions, including Camp Zarzal,
Zarzal Prison the Ponce complex, the Bayamón complex, the privately run
Wackenhut facility, and the Sabana Hoyos Prison.

Civil No. 79-4 (PG)                                          137.

**Combustible Loading**

        "Combustible load" refers to the combustible contents of the
building and includes all the combustibles inside the building
that are normally not associated with the construction of the
building; in correctional settings this typically includes
mattresses, bedding, the personal belongings of the inmate,
magazines, newspapers, and paper products. A common misconception
regarding fires is that the building structure itself is what
catches on fire; in fact, what burns during a fire is often the
contents of a building and not necessarily the building itself.
In addition to the sheer amount of combustible loading contained
in a building, another concern is the "continuity of combustion,"
meaning the close proximity of combustible contents which can lead
to the rapid spread of fire.

        Defendants take little or no precautions regarding the amount
of combustible loading in AOC buildings.  Many cells have more
mattresses than occupants (e.g., seven mattresses in a cell for
one).  In addition, some institutions have unsupervised storage
areas with combustible contents near or within occupied housing
units, which is extremely bad practice.  This creates a danger
that a fire can become well developed without being detected until
it has already turned into a major fire. Another common practice
at AOC institutions is the removal of fire retardant covers from

Civil No. 79-4 (PG)                                              138.

their mattresses.   Fire retardant mattress covers merely make
ignition of the mattress more difficult, however, they do not
prevent ignition.  Once ignited, these mattresses will burn well.
It is a common practice for inmates to take these covers off in
order to use them for other purposes such as shower curtains, for
privacy in cells, or to cut them into strips to use as
clotheslines. Hanging these covers in fact increases the risk of
fire spreading by making the material easier to ignite.

Bare wires constitute a fire hazard because they can be a
source of ignition, and can also lead to electrical shock (which
can also start a fire).  Bare electrical wiring and electrical
wiring problems are pervasive throughout AOC system and were
ordered removed more than a decade ago.   Bare wires endanger the
lives of inmates.   This problem was not observed at privately
operated institutions, however.

Vertical and horizontal fire areas are not separated.
Vertical and horizontal separation refers to the way a building is
designed, so that any fires will be contained to a relatively
small area by either walls, doors, ceilings, or other structural
features.  One of the problems that arises with large fire areas
is the evacuation of the entire population of the fire area at
once; for example, it may be significantly inefficient and
dangerous to evacuate a large number of inmates at once, whereas,

Civil No. 79-4 (PG)                                                139.

if a facility has proper compartmentalization, the spread of fire
might be prevented or else inmates can be evacuated in stages.
Although there are ways of compensating for the lack of adequate
vertical and horizontal separation, the AOC has apparently chosen
to take no steps to correct this problem.

Fire safety is an important and critical part of the
operation of a detention and correctional facility and somebody at
central office level must offer guidance and standards to staff at
the facility level regarding how fire safety is provided,
maintained and operated. Three persons were identified at the
AOC's central office level as responsible for fire safety: Mr.
Oscar Rodríguez, Director of Conservation and Engineering
Services; Mr. Daniel Colón, Coordinator of Safety and Fire
Control, who is responsible for fire safety training and
conducting fire safety reviews on a quarterly basis and who acts
as a liaison between the AOC and the fire department; and Mr.
Ricardo Hernández, an engineer and technical advisor on fire alarm
systems. Mr. Hernández, responsible for the regular review and
testing of fire alarm systems, was hired only in January 1999,
about the time the hearings began and at the same time that
evidence was presented showing the utter lack of fire safety at
the AOC. Defendants did not call any of these officials to
testify. Despite the fact that these three AOC officials are in

Civil No. 79-4 (PG)                                         140.

charge of fire safety issues, the necessary fire safety guidance
and assistance is quite clearly not reaching fire safety officers
or any of the other line staff at the facility level. As the
failure to maintain alarm and smoke detection systems suggests,
there is no coordination between fire safety personnel at the
central office and the persons responsible for facility
rehabilitation under the Facilities Rehabilitation Program.

    The AOC has no system-wide fire prevention and safety plan.
The only existing document approximating such a plan is the Plan
of Prevention, Suppression and Evacuation for Fires ("Plan de
Prevención, Supresión y Evacuación de Incendios").   This plan,
although not dated, is clearly at least 10 years old. Docket No.
1318.  And, in any event, it is clear that AOC institutions do
not comply with the terms and requirements set out in that
document.

    The Administration of Corrections provides a dangerous level
of fire safety to inmates and inmates are subjected to an
unreasonable risk of harm from fires.  As a general matter almost
none of the AOC operated institutions visited by the fire safety
experts provided an adequate level of safety.[30]   Mr. Tucker's
testimony, which confirmed that many of the fire safety

_____

    [30]  The privately run institutions provided a much higher level of
safety than AOC run institutions.

Civil No. 79-4 (PG)                                          141.

deficiencies observed by Mr. Jaeger during his April 1997 visits,
still existed in February 1999, exposes Administrator Laboy's
indifference to such issues.  Even after Mr. Jaeger's report was
filed in July of 1997, notifying Administrator Laboy of specific
and significant fire safety deficiencies, some of which could have
been easily remedied, defendants had not addressed those
deficiencies nineteen months later.  None of the evidence
presented in this court satisfactorily explained why this
correctional system fails so extremely to provide adequate fire
safety practices in every conceivable aspect.  Whether or not this
is attributable, as both experts appeared to agree, to "a major
operational flaw" or a "disconnect" within the agency,  the
unavoidable conclusion is that the AOC is not suitably addressing
serious and quite conspicuous deficiencies which endanger the
lives and safety of inmates in reckless disregard of Puerto Rico
fire regulations and the specific warnings contained in the
Comprehensive Report and earlier court orders.  The catastrophic
fire which killed scores of human beings in a San Juan hotel was
not expected by anyone who died or suffered in that conflagration.
There was no "experience"to warn about the risk which became
reality.  There is no "experience"of catastrophic fires at AOC
institutions but the risk is everywhere present, and everywhere
ignored by the defendants.

Civil No. 79-4 (PG)                                        142.

