**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

CARLOS MORALES FELICIANO, et
al,

    Plaintiffs,

        v.

HON. ANÍBAL ACEVEDO VILA, et
als,

    Defendants.

CIVIL NO. 79-4 (PG)

**OPINION AND ORDER**

1.    Twenty years ago the Plaintiff Class and the Defendants entered into a Stipulation after consultation and study, that required the defendants to file plans within 90 days from the court's final approval of the Stipulation that would require, among many other things, "the elimination of all padlocks as locking devices where such padlocks create a substantial fire or security risk." (Stipulation, p. 7; Dkt. 979). The matter was not settled then. On September 1, 1994 a further Security Stipulation (Dkt. 5242) was entered upon requiring the Administration of Corrections to set up and operate lock shops to repair and maintain the electric locking systems which operate both cell and hallway gates at many institutions. Today the court finds the defendants in contempt

of both orders because the evidence presented during the hearing held on October 15 through October 17, 2007, establishes beyond any doubt that the Secretary of Corrections is in "clear and undoubted disobedience of a clear and unequivocal command." Kraft v. Police Commissions of Boston, 417 Mass 235, 239; 629 N.E. 2d 995 (1994).

    2.    Literally on the eve of the hearing set by the court for October 15, 2007, the Defendants, pretended to obtain expert opinion to oppose Plaintiffs' well founded claims.  Contrary to their barefaced denial, one plaintiff's testimony and voluminous medical record was placed in evidence to maintain the Plaintiffs class' claims that grievous bodily harm is imminent; in this case, second degree burns and the serious consequences of smoke inhalation due to a burning mattress and a non-working fire sprinkler system.    Then the Plaintiffs presented overwhelming evidence of the dangers prevalent through Puerto Rico's prisons because of padlocking and closing mechanism deficiencies in institutions where fire alarms and sprinkler systems have been abandoned.

### THE EXPERT'S TESTIMONY

    3.    The plaintiff class presented one expert witness, Mr. Alfred J. Longhitano, a professional engineer, who was proffered, and accepted, as an expert in fire protection engineering, life safety analysis and investigations pertaining

to life safety issues.  Mr. Longhitano has a bachelor's degree in mechanical engineering and is a licensed professional engineer in New York, New Jersey, Pennsylvania, Maryland, Florida and Puerto Rico, where he has an extensive number of government and private clients.  He has been previously qualified as an expert in fire protection by the court, and has visited approximately thirty-three AOC institutions in 2000, 2002 and 2007.[1]  He has inspected at least one hundred correctional facilities and has conducted up to two-thousand site inspections including nursing homes and other residential facilities.  He also inspected the MDC at Guaynabo, which he certified for life safety compliance for the Federal Bureau of Prisons.

4.   His curriculum vitae was marked as Plaintiffs' Exhibit 11 and his Report as Exhibit 12.  His testimony was of particular value to the court; it was fact bound, specific and extensively explained, and he could, and did, spell out which institutions had in any way improved and which have become worse since 2000, and specified the degree of dangerousness which each institution presented to the inmates living there.  Thus, we quote *in extenso* from his testimony and give it entire credibility.

---

[1] Mr. Longhitano has acquired a broad background on fire and life safety code writing and experience to match in working with insurance associations and the National Fire Protection Association.

5.   The first aspect the court must underscore is the expert's understanding of the peculiarities and challenges of prison fire safety.  Unlike people in a courtroom, who are free in the event of a fire to get up and leave by way of the exits, where there is not the kind of a challenge that there is in a prison setting where people are locked up in cells and dormitories and do not have the authority to take care of themselves and save themselves.   This is not unique to correctional facilities.    In fact, it is almost identical to conditions that exist in hospitals and psychiatric facilities throughout the nation   where people are either confined by locking systems (primarily in psychiatric facilities) or they are confined by medication that prevents them from being able to save themselves, or just because their physical condition is so bad that they cannot save themselves.

6.   And one other important difference: prison inmates have a long history of building fires in the areas they occupy, which increases the exposure, not only to the inmates that start the fire, but to everyone around them.   (T. pp. 11-12 for October 16, 2007.)   With this in mind, the court now turns to the expert's testimony on the dangerousness or not of individual prisons.

7. First, let us set out Mr. Longhitano's standards. During cross-examination by Defendants he stated "I would say

using the word high or the word extreme means it's predictable that if there is a fire, someone will be injured or killed. And in the cases that I can say that it's low likelihood, I think it's still possible that somebody would be killed or injured, but it's not so likely." (T. p. 85; 16 October 2007).

8. And then he generally explained why there is no systematic resemblance and why there should not be, throughout AOC institutions, and why he does not expect that the Defendants will be able to fix these problems without guidance.

> Well, generally, what it means is that when these institutions were built, they were not built uniformly. They didn't take one building design and use it as a cookie cutter to make out the others. So because the buildings are of different designs, the risks are different. And they really aren't being treated that way.
>
> It's kind of like the fire protection plan is a one size fits all. And it doesn't fit all.
>
> In some of the buildings, just by the nature of the pen construction, if you do almost nothing to provide additional safety, the only person who is at risk is the person who is in the cell where the fire starts.
>
> You can take that same cookie cutter design, which you found in almost all of the institutions, you find some buildings that are built from the design, and they will be reasonabl[y] safe. Take that same design and instead of putting individual cells in it, you make it dormitories, you've changed the risk. You've now taken the combustible material of one cell as the source of the fire, and you've now made it the combustible

material from 15 to 20 mattresses, plus all the bed linens, plus, whatever else the inmates have in that dormitory.

[.....]

Some towels. You now have large amounts of combustible material. The hazard is different. The risk is different. You can build a much bigger fire not that it takes a lot of mattresses to build a big fire. Just a single mattress manipulated the right way can make a fire that is big enough that it would be dangerous to anybody who tries to come and try to rescue the individual in his cell.