As the First Circuit has recognized, fire safety is an important aspect of conditions of confinement under the Eight Amendment. <u>Santana v. Collazo</u>, 714 F.2d 1172, 1183 (1st Cir. 1983), <u>cert. denied</u> 466 U.S. 974 (1984) ("Persons involuntarily confined by the state have a constitutional right to safe conditions of confinement," and "[t]he state has a duty to ensure that safety, because the individuals concerned, by reason of the confinement, cannot provide for their own safety.") (citations omitted); <u>see also</u> <u>Toussaint v. McCarthy</u>, 597 F. Supp. 1388, 1411 (N.D.Ca. 1984) <u>modified on other grounds</u> 801 F.2d 1080 (9th Cir. 1986), <u>cert. denied</u> 481 U.S. 1069, 107 S.Ct. 2462 (1987) ("Safety from fire is an aspect of 'shelter,' and as such is properly an area of Eighth Amendment concern.")

Although it is true that not every deviation from ideally safe conditions constitutes a constitutional violation, <u>Santana</u>, 714 F.2d at 1183, it is clear that the deplorable conditions described above are well below constitutionally acceptable standards.    And, although the Eighth Amendment does not constitutionalize state fire codes, or other nationally recognized standards such as the Life Safety Code, such standards may be considered in determining whether an Eight Amendment violation has occurred. <u>See generally</u> <u>Inmates of Occoquan v. Barry</u>, 884 F.2d 828, 832, 839-40 (D.C. Cir. 1988) <u>cert. denied</u> 496 U.S. 924

Civil No. 79-4 (PG)                                                143.

(1990); <u>French v. Owens</u>, 777 F.2d 1250, 1257-8 (7th Cir. 1985),

<u>cert. denied</u> 479 U.S. 817 (1986); <u>Cody v. Hillard</u>, 599 F. Supp.

1025, 1029, 1049 (D.S.D. 1984) <u>aff'd</u> 799 F.2d 447 (8th Cir. 1986).

Although defendants have been fortunate enough to avoid any

multiple-death fire emergencies thus far, the court does not need

to wait for a tragedy to occur before concluding that the personal

safety of AOC inmates is at risk to a constitutionally

impermissible degree. <u>Fischer v. Winter</u>, 564 F. Supp. 281, 300

(N. D. Ca 1983), <u>see also</u> <u>Helling v. McKinney</u>, 509 U.S. 25 (1993).

The fire safety conditions at AOC institutions are at least as

dangerous as those described in <u>Toussaint v. McCarthy</u>,:

> Fire hazards abound in lockup units at [the
> institutions]. These include the <u>electric wiring</u>,
> described above, the <u>cell bar coverings</u>, described
> above, and the many <u>flammable materials stored inside
> inmate cells</u>. . . In the light of these hazards, fire
> preparedness at both prisons is very poor.  Many
> essential firefighting resources are lacking.  None of
> the lockup units has a <u>sprinkler system</u>.  Only the San
> Quentin Adjustment Center has <u>smoke detectors</u>.  The
> ventilation systems are inadequate to remove the smoke
> that accumulates in the upper tiers of cell blocks
> during even minor fires.  Lockup inmates receive no
> instructions for <u>procedures to be followed in the event
> of a serious fire</u>, nor do they participate in <u>fire
> drills</u>.  Evacuation would quickly become difficult or
> impossible during such a fire due to physical
> conditions.   Many inmates would have to <u>travel
> substantial distances to reach fire exists</u>. . . Certain
> <u>keys needed to open some cells are not kept in the units
> at all times</u>, and the necessity of retrieving them could
> occasion further delay.

Civil No. 79-4 (PG)                                             144.

Toussaint v. McCarthy, 597 F. Supp. 1388, 1399 (N.D.Ca. 1984)
(emphasis added).  In that case the fire safety conditions were
found to be, "so blatantly inadequate as to violate the Eight
Amendment.  Id. at 1410.  Also in Women Prisoners v. District of
Columbia, the District Court for the District of Columbia found
that conditions, less egregious than those currently found at the
AOC, amounted to a constitutional violation.  Women Prisoners v.
District of Columbia, 877 F. Supp. 634, 669 (D.D.C. 1994).  Citing
overcrowding, combustible loading, lack of compartmentalization,
insufficient fire exits, the lack of evacuation procedures, manual
fire alarms or sprinklers, and inadequate drilling the court in
that case found that "The Plaintiffs have shown that the living
conditions of women prisoners at the Annex present a risk of
injury by fire so serious that it violates contemporary standards
of decency," and "create an objectively intolerable situation."
Id.

     Other Courts have considered isolated failures such as those
found at the AOC to be contributing factors to the finding of an
Eight Amendment violation such as, insufficient fire safety
training, Women Prisoners, 877 F. Supp. at 653 ("[Since] inmates
need the assistance of third parties (correctional staff) to exit
a building[, i]t is . . . crucially important to educate and drill
staff in the removal of people from the building in an

Civil No. 79-4 (PG)                                                145.

emergency."); <u>Fischer</u>, 564 F. Supp. at 289-90; inadequate smoke

detection, <u>Women Prisoners</u>, 877 F. Supp. at 654; <u>Cody</u>, 599 F.

Supp. at 1029, 1049; <u>Toussaint</u>, 597 F. Supp. at 1399, 1410;

insufficient correctional officer surveillance, <u>Cody</u>, 599 F. Supp.

at 1029, 1049; inadequate testing or maintenance of fire alarms,

<u>Women Prisoners</u>, 877 F. Supp. at 654; <u>Tillery v. Owens</u>, 719 F.

Supp. 1256, 1277-9 (W. D.Pa. 1989); <u>Cody</u>, 599 F. Supp. at 1029,

1049; <u>Fischer</u>, 564 F. Supp. at 289-290; inadequate means to

communicate existence of fire emergency to a central control area,

<u>Women Prisoners</u>, 877 F. Supp. at 655; <u>Tillery</u>, 719 F. Supp. at

1277-9; inadequate drilling or the failure to conduct drills

altogether, <u>Women Prisoners</u>, 877 F. Supp. at 653; <u>Tillery</u>, 719 F.

Supp. at 1278-9; inadequate evacuation and emergency planning,

<u>Women Prisoners</u>, 877 F. Supp. at 655; inadequate exiting, <u>Tillery</u>,

719 F. Supp. at 1278-9, including insufficient exiting <u>Women</u>

<u>Prisoners</u>, 877 F. Supp. at 654; <u>Cody</u>, 599 F. Supp. at 1029, 1049;

locked or otherwise obstructed exits, <u>Leeds v. Watson</u>, 630 F.2d

674, 675 (9th Cir. 1980); <u>Fischer</u>, 564 F. Supp. at 289-290; <u>Cody</u>,

599 F. Supp. at 1029, 1049; overcrowding and its effect on the

efficient evacuation of inmates, <u>Fischer</u>, 564 F. Supp. at 289-290;

insufficient or inadequately maintained sprinklers, <u>Cody</u>, 599 F.