I'm sure the defendants are familiar with something called a Michigan roll.

[...]

The inmates will take a mattress and kind of roll it up lengthwise, so that they create something looks like a chimney. And they tie it together with strips of bed sheets, and stuff a little paper or some linens in the bottom of it, and set fire to the bottom of it. And there is a chimney where you get lots of reflection of heat back and forth inside the chimney. And the mattress will go up and create a fire that you would not believe that you could see from a single mattress burning. It's really serious fire.

But because of the fact that these institutions are built with concrete walls between the cells, a fire is not going to spread from one cell to the next. And once the fire and smoke go out of the front of the cell, if the roof is open, everything ventilates to the outside.

Again, go back to that same building design and make it a dormitory-type housing operation, and now you have as many as 22

inmates in the dormitory who are exposed to that fire with only one door that requires someone to go with a key with fire burning out through the bars of the cell of the dormitory, has to go in with a key and try to unlock this to let people out.

It's an entirely different risk, and it exposes many more people to serious injury and death.

Q. From the different inspections that you have conducted, particularly the ones of July of this year, did you get the sense that people at the AOC were addressing the difference in risks, as you have just taken measures to address the difference in risks in different institutions?

A. I don't believe so. I certainly didn't see evidence that those differences were being addressed any differently.

Just as an example, in Building C in 308, having-basically, there's just one big dormitory. Each housing unit is one big dormitory where you can accumulate a tremendous amount of combustible material.

If a fire gets started, or let's say more than one fire gets started-it's not unheard of in institutions-arson is a pretty common thing-you can cut off all the exits by having fires at two ends of the facility at the same time.

It is not addressed. The only way you can address that type of risk is [] either to have firemen standing there with charge those lines waiting to put a fire out, which is not likely to happen, or to have some sort of automatic extinguish system that puts out the fire. And those things don't exist. **(T. pp.68-71 id.)**.

9.    On July 8 through July 12, 2007, Mr. Longhitano

inspected the following institutions:

                    Bayamón 501
                    Bayamón 308
                    Bayamón 292
                    Vega Alta
                    Guayama 500
                    Ponce 1000
                    Ponce Max
                    Ponce 304
                    Ponce Women
                    Ponce Main
                    Bayamón 1072

     10.  He also visited Guayama 945 but inadvertently omitted
to include his findings in his report:  although the Defendants
had his notes, in which his observations on Guayama 945 were
included, on their objection the court excluded his testimony on
this institution.

     11.  Of these institutions some were of low dangerousness,
Building 5 at Bayamón 1072 where there are single cells is such
a building:  a fire started in one cell will harm the inmate in
that cell; it can however kill him even if smoke escapes.  And
at night there is only one officer to supervise 114 inmates.
The risk of a mayor conflagration is unlikely.  But at the same
Bayamón 1072 Buildings 7 and 8 are constructed and operated as
dorms.  A big fire can be built in there with just mattresses
and sheets.  These buildings are at the remote end of the
housing area from where the officer is stationed.  And Mr.
Longhitano stressed that, "Again with one officer on night
shift, if a fire starts in one of those dormitories, it's almost
guaranteed that lives are going to be lost."  (T. p. 32 for

October 16, 2007.)

12.  The same design, where all doors have to be operated
manually, the same protection is offered by the building design
-- what Mr. Longhitano called the 'open roof'.  So here "[...]
it's very unlikely that there would be a serious life loss fire"
at Guayama 500 (T. p. 65 for October 16, 2007.)

13.  The same would also be true for Ponce Main, where,
additionally, there is an officer located in the housing area
with the key that opens all the padlocks.

14.  Ponce women would also be a facility where one can
expect a fire to be certainly serious to the person in a cell
where a fire starts but not in exposure to other inmates or
correction officers (T. pp. 60-61 for October 16, 2007.)  Ponce
Max would also be a low risk institution for fire loss of life
because of the building, the electronic control of cell doors
and because inmates are locked up all the time.  (T. p. 58 id.)
This institution shows great improvement since 2000 when it was
a real mess.

15.  Mr. Longhitano explicitly stated that a low risk
classification of an institution or a particular housing
situation did not mean that a death could not happen.
Repeatedly he referred to single-celled inmates, cement walls,
open construction as factors which would probably mean that only
the one inmate in the cell where the fire started was exposed to

serious harm or death by fire.  This, however, as we discuss below is not the constitutional standard:  this is precisely the harm (even if in a double-celled situation) which the court had before it in the case of inmate Angel Caraballo Matos, discussed below.  Every single inmate in the custody of the Administration of Corrections is entitled to be protected, not haphazardly put at risk.

16.  We now hold that such protection is unconstitutionally denied to inmates in situations where he or she would be harmed, alone, by smoke inhalation or fire, however started, because help did not arrive on time.

17.  With respect to those institutions, dorms etc. that do present high or excessive risks of serious harm or death by smoke inhalation or fire, Mr. Longhitano gave testimony as to general issues and testified as to particular locations.  Let us take first the general conditions or issues and them go to the particular.

18.  Lack of adequate staffing is one.  The image of one officer during the 10:00pm to 6:00am shift responsible for supervising hundreds of inmates from outside a large building with several modules of dormitories and cells locked from 6:00pm to approximately 6:00am is one that sticks in the court's mind – and that in buildings with no fire prevention, smoke detectors or sprinklers. He explained

> In one respect padlocking is really no
> different than having a normal cell door
> lock. If the institution is one in which the
> only way cells are opened is by a
> correctional office going face to face with
> an inmate and unlocking the door, having a
> padlock on the door is no different than
> that, assuming the conditions are right.

[.....]

> Another potential complication is there is
> not always a correction officer in the
> housing area who has a key. In that case,
> somehow you need to find a way to tell the
> correction officer, wherever he is, that he
> needs to come and let people out because
> there is a fire in his cell.