Supp. at 1029, 1049; <u>Toussaint</u>, 597 F. Supp. at 1411; <u>Tillery</u>, 719

F. Supp. at 1277-9; combustible loading & continuity of

Civil No. 79-4 (PG)                                          146.

combustibles, <u>Women Prisoners</u>, 877 F. Supp. at 654; <u>Tillery</u>, 719

F. Supp. at 1278-9; bare electrical wires, <u>Toussaint</u>, 597 F. Supp.

at 1411; and inadequate compartmentalization, <u>Women Prisoners</u>, 877

F. Supp. at 654; <u>Cody</u>, 599 F. Supp. at 1029, 1049.  Given the

findings made with respect to all the different aspects of fire

safety, there can be little doubt that these deficiencies taken

together "have a mutually enforcing effect,"which deprives inmates

of the basic human need to be safe from death or serious injury in

a fire.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 304 (1991).

ENVIRONMENTAL HEALTH

Deficiencies  in  AOC  physical  structures,  maintenance,

sanitation, and environmental health practices have existed since

the inception of this case.  <u>Morales Feliciano v. Romero Barceló</u>,

497 F. Supp. 14, 31 (D. Puerto Rico 1980).

A crucial component of operating an effective environmental

health  program  is  to  incorporate  a  scheme  of  preventive

maintenance, in other words, to take steps to ensure that

facilities are not damaged and do not fall into disrepair.

Reactive, as opposed to preventive, maintenance involves remedying

problems which have already arisen.  By and large, neither

preventive nor reactive maintenance programs operate in AOC

institutions.  Many of the sanitation and water fixtures are

broken or in disrepair, and the plumbing is often defective.

Civil No. 79-4 (PG)                                    147.

Dangerous bare electrical wires and other electrical wiring problems are pervasive throughout the AOC system. The beds provided to inmates are often broken and inadequate and can cause musculoskeletal problems involving physical pain or, in the long term, musculoskeletal dysfunction. AOC facilities often have cracks in walls and ceilings and missing tiles which provide harborage for pests. At one institution, inmates had tried to fill in the cracks with soap to avoid leaking. Facilities also have peeling paint. Because of the lack of maintenance new facilities deteriorate rapidly and become unacceptably dilapidated within a relatively short period of time. Defects are evident even at recently rehabilitated facilities.

In 1987, Dr. Bailus Walker, an expert in environmental health, was engaged by the AOC to provide technical assistance in developing a flexible plan which would address these different aspects of environmental health. In late 1987, after an initial plan was developed, Dr. Sanford Brown, also an environmental health expert, was asked to assist Dr. Walker in the refinement and implementation of the plan. The environmental health plan was revised with the input of agency administrators by early 1988. Personnel responsible for environmental health and sanitation at each facility (Institutional Sanitation Officers, or ISOs) were

Civil No. 79-4 (PG)                                            148.

appointed by the AOC and trained to carry out this environmental

health plan.

Progress in environmental conditions has been arrhythmic at

best.  Docket Nos. 2009, 2559; Ex. 18-19.  The observations made

by consultants in 1997 and 1998 revealed no evidence of any

uniformly applied health program and a lack of centralized

coordination or organized effort towards the resolution of

widespread environmental health deficiencies at AOC institutions.

In 1997 Dr. Walker and Dr. Brown visited a number of AOC

institutions in order to evaluate the current state of

environmental health conditions and practices at those facilities.

The institutions visited were selected because they included

approximately 75% - 80% of the inmates in the system.  During

these site visits Drs. Brown and Walker visited the housing areas,

bathroom facilities, kitchen facilities and medical areas.  The

observations of Dr. Brown and Dr. Walker were made in light of the

environmental health plan stipulated to in this case (Docket No.

1786) which is based on standards developed by the American

Correctional Association, the American Public Health Association,

the National Health Association, the Food and Drug Administration,

and the United States Public Health Service.  In 1998 both Dr.

Walker and Dr. Brown returned to Puerto Rico in order to update

their findings, and again visited a substantial portion of the

Civil No. 79-4 (PG)                                               149.

AOC's institutions.  The Court finds that the methodology employed by these experts was sufficient to allow them to make conclusions regarding the state of environmental health in the AOC system.

Water for consumption, hygiene and sanitation is crucial for the operation of a safe correctional system.   Lack of adequate water supply increases the risk of contracting diseases associated with poor hygiene such as gastrointestinal disorders, scabies and shigella, and causes dehydration, which in turn can also cause a whole range of physiological disorders.   The failure to maintain an adequate water supply is particularly problematic in the institutional setting as it can disrupt a wide array of institutional operations, including regular sanitation, hygiene, medical services and meal services (which can be of particular concern when an inmate is on a special diet for medical reasons).  As has been true historically, AOC institutions suffer from frequent and significant water supply problems.   Water pressure levels also are too low.   When the water pressure is too low, faucets, toilets, lavatories and showers are rendered inoperable. The vacuum created within the pipes promotes deterioration and the accumulation of debris which may damage the plumbing when water flows through those systems again.   Inordinately high water pressure also damages plumbing and promotes leakage.   At AOC institutions water pressure is either too low or too high.   As a

Civil No. 79-4 (PG)                                          150.

result, the plumbing and water fixtures at AOC institutions suffer from deterioration and being poorly maintained, are damaged and leaking.

A separate problem associated with water management within a penal institution is the need for adequate drainage of waste water.  Inadequate drainage causes the accumulation of stagnant water, which in turn can promote the breeding of insects which carry diseases (such as·malaria, dengue fever, encephalitis, etc.).  At AOC institutions drainage is generally poor.  In some institutions, this is due to design/construction flaws; for example, some showers have been constructed in a way that guides waste water to flow away from rather than towards the drains and plumbing in some facilities does not have the necessary drainage capacity.  It can also be due to inadequate maintenance such as inappropriate drain coverings, or to improper sanitation practices such as disposing of food in water drains.  At AOC institutions improper drainage causes visible problems.  In Bayamón 308, improper drainage causes waste water to accumulate and infiltrate walls.  At the Ponce Complex, a flow of putrid water was accumulating outside one of the buildings.  At Guayama's provisional kitchen water used was discharged onto the floor of the yard area.  At the Bayamón Complex a kitchen floor was flooded with dirty water.  There were inmates living in flooded cells.  On

AO 72A
(Rev. 8/82)

Civil No. 79-4 (PG)                                                      151.

a number of occasions the experts saw insects breeding near accumulated water.