(T.pp. 14-15 October 16, 2007) About two weeks before the

hearing, the Fire Officer for Bayamón 501 testified, new officers

were assigned, one each per shift per module, he had never seen

before and he knew not where they came from. (T.pp.34 et seq.

for October 15, 2007) Obviously yet another instance of trial

preparation indulged in by Defendants without any explanation to

their own staff, which bodes ill for the permanence of the

measure. Lt. Ana Rodríguez, now in charge of Bayamón 501 did not

know whither the officers came, and she had purportedly

"reinforced" only the evening and night shifts, not all three.

Yet, the Defendants did not present any rosters or documentary

evidence to support the highly suspect and self-serving testimony

of "new reinforcements."[2]

19.    The extent of non-communication is phenomenal.    The
Defendants tried to establish two things, in their defense, and
they failed: they had set up "a plan" to correct all the defects
pointed out by the Plaintiff class in the use of padlocks, and
that the use of padlocks was "temporary" (beginning in April
2007).    During her examinations Lieutenant Rodríguez debunked
both postulates.

    Q.    Now, for how much longer do you anticipate
          to continue using padlocks to close cells at
          Section 2 and 3-L?

    A.    Until the system is corrected.

    Q.    Can you give Your Honor an estimate of how
          long you anticipate that will take?

    A.    With all due respect Your Honor, I cannot
          give him the time.  It's not in my hands.

    Q.    Have you had any conversations with Regional
          Director Diaz Correa about the subject?

    A.    In our staff meetings we always discuss this
          situation  and  the  possibility  of  the
          electronic system being repaired.

    Q.    In those staff meetings has the regional
          director expressed any estimate of time?

    A.    No.

    Q.    So you do not know if it's going to be

---

[2]    Lieutenant Rodríguez clarified that, at Bayamón 501, padlocks were used to
close the 125 cells in Section 2, which housed a total of 225 inmates, and
the 16 cells of Section 3-L, which housed 32 inmates. [T. pp. 79 and 85.]
Thus, 257 inmates are housed in cells where padlocks have been used since May
of this year; that is more than half of the total inmate population of
Bayamón 501.

months or perhaps years before that problem
is fixed, do you?

A.   No, I don't.

Q.   Now –
         THE COURT: Before you go into that.
     Do you know if -- have you heard from any of
     your superiors that a plan has been
     institutionalized to correct these problems?

         THE WITNESS: Your Honor, I know that
     the request for repair have been generated.
     I have not received a reply as of yet, but I
     know that it's being worked on. That's the
     office of facilities.

         THE COURT: But in those responses that
     you have had, have you been told that at the
     central level there has been a plan to
     correct all this already in place,
     functioning?

         THE WITNESS: With all due respect, the
     regional director has told me that this has
     been taken. This request has been taken to
     the central level, the request of repair.

         THE COURT: But aside from the request
     to repair that situation, do you know if the
     central office has already in place a
     program to correct that situation?

         THE WITNESS: No, sir, I don't know.

(T. pp 86-87 for October 15, 2007)

     20.  After extensive and detailed examinations of the

conditions and hazards existing in Bayamón 501, Mr. Longhitano

concluded and the court certainly agrees

         My opinion is that if fire – if a fire
     were to start in a housing area in Bayamón
     501, it [is] a pretty high probab[ilit]y that
     several people will die in it.   I think

> that's a very predictable condition under the
> conditions that I saw between July 8th and
> July 11th.

(T. p. 29 for October 16, 2007)  The same was true of building 7

and 8 at Bayamón 1072, where for the stated reasons "the

probability of a serious fire that could kill and injure several

people is quite high at this location."    (T.p.34 id.) and

Bayamón 308 Section C.

> In this condition where the cells are open
> at all times, and the combustible load at
> the time that I was there was significant
> even in the hallway, because there were
> mattresses out on the floor, bed linens on
> the floor, bed linen hanging in front of
> cell bars. So there was certainly enough
> combustible to build a really big fire.

[…]

> My conclusion in this building was that
> because of inadequate staffing, that there
> would be - if there were a fire in this
> facility, there would definitely be some
> deaths and serious injuries.  (T. pp. 37-38
> id.)

21.  And of Bayamón 308 Section Q

> This is an area where a large enough fire
> can certainly be built, and without any
> correction officer  knowing about it until
> it's too late to get everyone out of the
> unit will wind up with some at least serious
> injuries, if not deaths, as a result of a
> fire.  (T. p.41 id.)

22.  And so we move on to Vega Alta, a women's prison

consisting of several buildings and an infirmary. Building A has

five dormitories that house from 17 to 48 inmates. There are no

officers inside the dormitories and the emergency keys were not color coded.    There is no fire detection or sprinkler system protecting the housing areas of this building. The exit doors are padlocked.    Communication for additional help is by radios that are not reliable according to the staff and, again, since there is a dormitory there is an abundance of combustible material which could be used to set up a big fire: and there are times when there is not a correctional officer in the second floor and none within the housing areas.    A fire there would result in a number of people being killed or very seriously injured, and it would be very likely that such a situation would occur.

23.  At Building B, a maximum security facility, there are 34 inmates in key-locked cells for one officer with one common key. There are two remote doors on the second floor and they were both jammed.    The officer on the second floor did not even have a radio.    And with no sprinkler system, no fire alarm and difficulty in getting help, in the event of an emergency there is a pretty high probability that people are going to be injured or killed in a fire.

24.  Building D at Vega Alta housed 40 inmates in a dormitory arrangement, with one officer posted outside.    There is no fire detection or alarm system and a partial sprinkler system.    With the amount of combustible material, and if the

fire was close to the gate, the officer would not be able to get there to open it. It certainly is a place where people can be trapped and killed very easily.

25. Of the infirmary Mr. Longhitano testified that even with a working fire alarm system, this was a place there is danger of injury or death, because patients who are medicated are not necessarily able to save themselves. In the absence of a sprinkler system, which there is not, patients and those trying to rescue them are at serious risk.