In the event of water shortages, whether they be island-wide or merely related to deficiencies associated with the institution, the population of a correctional environment, unlike the population in the free community, is not able to search out alternative sources of water. Inmates must therefore rely on the AOC to anticipate such water shortages and provide emergency water supplies or plans in the event of a water shortage. Stored water should be reserved in closed containers and chemically treated to avoid contamination and the breeding of infectious agents, otherwise the water is rendered unfit for human consumption and generally inadequate as a substitute for water direct from the tap. The Ponce Complex, which consists of seven institutions, does not have an emergency water supply plan in place. Because backup water supplies do not operate properly, inmates resort to storing water in open barrels for long periods without adequate chemical treatment. Even when water is available, water is stored in this improper way in anticipation of a possible water shortage.

**Sanitary Facilities & Sanitation Services**

At AOC institutions waste materials are not regularly and effectively collected, stored, or discarded. Food waste is improperly managed and discarded. Sanitary facilities, such as

Civil No. 79-4 (PG)                                                152.

washbasins, commodes and showers, are inadequately maintained and

cleaned, at times emitting noxious odors through connected areas.

Kitchen areas are also poorly cleaned.   Although some of the

laundry facilities operate satisfactorily, the laundry program as

a whole does not operate properly.   Laundry is not collected

regularly.  When it is collected, inmates sometimes do not get it

back and must resort to laundering their bedding and clothing for

themselves whenever and wherever they can.   No conventional

periodic housekeeping or sanitation program is followed at most

institutions.  Poor housekeeping and sanitation practices, as well

as the improper disposal of waste, enhance the risk of disease

transmission by promoting the growth and spread of disease-

producing organisms and creating a favorable environment for the

breeding of insects and rodents that serve as vectors of disease.

**Insects and Rodents**

An integral part of correctional environmental health is the

control of insect and rodent infestation, since these pests can

carry any number of diseases.  In order to adequately control pest

populations it is crucial that there be an effective housekeeping

and sanitation program which eliminates potential food sources for

pests.  It is also necessary to repair cracks and missing tiles

which provide harborage for pests.  Lastly, facilities should be

treated with a mild chemical pesticide which should not be harmful

Civil No. 79-4 (PG)                                                        153.

to inmates.   It is unclear whether pesticide treatments are applied at the AOC, but, because the AOC does such a poor job at housekeeping, sanitation and maintenance, pesticides would not be effective, even if they were utilized.

As a result, most AOC institutions are infested with insects and rodents.  Even though it is rare to see actual rodents during a daytime inspection unless infestation is severe, cockroaches, rats and mice are visible during the day at AOC institutions.  The infestation extends throughout the different areas of these institutions, including living areas, kitchen areas, and areas in which eating utensils are stored.

**Overcrowding and Ventilation**

The prison population must have adequate space and temperature, breathable air and sufficient air circulation to allow heat loss from the human body, particularly in Puerto Rico's hot climate and at institutions where there are frequent shortages of water for drinking and bathing.  Ex. 20 at 14-17.  Otherwise inmates are put at risk to heat related illnesses such as heat stress and heat stroke, and become more vulnerable to airborne diseases such as rheumatic fever, meningococcal disease (cerebral meningitis), pulmonary tuberculosis and accumulated allergens. At   some AOC institutions inmates are living in overcrowded

Civil No. 79-4 (PG)                                              154.

quarters.  In addition, inadequate measures are taken to properly

ventilate closed facilities.

**Food Sanitation & Hygiene**

Generally, the AOC is doing an unsatisfactory job with food

preparation.[31]   Compliance with acceptable food sanitation

standards were measured using an itemized evaluation form

developed by the Food and Drug Administration and the U.S. Public

Health Service.[32]  Usually, in order to be considered to have met

minimally acceptable health standards, a kitchen area must obtain

a score of eighty or higher (out of one hundred) and not have a

violation of any of the five point items (such as meat storage

temperature, storage of toxic items, etc.) which are considered to

be critical.  Out of five AOC prison kitchens examined, only one

was found to be acceptable under this instrument.[33]  Each other

kitchen scored well below the minimum eighty points and had

violations of five point items.[34]

_____

[31]   The situation was notably better at the privately operated
institutions.

[32]   This instrument is utilized by the Puerto Rico Health
Department and almost universally throughout the United States.

[33]   Although only five kitchens were examined, each of these
kitchens feed inmates at various institutions.

[34]   Ponce's kitchen, which prepares food for Ponce Maximum, Ponce
Minimum, Ponce Women and Young Adults, Ponce Classification, Ponce Main,
Ponce Annex 246, and Ponce Adults, received a score of 47.  One Bayamón
kitchen area received a score of twenty two out of a hundred.

Civil No. 79-4 (PG)                                          155.

Throughout AOC institutions, deficiencies in food handling
were found (e.g. handling food with bare hands, failure to wear
hair restraints, aprons, and clean clothing). The improper storage
of food and food waste attracts rodents in kitchen areas. Spoiled
food was found stored at the kitchen of the Bayamón complex. Food
is kept at temperatures that are inadequate to prevent spoilage or
contamination. Utensils and surfaces used for food preparation
are often unclean and make food vulnerable to contamination. In
addition, the AOC does not provide special diets for inmates with
conditions such as diabetes, hypertension, or high cholesterol
which interferes with the effective treatment of these and other
medical conditions and may provoke health complications associated
with these diseases.

**Incidence of Illnesses Associated with Environmental Conditions**

Dr. Ingrid Fernández testified as an expert witness on
infectious diseases, the control of infectious diseases, auditing
of infectious disease, the epidemiology and generally in medicine.
In preparation for her testimony, Dr. Fernández compiled
information regarding the occurrence at AOC institutions during
1998 of illnesses which are closely associated with certain
environmental conditions, including chicken pox, influenza,
pediculosis, scabiosis, conjunctivitis, gastroenteritis, Hepatitis
A, and impetigo. The data collected was based on information

Civil No. 79-4 (PG)                                          156.

reported to the AOC central office by infection control nurses at

the various institutions.  As a member of Correctional Health, Dr.