26. At Ponce Young Adults where the doors are remotely controlled, an exercise to open them by hand was given up when 22 minutes and 33 seconds after the exercise had started, it was discovered that a wrong key ring of which the keys were not color coded had been brought from key control. By then it would have been a disaster in case of a real fire. A disaster very easily preventable by having the keys – identified – where they could be easily located.

27. From the Defendants' evidence, and particularly from the dates of their documents, it is obvious that they prepared their defense with Mr. Longhitano's report in hand.

## THE DEFENSE

28. Shortly before the start of the October 15, 2007 hearing, Plaintiffs filed a Motion to Strike and/or In Limine (Docket No. 9273), whereby they highlighted the absence of

qualifications on the part of Mr. Thomas Jons, Defendants'
purported fire expert, in the areas of fire and life safety and
fire prevention and protection. Given the lack of any formal
education, training or specialized knowledge of Mr. Jons in
those technical areas, they moved for an order *in limine* barring
Defendants from presenting him as an expert in those fields.

29. The Court held in abeyance ruling on the Motion and
allowed the parties to examine Mr. Jons on his qualifications.
Mr. Jons testified that he worked for MGT of America, Inc. In
view of the nonexistence of any qualification in the fields of
life and fire safety and Mr. Jons' candid admission to the
effect that he did not consider himself as an expert in the Life
Safety Code or the Puerto Rico Fire Safety Code, the Court had
no difficulty in concluding that he was not an expert in those
fields and precluded him from testifying as such. The court now
reiterates that ruling based on the "gate-keeping
responsibility" entrusted by *Daubert v. Merrell Dow
Pharmaceuticals, Inc.*, 509 US 579 (1993), and its progeny.

30. Rule 702 establishes three distinct requirements to
allow a witness to offer expert opinion testimony, the first
being that "a proposed expert witness must be qualified to
testify as an expert by 'knowledge, skill, experience, training,
or education'" *U.S. v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995).
*Accord Tokio Marine & Fire Insurance Co., LTD. v. Grove*

*Manufacturing Co.*, 762 F.Supp. 1016, 1017 (D.P.R. 1991) ("Pursuant to Rule 702, when determining whether to admit the testimony of an expert, the Court must first examine who the proposed expert is: does she fall within the traditionally known fields of learning and expertise such as architecture, engineering or medicine, and does she possess the knowledge, skill, experience, training or education so that she can be qualified as an expert"); and *Figueroa v. Simplicity Plan de Puerto Rico*, 267 F.Supp.2d 161, 164 (D.P.R. 2003) ("Judges as gatekeepers, must ensure that the following requirements are fulfilled before an expert can give a testimony: (1) the expert is qualified to testify as an expert in a certain field…")

31. Since the purpose of expert testimony is to "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702, "[a]n expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *U.S. v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991); emphasis in the original. As the Court in *Shay*, admonished, "[u]nless the witness's opinions are informed by expertise, they are no more helpful than the opinions of a lay witness." 57 F.3d at 133.

32.  Mr. Jons' lack of special knowledge, training or skill
in the fields for which defendants proposed him as an expert
left no choice to the Court but to prevent him from offering any
expert opinion testimony.  At Defendants' request he testified
under Rule 701.

33.  Mr. Jons agreed with Mr. Longhitano that, without
staffing changes and other procedures, padlocking gates
presented a life-threatening situation.

34.  Mr. Jons testified that he participated in a joint
effort with AOC officials to design and draft the October 1,
2007 plan and measures entitled "The Procedures for the
Temporary Use of Padlocks", which was admitted into evidence as
Defendants' Exhibit C. According to Mr. Jons, the emergency plan
devised tended to Plaintiffs' legitimate concerns on the use of
padlocks and, presumably, brought Defendants' use of same within
compliance of the 1987 Order.

35.  Notwithstanding Mr. Jons' best wishes, his admissions
to the effect that he was not aware of the September 1, 1994
Stipulation Regarding Security, which was received into evidence
as Plaintiffs' Exhibit 14, were most telling as was his candid
acknowledgment, upon review of the Stipulation, that it already
provided for the creation of maintenance crews and lock shops to
take care of maintenance problems in locking mechanisms, which
was one of the measures called for by the October 1, emergency

plan that he had assisted in drafting. Mr. Jons further admitted
that a 2002 report by MGT, which he also participated in
drafting, concluded that the use of padlocks was a primitive
approach to security and a violation of safety codes and
recommended that they be discontinued.   When confronted with a
2005 status report by MGT, Mr. Jons further admitted that it
recommended that a locking system and replacement plan within
the AOC be developed and implemented.

36.  Much to defendants' dismay, Mr. Jons was not able to
articulate any explanation why, in light of the existence of
those prior stipulations and recommendations, Defendants had not
complied with their voluntarily assumed obligations and had only
limited themselves to promulgate, at the Eleventh Hour, a series
of "emergency" measures that should have been in place at least
13 years ago.

37.  The following colloquy captures the full scope and
extent of Defendants' predicament:

     THE COURT:  Doesn't the plan, the emergency plan
of October 1st state, Two crews of trained staff with
knowledge and equipment to conduct minor repairs and
maintain locking systems will be created to make
emergency repairs and maintenance needed in the
locking systems?  Isn't that part of your plan?

     THE WITNESS:  That is part of the AOC plan, yes,
Your Honor.  That is with the specialty teams.

     THE COURT:  That's what you recommended?

     THE WITNESS:  That is correct.

THE COURT:  All right.

THE WITNESS:  The specialized team.

THE COURT:  And since 1994 we have a stipulation
and an order of this Court that maintenance crews,
lock shops be established precisely to take care of
maintenance problems in locking systems.

THE WITNESS:  I understand.  I was confused with
lock shops.  That means something different to me
versus a specialized crew.  But I understand what you
are saying, you're saying a lock shop means.