Fernández has observed conditions at many AOC institutions which

are related to the diseases which have been reported at those

institutions.

Chicken pox is an airborne disease, but it can also be

contracted through direct contact with the skin of an infected

patient.  The disease is therefore closely related to conditions

of overcrowding and poor ventilation.  In adults, chicken pox is

a serious illness which can have quite serious complications,

including pneumonia, comma, and death. For HIV patients chicken

pox is even worse and is usually lethal unless special treatment

is administered.  In 1998 outbreaks of chicken pox occurred at

Bayamón, the State Penitentiary, and Ponce.  Influenza is also an

airborne illness, yet it can also be contracted by direct contact

and is an indicator of poor ventilation as well as poor hygiene.

Influenza outbreaks occurred at the State Penitentiary and Camp

Juana Diaz.

Pediculosis is contracted through live infection of the hair

in the head, face or pubic area, direct contact with the skin of

infected patient or direct contact with contaminated clothing,

personal utensils, beds or padding and is therefore most closely

associated with overcrowding as well as hygiene and general

Civil No. 79-4 (PG)                                                157.

sanitation.   Outbreaks of the disease occurred at Ponce Women and
Vega Alta, which is probably due to the fact that the disease is
more easily transmitted in women than in men because women tend to
have   longer   hair   than   men   and   because   female   correctional
populations tend to have prostitutes which raises the probability
of having pediculosis as a sexually transmitted disease.   The
numbers  are  significantly  lower  in  Vega  Alta  than  in  Ponce,
probably because the latter is more crowded and because Vega Alta
has a better infection control system.   Other incidences of the
disease were found at Bayamón 308 and State Penitentiary.

     Scabiosis is transmitted by a mite that burrows into the skin
and which can be contracted through direct contact and contact
with contaminated bedding, towels, clothing, and personal hygiene
items.   Like pediculosis, scabies is an indicator of general
hygiene and sanitation and can be associated with overcrowding.
Scabiosis is rampant throughout the AOC.   In the Ponce Complex and
in the Bayamón Complex (where 298 cases were noted in 1998) the
situation  with  this  illness  is  particularly  uncontrolled.
Treatment includes shampooing of the patient with special soap and
disinfection of the patient's room or cell, including laundering
of towels, bedding, and clothing.   If this disinfection is not
properly coordinated the patient will simply become infected again
from contact with contaminated articles.   The failure to control

Civil No. 79-4 (PG)                                               158.

scabiosis outbreaks is due, in large measure, to defendants'
inability to coordinate these necessary sanitation measures.

Conjunctivitis is transmitted though direct contact with the
skin of an infected patient and through direct contact with
contaminated clothing, personal utensils, and bedding, and is
therefore associated with general hygiene, sanitation and
overcrowding.  Conjunctivitis is common at AOC institutions and
its incidence rose after September 1998, probably due to water
supply problems following Hurricane Georges which affected
hygiene.  Impetigo, an airborne bacterial disease which can also
be contracted through direct contact with the skin of the infected
patient or through contact with contaminated clothing, personal
utensils, beds or padding, is associated with overcrowding, poor
ventilation and poor hygiene.  A high incidence of impetigo was
noted in Bayamón 1072.  An extremely high incidence of topical
fungal infections, which develop from wearing shoes for long
periods of time or from lack of sanitation in showers and
bathtubs, occurred throughout the AOC system.

Gastroenteritis and Hepatitis A, transmitted through
oral/fecal contact, are indicators of the level of personal
hygiene and sanitation at an institution.  An outbreak of
gastroenteritis at the State Penitentiary was most likely
associated with water supply problems and improperly functioning

Civil No. 79-4 (PG)                                                      159.

toilets.  In addition, a breakout of gastroenteritis in Guavate

was traced back to fluctuations in electricity which affected the

storage temperature of meat served to inmates.   A high incidence

of gastroenteritis was also noted at Zarzal.   There were high

incidences of Hepatitis A at Bayamón, State Penitentiary, and

Sabana Hoyos.   The problems at Bayamón and the State Penitentiary

are most likely the result of water supply problems and lack of

access to clean water.  The outbreak noted at Sabana Hoyos, which

has also been reported to have water supply problems, lasted

throughout the year, and appears not to have been adequately

controlled.

     The trends in illnesses reported at AOC institutions show a

significant number of cases of diseases associated with poor

environmental conditions.  In particular the Bayamón institutions

show the highest incidence of such illnesses, followed by Ponce

and State Penitentiary.  The primary factors contributing to these

illnesses are overcrowding and personal hygiene, i.e. access to

soap and water, to hand washing facilities, to frequent baths or

showers, laundering for towels, not sharing personal items such as

mattresses, bed sheets, drinking receptacles, and adequate and

effective elimination of fecal matter.

Civil No. 79-4 (PG)                                           160.

## AOC Central Office

As is evident, the current condition of AOC environmental health is unsatisfactory and puts inmates at increased risk of disease and dysfunction. Since the late 1980s, there has been only minimal and sporadic improvement in the environmental health conditions at AOC institutions. The assessments made in the Comprehensive Report submitted to this court in 1997, remain largely true as of the time that these hearings were held. The observations made by experts in 1997 and 1998 revealed no evidence of any uniformly applied environmental health program and it is clear that there is no centralized coordination or unified effort towards the resolution of widespread environmental health deficiencies. By and large the problems and deficiencies noted in the last two years by Drs. Brown and Walker are problems which they have observed time and again during the more than ten years of their involvement in this case.

The environmental health plan developed in 1988 has gone largely ignored. The specialization and training of a group of staff as Institutional Sanitation Officers (ISO's), who would be responsible for environmental health and sanitation at each facility, was abandoned. Although this corps was considered to be vital to the implementation of the environmental health plan, the ISO program was never formally adopted as AOC policy, and

AO 72A
(Rev. 8/82)

Civil No. 79-4 (PG)                                            161.

throughout the AOC only three or five ISOs continue to work in a few institutions. In fact, there is no evidence of any current maintenance, sanitation, housekeeping, cleaning, or any other environmental health policies, formal or informal, written or not. Certainly, no documentary evidence of any such policies, programs etc. was produced either to the experts who inquired about such policies, or by Defendants at the hearing. Furthermore, the observations made by the experts about the state of affairs at the institutions visited reveal that no such plan is actually in place.