THE COURT:  What I'm saying is that the
stipulation in 1994 required the AOC to establish
crews to deal with minor repairs and maintaining
locking systems and make the emergency repairs and
maintenance needed in the locking systems. That's what
you were recommending to the AOC now that they filed
[Plaintiffs] a motion requesting contempt, and we had
to do through all this, we had to go through all this,
hurry up, get some emergency plans in to the AOC on
October 1st.  And since 1994 we've had that in the
record of the case.

To add insult to injury, Mr. Jons admitted that he could

not attest that the measures of the October 1 Plan had been

actually put into effect as of the date of the hearing held in

this matter. (Transcript pp. 193-196.)

38.  Mr. Jons also testified with candor about Bayamón 501

that "[t]he locking systems and the fire control systems are so

badly damaged" that they cannot be fixed in-house but the work

must be done through a contract.

39.  He further admitted that the state of ill repair of

the locking mechanism due to vandalism at Bayamón 501, which

prompted the use of padlocks, was caused by the inadequate inmate supervision on the part of AOC officers and "the lack of an adequate inmates discipline system." [T. p. 192 ___ 13-15] He finally agreed with the Court that the lack of supervision on the part of the AOC was one of the elements that created life-threatening situations by the use of padlocks. [T. p. 193; ___ 11-15.]

40. Then the Defendants called Subsecretary Rafael Santiago to the stand. If the court understands his arithmetic the Administration of Corrections has $166 million available for construction, repairs, maintenance ($120 million have been spoken about for years in this case.) but not necessarily for fixing locking mechanisms at all institutions.

41. His other testimony, to the extent that it was not evasive, was punctilious, for lack of a better word: for example, "At this time we do not have a plan to eliminate [padlocks from Bayamón 1072]. I explained to you that we have a plan to ensure the safety of all the inmates and all the personnel. That doesn't mean by any way they will never be eliminated from an institution."

42. The insufficiency of custodial personnel in AOC institutions has been an issue in this case since it began nearly thirty years ago.

43. Subsecretary Santiago also referred to a letter from

the   Commonwealth's   Chief   Fire   Marshal   allowing   the

Administration  an  exemption  from  regulations  concerning  fire

alarm systems, sprinklers, etc. if certain conditions were met.

The court transcribes the full text of the March 7, 2007 letter

here:

> Dear Mr. Pereira:
>
> Greetings from myself and from the staff of the Puerto
> Rico Fire Department.
>
> The Puerto Rico Fire Department has been evaluating
> your request to be exempted from maintaining alarm
> systems at the correctional institutions in Puerto
> Rico. After a careful analysis, I am pleased to inform
> you that we are granting your petition.
>
> In order to make that decision we analyzed Fire
> Prevention Code Section 1300.6, Fire Alarm System,
> which provides as follows:
>
>> "Institutional: Each establishment shall be
>> equipped with a manual alarm system, which
>> shall be electrically supervised. Any fire
>> detection system shall be electrically
>> interconnected to the fire alarm. Special
>> consideration will be given to restricted
>> care institutions, such as correctional
>> institutions and similar establishments."
>
> In order for this decision to prevail, the Corrections
> Administration must meet the following guidelines:
>
> 1. Appoint a Fire Safety and Emergency
>    Management Officer with vast knowledge on
>    Fire Safety and Prevention Codes, as well as
>    construction requirements. This Officer shall
>    inspect the institutions on a monthly basis
>    to check that they are in compliance with
>    fire safety and prevention regulations.
>
> 2. Develop and implement the corresponding
>    emergency plans.

   3.   Install   and   maintain   emergency   power
        generators.

   4.   [Have] exit doors in optimal conditions.

   5.   Have   sufficient   personnel   who   are   also
        trained to handle any emergency and have
        properly identified keys available to open
        all exit doors in the event of an emergency.

   6.   Outline duly approved evacuation plans.

   7.   Conduct fire drills, at least four (4) times
        per year, per shift, twelve (12) drills in
        total,   during   which   the   institutional
        safety/security of employees and inmates is
        guaranteed.

   8.   [Have] adequate signage for exits and safety
        mechanisms and/or devices.

   9.   [Meet] other requirements that the Puerto
        Rico Fire Department deems necessary.

I hope this decision may resolve the situation that
was brought to our attention.

Cordially,

(Signed)
Germán Ocasio Morales
     Chief

44.  No evidence at all was presented to show that any of
these conditions exist at any institutions.

45.  Mr.  Santiago  also  claimed  that  two  lock  shops
confusing them apparently with the specialized teams "mentioned
by Mr. Jons.  One such team, which includes inmates, is at
present cannibalizing one prison recently closed down; another
is at Guayama.  Lock shops are nowhere. [T. pp. 17-19 for

October 17, 2007.]

## I. *Contempt Criteria and Remedies*

46. At the outset of this discussion, the Court is compelled to accentuate that the pertinent principles to a finding of civil contempt were first articulated in this litigation twenty (20) years ago. *See Morales Feliciano v. Hernandez Colon*, 672 F.Supp 627 (1987); and *Morales Feliciano v. Hernandez Colon*, 697 F.Supp 26 (1987). Although the tenets previously summarized remain unchanged, the issues now pending before the Court require that the ample body of law on the subject be revisited.