The degree of compliance or noncompliance with acceptable environmental health standards varied from region to region, complex to complex, institution to institution, and within institutions, a trend which can be attributed to the failure of centralized leadership in the development and implementation of environmental health policies, a system of accountability for noncompliance and the failure to establish a mechanism for monitoring compliance.

**The Law of Environmental Health**

The Supreme Court has noted the states' affirmative duty to adequately provide for the basic human needs of inmates, including basic safety. <u>Helling v. McKinney</u>, 509 U.S. 25, 32 (1993); <u>see also Bagola v. Kindt</u>, 131 F.3d 632 (7th Cir. 1997) ("The Eighth

Civil No. 79-4 (PG)                                    162.

Amendment's prohibition against 'cruel and unusual punishments'
does not only restrain affirmative conduct, such as prison
officials' use of excessive force against prisoners.  It also
imposes duty upon prison officials to provide humane conditions of
confinement and to 'take reasonable measures to guarantee safety
of inmates.'") (citations omitted).  "Sanitary and hygienic living
conditions are among the necessities guaranteed by the Eighth
Amendment." Martin v. Lane, 766 F. Supp. 649 (N.D. Ill. 1991);
see also Howard v. Atkinson, 887 F.2d 134, 137 (8th Cir. 1989)
("Inmates are entitled to reasonably adequate sanitation, personal
hygiene, and laundry privileges . . . .").

     Conditions such as those described above have been considered
in countless other cases in establishing the existence of an Eight
Amendment violation. E.g. Keenan v. Hall, 83 F.3d 1083, 1090-1
(9th Cir. 1996) (inadequate ventilation, inadequate food and
drinking water) amended and reh'g denied 135 F.3d 1318 (9th Cir
1998); Tillery v. Owens, 907 F.2d 418, 423, 427-8 (3rd Cir. 1990)
(unsanitary conditions caused by the lack of a housekeeping
program, inadequate ventilation, infestation of vermin, inadequate
plumbing, damaged water fixtures, standing water); Jackson v.
State of Arizona, 885 F.2d 639, 641 (9th Cir. 1989) (unsanitary
food handling and polluted water); Johnson-El v. Schoemehl, 878
F.2d 1043, 1054-5 (8th Cir. 1989) (inadequate kitchen sanitation);

Civil No. 79-4 (PG)                                                163.

Gillespie v. Crawford, 833 F.2d 47 (5th Cir. 1987) (inadequate

ventilation, insect infestation, generally filthy conditions);

Hoptowitt v. Spellman, 753 F.2d 779, 783 (9th Cir. 1985) (plumbing

problems, vermin infestation, ventilation problems, standing water

and flooded toilets and sinks); Martin v. Lane, 766 F. Supp. 641

(N.D. Ill. 1991) (infrequent access to showers resulting in a skin

condition); Touissant v. McCarthy, 597 F. Supp. 1388, 1409-10

(N.D.Ca. 1984) (inadequate plumbing, inadequate temperature and

ventilation, hazardous bare electrical wires), rev'd in part on

other grounds and remanded 801 F.2d 1080 (9th Cir. 1986), cert.

denied 481 U.S. 1069 (1987); Dawson v. Kendrick, 527 F. Supp. 1252

(S.D.W.Va. 1981) (poor plumbing, unclean towels, clothing and

bedding, inadequate housekeeping resulting in an unclean

environment, inadequate kitchen sanitation); Owens-El v. Robinson,

442 F.Supp. 1368 (D.C.Pa. 1978) (failure to provide adequate beds

or other sleeping facilities).[35]

---

[35] "In determining when prison conditions pass beyond legitimate
punishment and become cruel and unusual . . . . [t]he court must examine
the effect upon inmates of the condition of the physical plan (lighting,
heat, plumbing, ventilation, living space, noise levels, recreation
space); sanitation (control of vermin and insects, food preparation,
medical facilities, lavatories and showers, clean places for eating,
sleeping, and working); safety (protection from violent, deranged, or
diseased inmates, fire protection, emergency evacuation); inmate needs
and services (clothing, nutrition, bedding, medical, dental, and mental
health care, visitation time, exercise and recreation, educational and
rehabilitative programming); and staffing (trained and adequate guards
and other staff, avoidance of placing inmates in positions of authority
over other inmates) . . . When 'the cumulative impact of the conditions
of incarceration threatens the physical, mental, and emotional health

Civil No. 79-4 (PG)                                            164.

Various conditions of confinement, taken together, will establish an Eight Amendment violation when "they have a mutually enforcing effect that produced deprivation of a single identifiable human need," Wilson v. Seiter, 501 U.S. 294, 304 (1991), specifically that of sanitary and hygienic living conditions and reasonable safety from disease. It is clear that some of the conditions described above taken by themselves, without considering the larger picture with respect to environmental conditions, would be sufficient to establish an Eight Amendment violation. E.g. Hoptowitt v. Spellman, 753 F.2d 779, 783 (9th Cir. 1985) (Plumbing and water supply problems which disrupted basic hygiene of the inmate population was, alone, sufficient to establish a Eighth Amendment violation.). Even if this were not the case, the evidence on environmental conditions presented in this case and, in particular, the failure of the AOC central office to implement an environmental health plan stipulated to and developed by the AOC, or to take any affirmative steps to remedy system wide environmental health deficiencies, unquestionably demonstrates that these environmental conditions, taken together, conspire to place inmates at serious risk of pain

_____

and well being of the inmates and/or creates a probability of recidivism and future incarceration,' the court must conclude that the conditions violate the Constitution." Rhodes v. Chapman, 452 U.S. 337, 364 (1981) (Brennan, J., concurring) (citations omitted).

Civil No. 79-4 (PG)                                        165.

and physical harm from illness, <u>Wilson</u>, 501 U.S. at 304, and

clearly demonstrate the defendants' reckless disregard of danger

to the plaintiffs' health.