47. Under Fed.R.Civ.P. 70, a party moving to hold another party in civil contempt must meet the following criteria: (1) that the order that the contemnor failed to comply with is clear and unambiguous; (2) that proof of noncompliance is clear and convincing; and (3) that the contemnor has failed to make reasonably diligent efforts to, at the very least, substantially comply. *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 15-16 (1st Cir.1991); *Langton v. Johnston*, 928 F.2d 1206, 1220 (1st Cir. 1991). Regarding the third factor, the court in *Aspira v. Board of Educ.*, 423 F.Supp. 647, 654 (S.D.N.Y.1976), explained that the standard was "whether defendants have been reasonably diligent and energetic in attempting to accomplish what was ordered." Or, as the court in *Sekaquaptewa v. MacDonald*, 544

F.2d 396, 406 (9th Cir.), cert. denied, 430 U.S. 931 (1976), phrased it, whether defendants took "all the reasonable steps within their power to insure compliance with the orders."[3]

48.  Intentional or willful disobedience of the order need not be shown to establish civil contempt. *Star Fin. Servs. Inc. v. AASTAR Mortg. Corp.,* 89 F.3d 5, 10 (1st Cir.1996) ("An act does not cease to be a violation of law and of a decree merely because it may have been done innocently."); *Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 128 n. 2 (2nd Cir.1979) ("The fact that the prohibited act was done inadvertently or in good faith, however, does not preclude a citation for civil contempt, for the sanction is remedial in nature."); *Select Creations, Inc. v. Paliafito America, Inc.,* 906 F.Supp. 1251, 1272 (E.D.Wis.1995) ("[A] civil contempt may be established even though the failure to comply with the Court's order was unintentional or done with good intentions").

49.  Upon a finding that a party is in civil contempt, a district court is vested with broad discretion to fashion an appropriate coercive remedy based on the nature of the harm caused. *Goya Foods, Inc. v. Wallack Management Co.,* 344 F.3d 16, 21 (1st Cir. 2003) ("A trial court's power to assert its authority over a contemnor is broad"); *Morales Feliciano v.*

---

[3] Proof by "clear and convincing evidence" means proof that it is "highly probable" that the facts alleged are true. *Colorado v. New Mexico,* 467 U.S. 310, 316 (1984).

*Hernandez Colon*, 697 F.Supp 26, 35 (1987)   ("In choosing sanctions designed to coerce future compliance, the district judge sitting in equity is vested with wide discretion in fashioning a remedy.")   This discretion is particularly broad in public law litigation such as the one at issue in this case. As the Court in *Langton*, 928 F.2d at 1221, recognized:

At least since the time of *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), district courts have exercised broad powers and enjoyed great latitude in regulating the operations of state institutions, ranging from school districts, to hospitals, to prisons, as may be necessary to enforce federally assured rights.

50.   Consistent with the broad discretion afforded to trial courts in fashioning appropriate remedies, decisions to grant or deny contempt motions in public law litigation cases is that of abuse of discretion. *Massachusetts Ass'n of Older Americans v. Commissioner of Public Welfare*, 803 F.2d 35, 38 (1st Cir. 1986).

51.   Two kinds of remedies or sanctions are available in civil contempt proceedings: (1) those that seek to compensate the victim for contempt; and (2) those that seek to coerce prospective compliance with the court's own order. *US v. Saccoccia*, 433 F.3d 19, 27 (1st Cir. 2005) ("Civil contempt may be imposed to compel compliance with a court order or to compensate a party harmed by non-compliance"). In shaping such a remedy, the court must consider the "character and magnitude of the harm threatened by continued contumacy, and the probable

effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers,* 330 U.S. 258, 304 (1947).

52. The remedies or sanctions that may be imposed in a civil contempt proceeding are those "designed to compel future compliance with a court order, [which] are considered to be coercive and avoidable through obedience." *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827 (1994). *See also, US v. Dowell*, 257 F.3d 294, 299 (7th Cir. 2001) ("Coercive sanctions seek to induce future behavior by attempting to coerce a recalcitrant party or witness to comply with an express court directive.")

53. Remedies or sanctions that are meant to ensure future compliance may include, but are not limited to, monetary fines. Keeping in tune with the dual purpose behind any contempt sanction:

> There are also two types of civil contempt fines. The first kind is payable to the complainant as compensation for damages caused by the contemnor's noncompliance. The second kind is payable to the court, but defendant can avoid paying the contempt "fine" by performing the act required by the court's order.

*Roe v. Operation Rescue*, 919 F.2d 857, 868 (3rd Cir. 1990); citations omitted. *Accord Hicks v. Feiock*, 485 US 624, 631-32 (1988).

As the Supreme Court explained in *International Union*:

A close analogy to coercive imprisonment is a per diem
fine imposed for each day a contemnor fails to comply
with   an   affirmative   court   order.   Like   civil
imprisonment, such fines exert a constant coercive
pressure, and once the jural command is obeyed, the
future, indefinite, daily fines are purged.

512   S. at 829.

54.   A court may also assess attorney's fees as a sanction
for "the willful disobedience of a court order." *Chambers v.
NASCO, Inc.*, 501 U.S. 32, 45 (1991) (proclaiming that as part of
the sanction a court may impose attorney's fees representing the
entire cost of the litigation).

55.   As the Court cautioned in *Goya Foods*, "[i]n crafting a
monetary sanction, a court must bear in mind not only the
factual circumstances of the particular case but also the
purpose for imposing the sanction in the first place." 344 F.3d
at 20.   Equally fact intensive is the determination of whether
the contemnor has substantially complied with the order.
*AccuSoft Corp. v. Palo*, 237 F.3d 31, 47 (1st Cir. 2001) ("The
determination of whether substantial compliance has been
achieved will 'depend on the circumstances of each case,
including the nature of the interest at stake and the degree to
which noncompliance affects that interest.'") As the Court in
*Fortin v. Comm'r of Mass. Dept. of Pub. Welfare*, 692 F.2d 790,
795 (1st Cir.1982), further explained, "no particular percentage
of compliance can be a safe-harbor figure, transferable from one

context to another. Like 'reasonableness,' 'substantiality' must depend on the circumstances of each case."