## FACILITIES REHABILITATION PROGRAM

The Facilities Rehabilitation Program grew out of sections

17, 18, and 19, of the <u>80th Report of the Court Monitor — Report</u>

<u>Recommending Adoption of Plans on Facilities and Environmental</u>

<u>Conditions</u> (the "Environmental Plan"; Docket No. 1786). Those

sections required the AOC to undertake an evaluation of

structural, electrical, and plumbing deficiencies at its prisons

and to prepare a plan for correcting those deficiencies. The

Court confirmed the Environmental Plan on March 30, 1990 and

enjoined defendants to implement the plan. <u>See</u> Opinion and Order

dated March 30, 1990 (Docket No. 2137). The project by which

defendants would implement sections 17, 18, and 19 of the

Environmental Plan has become known as the Facilities

Rehabilitation Program (FRP). The FRP offered the Commonwealth

the unique opportunity to convert dilapidated facilities into

safe, modern ones.

The history of the FRP from its inception has been

contentious, and has included the appointment of a special master

to execute a contract on the AOC's behalf with a firm to perform

Civil No. 79-4 (PG)                                                          166.

the evaluations, planning, and correction of the environmental deficiencies encompassed by the FRP. See Order Appointing Special Master, dated July 17,1991 (Docket No. 3064). Although the parties agreed to supplant the special master's ultimate recommendation, to which the Court reluctantly acquiesced, see June 29, 1992 Order Authorizing Execution of Contract, Accepting Final Report of Special Master, and Relieving Special Master of his Duties (Docket No. 3758), efforts under that agreement led to further litigation, culminating in the termination of the contract with the firm selected by the parties and a new stipulation executed June 3, 1994 (the "FRP Stipulation"; Docket No. 5093). That stipulation was approved and defendants were enjoined to implement it in an order dated December 5, 1994. (Docket No. 5429). The stipulation provided, *inter alia*, for an FRP Director to be appointed by the Governor with the approval of the Court, and for the hiring of a new program manager pursuant to a contract to be approved by the Court. Evidence presented at the hearing regarding the current status of the FRP painted a disturbing picture.

Although new FRP construction projects were scheduled to commence in 1998, none were initiated. Mr. Ramón Mellado, the current FRP Director (nominated by the Governor and appointed pursuant to the FRP Stipulation), testified that the delays in

Civil No. 79-4 (PG)                                      167.

initiating projects have resulted primarily from two problems.

First, FRP projects have been delayed because of lack of

relocation housing.   Second, budgeting problems have hampered

efforts to initiate new projects.

In spite of the construction of a number of housing units

intended for relocating inmates during the FRP process, from the

start the AOC has occupied these units as part of its regular

stock of housing, rendering the relocation units unavailable for

their intended purpose.   This problem has existed for some time.

Lack of relocation housing has resulted in the termination of at

least one project that was undergoing construction.  Administrator

Laboy is aware of the shortage in relocation housing and its

effect on the FRP.

The second primary cause of delays has been cash flow

problems caused by interference from the Director of the

Commonwealth's Office of Management and Budget.[36]  Although the FRP

Director had obtained a line of credit from the Government

Development Bank (GDB) to finance new projects in 1998, the line

of credit could not be activated until some months later because

------

[36]  Mr. Jorge Aponte is the Director of the Office of Management
and Budget ("Oficina de  Gerencia y Presupuesto," hereinafter "OMB").
The law creating this office clearly shows that the Hon. Governor Pedro
Roselló, who is a Defendant in this suit, exercises authority over the
Director of the Office of Management and Budget.  Law #110 of June 18,
1980, P.R. Laws Ann., tit. 23, §§101 et seq.

Civil No. 79-4 (PG)                                                           168.

the OMB Director refused to provide the necessary assurances to the GDB that the line of credit would be paid, and actually attempted to cause the FRP Director to eliminate all new rehabilitation work from the FRP's budget for the following fiscal year.[37]  All of this has resulted in delays in commencing new FRP projects.

Even the employment of a program manager, which was a core aspect of the FRP Stipulation, has suffered.  The AOC's contract with Rosser R&G, the program manager selected following the execution of the FRP Stipulation, had expired in June 1998 and still had not been renewed as of the date of the hearing: the previous contract has been extended for brief periods of time pending execution of a new contract.  The lack of both a finalized, updated work plan and the lack of funds resulting from the OMB Director's refusal to activate the GDB line of credit have contributed to the inability to draw up and execute the contract.

The work plan is a crucial element of the FRP process, as it contains the budget and schedule plans for the entire program.  See FRP Stipulation (Docket No. 5093).  The work plan for the FRP has not been updated since September 1997, even though an update was supposed to have been completed by April 1, 1998.

---

[37]  It is not clear what forces, if any, intervened to put a stop to this, but the request was subsequently rescinded.

Civil No. 79-4 (PG)                                                     169.

The defendants' failure, after more than four years, to achieve any real progress in carrying out the FRP is due to their refusal to foster expertise in maintenance operations in the management of the AOC. This is of special concern, given the FRP Director's testimony and statements in his December 1998 Quarterly Report indicating that poor maintenance is having an adverse effect on FRP projects. It is clear that this area is receiving inadequate attention within the context of the FRP.

The FRP structure is undergoing reorganization. Yet this reorganization will have little bearing on the lack of temporary space. Testimony from other witnesses, recounted elsewhere in these findings, evidences serious deficiencies in the quality of the construction work that has gone into the FRP. Ponce Minimum has cracks in the walls and ceiling, as well as water seeping into light fixtures. Contractors have installed fire detection systems which are inappropriate for the environment and institutions in which they were installed; on the other hand, in most cases these systems either ceased to work very soon after installation or else never worked in the first place. Systems that were appropriate, such as manual fire alarms, also do not work.

Other testimony can only lead to the conclusion that either inmates or staff, or both, have sabotaged improvements installed as part of the FRP. Emergency doors, which were installed to

Civil No. 79-4 (PG)                                              170.

improve safety, have been welded shut, essentially rendering them useless and creating a fire hazard.  Wiring at Sabana Hoyos Annex 384 dormitories was ripped out of the walls, apparently by institutional staff, for unexplained reasons.

Nevertheless, the facts that were developed demonstrate that problems with the FRP have resulted in conditions that pose an unreasonable risk to the health and safety of inmates.  It is of serious concern that the lack of relocation housing has caused the AOC to terminate rehabilitation work on the dormitories at Bayamón 308.  These dormitories were, in the opinion of fire safety expert Thomas Jaeger, among the worst he had ever seen in his life.  Both Dr. Bailus Walker and Dr. Sanford Brown, the Expert Witness' consultants in environmental health, recommended that the dormitories be shut down as unfit for human habitation.  Thus, the cessation of rehabilitation activities at Bayamón 308 has resulted in the prolongation of inmates' living in inhumane conditions.