56.   However,   "[c]ourts   have   been   particularly unsympathetic to purported excuses for less-than substantial compliance where the contemnor has participated in drafting the order against which compliance is measured." *United States v. Tennessee,* 925 F. Supp. 1292, 1302 (W.D.Tenn.1995). The reason for the understandable lack of sympathy in those instances derives from the undeniable reality that "[w]hen a party participates in drafting the relevant order, it does (or is held to have done) so 'with an understanding of what it can reasonably accomplish.'" *Cobell v. Babbitt*, 37 F.Supp.2d 6, 9-10 (D.D.C. 1999) (citing *United States v. Tennesse, Id.*)

57.   Hence, a public defendant will be found in contempt if "it is shown that [he] has violated his obligations imposed by a court decree by failure of diligence, ineffective control, and lack of purpose in effectuating the requirements of the decree." *Jordan v. Arnold*, 472 F.Supp. 265, 289 (D.C.Pa. 1979). *Accord Morales Feliciano v. Hernandez Colon*, 672 F.Supp 627, 638 (1987). In this sense, the public official "is like a corporate official in that he must do all that he reasonably can to see that a court order is obeyed." *Jordan, id.*

58.   Courts have repeatedly held, in a myriad of contexts and factual settings, that Eleventh Hour efforts to comply with

an order do not shield the recalcitrant party from contempt, particularly when defendants' rush to action occurs after the filing of the plaintiffs' motion. *In re Lawrence*, 251 B.R. 630, 653 (S.D.Fla. 2000) ("[A]ppellant's half-hearted, last-minute attempts to purge the contempt finding are plainly insufficient"); *Benjamin v. Sielaff*, 752 F.Supp. 140, 147 (S.DN.Y 1990) (holding that efforts that "proved to be too little, too late" were no defense to a contempt motion); and *Aspira*, 423 F.Supp. at 654 (finding defendants in contempt for having "displayed an evident sense of nonurgency bordering on indifference, contrasting vividly with the spurt of activity on the heals of plaintiffs' motion").

59. Finally, this court is compelled to underscore that self-inflicted harms do not provide a defense to a finding of contempt for the same reason that numerous other courts have held that a party that places itself in harm's way is not entitled to any judicial remedy in its favor. *See*, among many others, *McDermott v. Bender*, 598 A.2d 709 (Del. 1990) (holding that former husband's psychological disability resulting from self-inflicted heroin addiction was no defense in a contempt proceeding for nonpayment of child support); *Finney v. Hill*, 13 Vt. 255 (Vt. 1841) ("Though it has been said the law furnishes a remedy for every injury, this, I believe, has never been considered as extending to *self inflicted* injuries") (emphasis

in the original); *Adams v. City of Milwaukee*, 129 N.W. 518,
522 (Wis. 1911), *aff'd* 228 U.S. 572 (US 1913) ("Self-inflicted
damage is not recoverable"); *Ankeney v. Brenton*, 238 N.W. 71,
75 (Iowa 1931) ("[S]elf-inflicted injury cannot be the basis for
a recovery"); *Opticians Ass'n of America v. Independent
Opticians of America*, 920 F.2d 187, 197 (C.A.3 (N.J. 1990) ("By
virtue of this recalcitrant behavior, the [defendant] can hardly
claim to be harmed, since it brought any and all difficulties
occasioned by the issuance of an injunction upon itself");
*Pappan Enter. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d
Cir.1998) (holding in trademark infringement case that "a
party's self-inflicted harm by choosing to stop its own
performance under the contract and thus effectively terminating
the agreement is outweighed by the immeasurable damage done to
the franchiser of the mark"); and *Midwest Guar. Bank v. Guaranty
Bank*, 270 F.Supp.2d 900, 924 (E.D.Mich.2003) (holding that a
party "cannot place itself in harms way, and then later claim
that an injunction should not issue because of costs which it
must incur in order to remedy its own misconduct").

## II.   The Guayama 500 Fire

60.   During the hearing, the parties presented conflicting
testimonies about whether the sprinkler head at cell no. 256 of
C-Control, Section C, of Guayama 500 activated itself during the
fire that occurred on July 27, 2007. On one side, Mr. Angel

Caraballo Matos, the inmate that received second degree burns throughout his body and suffered respiratory failure due to smoke inhalation, testified that the sprinkler did not turn on while Mr. Alfred Longhitano, Plaintiffs' fire and life safety expert, testified that he would not be surprised to learn that it did not given that he had detected, during the site inspection conducted only two weeks earlier, that the valve that fed the sprinkler system was shut-off. On the other side, Lieutenant Jorge L. Valentín Soto and Sergeant Benítez, who showed up at the scene while the flames were still lit or immediately after Officer José Burgos had used the fire extinguisher, both testified that the sprinkler did pour substantial amounts of water, so much so that the cell floor was practically flooded and the inmates' belongings were all damp.

61. Before addressing the conflicting versions about the role that the sprinkler played during the fire, the Court highlights the fact that the Defendants failed to present Officer Burgos as their witness. Mr. Caraballo Matos, Lieutenant Valentín and Sergeant Burgos all coincided in testifying that Officer Burgos had been responsible of extinguishing the flames and, in doing so, was the AOC employee that was closest to the interior of the cell. Thus, he was in the best position of ascertaining whether, in fact, the sprinkler within the cell did turn on at any moment. Notwithstanding that acknowledged

advantage point, Defendants elected not to present him as a witness during the hearing and did not offer any explanation why, instead, they preferred to present Lieutenant Valentín and Sergeant Burgos.

62. Under these circumstances, the Court must apply the presumption commonly referred to indistinctively as that of the "missing" or the "absent" witness. The origins of this presumption have been traced more than a century ago to *Graves v. US*, 150 US 118, 121 (1893), wherein the court reasoned that:

> if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.

63. Our circuit court explained in *US v. Ariza-Ibarra*, 651 F.2d 2, 15-16 (1st Cir. 1981), that:

> In the absence of a satisfactory explanation, when a party fails to call a witness whom that party would ordinarily produce if the facts known by the witness were favorable to that party, the jury may infer that the absent witness's testimony would have been adverse to that party.