By sealing off emergency exits in rehabilitated buildings, by not maintaining fire safety systems, and by installing inappropriate fire safety systems at various institutions, defendants have essentially taken affirmative actions that place inmates at immediate risk of injury or death from fire.  The failure to provide adequate fire protection at the relocation

Civil No. 79-4 (PG)                                              171.

housing at Bayamón 448 also constitutes a risk to inmates' health and safety.

Thus far the FRP has had little success, lack of control, and lack of accountability.   There continues to be disagreement between the AOC and the FRP office with respect to matters of design and mission.   There has been little consideration to the effect of haphazard construction on the AOC's basic infrastructure, e.g., that adding a significant number of beds to a prison is going to affect the existing water supply.

Interference by other government agencies, increases in change orders leading to claims by contractors against the AOC, terminated projects, inappropriate fire safety systems installed at significant expense, delays due to the AOC's inability to manage its population, inadequate security measures applied to construction sites (described in Section VI of these findings), deterioration and sabotage in rehabilitated facilities: all are alerts that the FRP itself requires much more extensive oversight.


## A REMEDY

The court is well aware that prison administrators are to be given a first opportunity to remedy the unconstitutional deficiencies found to still exist in the prisons operated by the Administration of Correction, and that the court should defer to

Civil No. 79-4 (PG)                                            172.

the expertise of prison administrators.  Lewis v. Casey, 518 US

343 (1996); Turner v. Safley, 482 US 78 (1987); Bounds v. Smith,

430 US 817 (1977); Preiser v. Rodríquez, 411 US 475 (1973).  The

court finds, however, that AOC initiatives have remedied nothing

and the evidence presented by defendants at the hearings show that

proposed action are either unfunded, unplanned or insufficient and

will not provide a coherent structure to prevent constitutional

harm to plaintiffs.  The court further finds that there is such a

scarcity of correctional management and administrative expertise

in the operations of the Administration of Corrections that the

court has no one to whom deference can be shown.

     The court requested proposals for a remedy from plaintiffs

and defendants at the conclusion of the hearings last March.  At

this late stage, the defendants request a free hand ( vacation of

all previous orders) to prepare a necessary comprehensive plan

which they will now develop if the court provides funding.  The

record of this case and the findings and conclusions in this

opinion and order make it abundantly clear that the court cannot

abdicate authority and responsibility to the defendants, who have

failed repeatedly to come up with their own solutions, have failed

to execute their own proposals, and have turned their back on

court orders.  Nor can the court accept American Correctional

Association standards as substitutes for the court's own "duty to

AO 72A
(Rev. 8/82)

Civil No. 79-4 (PG)                                    173.

determine by its own judgment the controversy presented." <u>Kimberly</u>

<u>v. Arms</u>, 129 US 512, 524 (1889), quoted in <u>Reilly v. United</u>

<u>States</u>, 863 F 2d 149, 157 (1st. Cir. 1988).[38]   This court cannot

accept defendants' proposed remedy without joining them in a

flight from reality.

The plaintiffs' proposal that the court should appoint a

technical and confidential advisor to aid the court in developing

a remedy is better grounded on the record of this case and the

evidence before the court.   The plaintiffs' expert witness, Mr.

Steve J. Martin, has vast experience in corrections and in reform

litigation.   During many years of work in this litigation he has

acquired a profound knowledge of AOC operations and the

organizational problems that need to be corrected.   His testimony

now and always has been candid, fact-bound, and non-adversarial.

The court finds that his testimony and recommendation on the

advisability of appointing a technical advisor to the court in the

fashioning of a remedy is the most reasonable method to develop an

efficient remedy.

---

[38]   The basic irrelevance of associational standards to judicial
determinations of constitutional issues has long been established: <u>Bell</u>
<u>v. Wollfish</u>, 441 US 520, 544 n. 27 (1979) held that, while
recommendations developed by American Public Health Association,
American Correctional Association, the National Sheriff's Association,
and Federal Corrections Policy Task Force of the Department of Justice,
"may be instructive in certain cases, they simply do not establish the
constitutional minima; rather, they establish goals recommended by the
organization in question".

Civil No. 79-4 (PG)                                                      174.

Both the plaintiffs and the defendants, however, agree that it is time to provide a comprehensive, long term plan to achieve operational and administrative efficiency at the AOC. The parties also agree that the time has come for clarification of the remedial structure develop in this litigation. The court does expect defendants to participate actively in this procedure. The evidence so extensively discussed in this opinion is a determination by the court of the present operative facts and applicable law, which the defendants must act on. Defendants must not continue to make tendentious selections of the record to propose unreasonable remedies.

The substantive and procedural law on the appointment of a technical advisor has been clearly explained by our Court of Appeals in Reilly v. United States, 863 F 2d 149 (1st. Cir. 1988). The first step in plaintiffs proposal, which is compatible with Reilly, is the determination of facts and law as set out in this opinion. The second and third steps, which the court also accepts, is the preparation of a charge or set of written instructions to define the technical advisor's work: see, Reilly, 863 F 2d at 158 ("We agree that it would have been better practice to document the interchange between jurist and advisor in some more readily retrievable fashion."); Id at p. 159 ("We also think that there is much to commend the performulation of a written job

Civil No. 79-4 (PG)                                                    175.

description for the advisor [...]."  The court must alto find and notify the parties of the advisor's identity.  <u>Reilly</u> at p. 159.

There is obvious need for the appointment of a correctional technical advisor in this case.  The court simply needs the know-how, in a complex, multidimensional area, to prepare a comprehensive order.  The defendants are unable or unwilling to come up with a sufficiently specific proposal and they have failed to do so for years.  The court cannot rely exclusively on plaintiffs' experts and counsel.  The court needs its own "sounding board" to help "to educate himself in the jargon and theory disclosed by the testimony and to think through the critical technical problems."  <u>Reilly</u> at p. 158.

IT IS THEREFORE ORDERED that plaintiffs and defendants are granted until March 1, 2000 to submit to the court proposals on the advisor's charge or scope of work.

IT IS SO ORDERED.

At San Juan, Puerto Rico, this 25th day of January 2000.

                                          JUAN M. PEREZ GIMENEZ
                                          US District Judge

AO 72A
(Rev. 8/82)