64. The adverse presumption for the voluntary omission of pertinent and arguably determinative evidence is not limited to testimonies. In *Commercial Ins. Co., of Newark, N. J. v. Gonzalez*, 512 F.2d 1307, 1314 (1st Cir. 1975), *cert. denied,* 423 U.S. 838, the First Circuit Court of Appeals enunciated that "[i]t is elementary that if a party has evidence, here,

allegedly, a document, in its control and fails to produce it, an inference may be warranted that the document would have been unfavorable."

65. In this case, there is no question that Officer Burgos was the type of witness that Defendants would have produced if the facts known to him regarding the sprinkler were favorable to them. The fact that they did not call him as their witness leaves no room for doubt to conclude that, had he testified, he would have corroborated the version advocated by Mr. Caraballo Matos much to Defendants' chagrin.

66. Although the application of the missing witness presumption would be more than sufficient to reach the conclusion that the sprinkler did not work, the Court does not have to rely exclusively on it to resolve the conflictive testimonies. Most telling in unraveling this evidentiary conundrum is the fact that the recount by Lieutenant Valentín and Sergeant Benítez did not provide a viable explanation as to why, if the sprinkler, which was located very near the cell door, poured the amount of water that they claim, the flames were only put out by Officer Burgos' heroic use of the fire extinguisher.

Although "judges are not fools required to believe what ordinary citizens do not accept," *Carrasquillo v. Aponte Roque*, 682 F.Supp. 137, 141 note 1 (D.P.R. 1988) (*citing Pueblo v. Luciano*

*Arroyo,* 83 D.P.R. 573 (1961) ("[w]e judges should not, after all, be so naive as to believe statements which no one else would believe"); *United States v. Ventura Meléndez,* 186 F.Supp.2d 55, 59 (D.P.R. 2001) (same), the reason for their lack of any reasonable explanation is exposed by the photographs that Defendants' agents took shortly after the incident, admitted into evidence as Plaintiffs' Exhibit 19, which indisputably show the cell floor and the inmates' belongings completely dry. "Mindful of the adage that 'a picture is worth a thousand words,'" *US v. Drozdowski,* 313 F.3d 819, 821 (3rd Cir. 2002), the Court concludes as a matter of fact that the sprinkler was not activated during the fire.

When the pertinent legal principles are applied to the dreadful factual scenario painted by the evidence presented at the hearing held in this case, the Court is convinced that Defendants are in contempt of the 1987 Order and the 1994 Stipulation. There is no doubt that Plaintiffs in Bayamón 501, Bayamón 1072, Bayamón 308, Vega Alta, and Ponce Young Adults are in imminent risk of serious bodily injury or death due to the numerous fire hazards that exist in those facilities, particularly the use of padlocks in the first two.   The measures promulgated by Defendants in the October 1, 2007 emergency plan are simply "too little too late".

Not only were those measures unnecessary, since they were already provided for by either the 1987 Order, the Environmental Plan, the 1994 Stipulation or the March 7, 2007 letter from the Puerto Rico Chief Fire Marshall, but most importantly, Defendants did not present any evidence to substantiate their contention that those measures had been actually implemented.

The Court agrees with Defendants that the conditions in Bayamón 501 rise to the level of a real and patent emergency. However, that serves as no defense to a finding of contempt since the crisis has been of their own making by their outright failure to properly supervise inmates and to implement the required preventive and corrective maintenance programs.

As a result, many lives have been placed at risk. After more than 28 years of litigation, the numerous Orders by the Court, the amount of resources that have been spent and/or invested, this situation is completely unacceptable, unexplainable and intolerable.

The Court is truly saddened and disappointed by the decision reached today inasmuch as it could not have come at a more inconvenient time. On August 15, 2006, at the Court's initiative, the parties began to pave the way to reach an end to this litigation. See Docket No. 9040. A process of detailed operational reviews of each AOC institution ensued, which is still on-going. Corrective measures were supposed to follow the

reviews, all geared to finally bring the AOC within compliance of the minimum constitutional standards.

The findings set forth above call into question the effectiveness of the process and raise doubts about the viability of the desired conclusion of this litigation. The assurances that Secretary Pereira has made to the Court that he will end this litigation by the end of the year 2008 are belied by the dangerous and life threatening conditions created by the Defendants' utter disregard for this Court's Order of 1987 and the 1994 Stipulation thru which Defendants voluntarily assumed obligations which 13 years later they still have not complied with. The Court must underscore that this case will only come to an end when Defendants cultivate the will and desire to meet constitutional requirements.

WHEREFORE, it is hereby

ORDERED that Plaintiffs' Motion for Contempt should be, and is hereby GRANTED. Accordingly, Defendant Miguel A. Pereira Castillo is found in Contempt of the 1987 Order and the 1994 Stipulation. It is further

ORDERED that Defendant Pereira must pay $10.00 per day for each padlock used to close cell doors at Bayamón 501 and dormitory doors at Bayamón 1072 from the date of this Order until the practice is discontinued altogether. It is further

ORDERED that Defendant Pereira must satisfy the $10.00 per-day-per-padlock fine for the year 2007 on or before January 15, 2008, and thereafter, on a Quarterly basis, within fifteen (15) days of the conclusion of each Quarter.  It is further

ORDERED that Defendants must submit with the required payments a report detailing the number of padlocks used in each facility during the relevant period.  It is further

ORDERED that Defendants will immediately notify Plaintiffs' counsel whenever the use of padlocks is discontinued in any given facility or sections thereof and to immediately allow Plaintiffs' counsel alone to conduct an inspection of said facilities or section thereof with photographic and or video equipment so that they may ascertain whether the practice has been discontinued.  Said inspection may be conducted at any time of day or night.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 13th day of December 2007.

JUAN M. PÉREZ GIMÉNEZ
Senior U.S. DISTRICT JUDGE