## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| CARLOS MORALES FELICIANO, et al, | : | Civil No. 79-4(PG) |
| Plaintiffs, | : | |
| v. | : | |
| LUIS FORTUÑO BURSET, et al, | : | |
| Defendants. | : | |

## OPINION AND ORDER

"[I]t is impossible for a written opinion to convey the pernicious conditions and the pain and degradation which ordinary inmates suffer within [unconstitutionally operated prisons]. . . . For those who are incarcerated within [such prisons], these conditions and experiences form the content and essence of daily existence. It is to these conditions that each inmate must wake every morning; it is with the painful knowledge of their existence that each inmate must try to sleep at night. But these iniquitous and distressing circumstances are prohibited by the great constitutional principles that no human being, regardless of how disfavored by society, shall be subjected to cruel and unusual punishment or be deprived of the due process of the law within the United States of America. Regrettably, state officials have not upheld their responsibility to enforce these principles. In the wake of

1

Civil No. 79-4 (PG)

their default, the United States Constitution must be enforced .

. . by court decree." Ruiz v. Estelle, 503 F.Supp. 1265, 1391

(S.D. Tex. 1980).

### INTRODUCTION & BACKGROUND

Deficiencies in Administration of Corrections' (hereinafter "AOC") food service, food storage, food sanitation and food safety have existed since the inception of this case. Morales Feliciano v. Romero Barceló, 497 F. Supp. 14, 30-34 (D. Puerto Rico 1980). At that time, the Court entered orders relating to food sanitation and the provision of special diets when medically necessary. Id. at 84-86.

In 1986, the Court found that conditions in the AOC's prison system continued to violate the U.S. Constitution (Docket No. 868), and entered an order appointing Court Monitors to assess Defendants' compliance with the Court's order of 1980 and to propose a detailed remedial order to correct unconstitutional conditions in AOC prisons (Docket No. 869). Under a stipulation between the parties entered into (Docket No. 981) and approved by the Court in 1987 (Docket No. 1044), the Defendants agreed to file various plans designed to remedy unconstitutional conditions of confinement within the correctional system, including a plan pertaining to general environmental health and sanitation. (Id.).

2

Civil No. 79-4 (PG)

Defendants filed such a plan, in which they committed themselves to the development and maintenance of certain minimum standards in the area of environmental health and sanitation, including food service and safety.   (Docket No. 1102, Ex. 10). This Environmental Health and Maintenance Plan, as it later came to be known, was revised with the input of experts consulted by the Court Monitor and agency administrators; agency personnel were identified and appointed by the AOC and trained to carry out the plan; and the plan was ultimately approved by the Court and incorporated into the orders in this case on 30 March 1990. (Docket No. 1786, 2137).

The requirements of the plan were fairly specific.   With respect to food service, the ultimately approved Environmental Health and Maintenance Plan required, among others, that menu plans meeting minimum nutritional requirements should be approved by a licensed dietitian, that inmates who suffer from medical conditions requiring dietary restrictions be provided appropriate special meals; that food storage areas be hygienic and temperature controlled, that food temperature be properly maintained to avoid the growth of bacteria and other pathogens, that food storage and serving containers, food utensils and temperature control food transport equipment be in good condition, access to hot water in food preparation and cleaning

Civil No. 79-4 (PG)

areas, the maintenance of thermometers in order to monitor the
adequacy of temperatures in all areas of food service (storage,
cooking, serving and cleaning), and that food services comply
with all applicable present and future regulations of the Puerto
Rico Department of Health.   (Docket No. 1786, Article 15 (also
labeled Sections 24.0-32.0).

In 1997, after determining that the record in this case
required updating, the Court appointed an expert witness under
F.R.E. 706.   The Court selected Vincent M. Nathan, who at that
time had been designated by the parties as a "Joint Compliance
Consultant", see Order Granting Joint Motion Requesting Vacation
of Order of Reference, etc. (Docket No. 6234).   The Court
directed Mr. Nathan to produce two reports, the first to assess
the current state of affairs with respect to correctional health
care, and the second to report on the status of conditions of
confinement in the areas of crowding and population control,
environmental conditions, fire safety, the facilities
rehabilitation program, security, staffing, personnel
management, inmate discipline, use of force, classification, and
"inmate management."   This second report was filed on 15 July
1997 (Docket No. 6604).   Mr. Nathan, in his report, concluded
that the Administration of Correction still was not providing
constitutional conditions of confinement to its penal

4

Civil No. 79-4 (PG)

population.   Memorializing widespread violations in virtually every area of correctional operations, Mr. Nathan concluded that only the appointment of a receiver to oversee and run the Administration of Correction would be sufficient to remedy the deficiencies he found.  (Id.)

Lengthy hearings on Mr. Nathan's Report concerning all areas of correctional operations, took place beginning in January 1999, and evidence was presented, inter alia, that the AOC was still doing an unsatisfactory job with food preparation including, improper storage of food leading to spoiled food in storage areas, inadequate temperature maintenance, improper cleaning of food service trays and utensils, a failure to provide special diets for inmates with medical conditions, and unavailability of hot and clean water.  (Docket No. 7478). After the presentation of this evidence, both parties made proposals regarding the type of remedy to be entered. Plaintiffs proposed the appointment of a technical advisor to assist the Court in providing a comprehensive and long term plan to achieve administrative and operational efficiency at the AOC and to clarify the remedial structure in this case.  (Docket Nos. 7339, 7341, 7451, 7513).  Rejecting Defendants' proposals at the time as unviable and viewing Plaintiffs proposal as a less intrusive alternative to the receivership recommended by

Civil No. 79-4 (PG)

the Court's expert, Vince Nathan, the Court adopted Plaintiffs proposed remedy in July of 2000. (Docket Nos. 7478, 7661).

A little more than a year later, in December of 2001, Plaintiffs filed a Motion for Prospective Injunctive Relief for failure to deliver adequate food services to members of the Plaintiff Class in Violation of their Constitutional Rights. (Docket No. 8110, 8116). This motion was opposed by Defendants. (Docket Nos. 8133, 8137, 8139, 8156, 8161). The Court later granted Plaintiffs' "urgent" motion to consolidate hearings on the food services issue with other pending hearings in the case. (Docket No. 8203). Plaintiffs and Defendants engaged in negotiations to attempt to resolve these issues without the need for a hearing. (Docket No. 8270).

The parties later filed a joint compliance plan which addressed, among others, the food services issue. (Docket No. 8271). With respect to food services the joint plan provided that the AOC would outsource the provision of "complete food services for inmates," which should provide special diets as medically prescribed. (Id.). The AOC would also develop a new Manual of Rules and Procedures for the Food Services Program. (Id.). A report evaluating the AOC's food service and distribution facilities would be submitted to the Court within

6

Civil No. 79-4 (PG)

45 days of the approval of the compliance plan. (Docket No. 8278).

In approving the plan in August of 2002, the Court noted that "the joint Compliance Plan offers a new hope that Defendants are prepared at this time to undertake the long overdue task of providing constitutional conditions of confinement to members of the plaintiff class, at least in the areas of environmental health and food services." (Docket No. 8283).

In October of 2002, the Court's technical advisor rendered a detailed system wide assessment of the areas of correctional operations relevant to this case. (Docket No. 8321). In its Assessment of Administration of Corrections Ancillary Services, the technical advisor documented the following observations, findings and recommendations regarding the food services offered by the AOC's existing fifteen (15) kitchens, among others:

• kitchens built to feed a fairly small number of inmates now routinely prepare meals for as many as ten times that number;

• little or no use made of recipes in preparing meals, with limited supervision of meal preparation by qualified supervisors;

Civil No. 79-4 (PG)

- inadequate medical diets - food service personnel generally provide low-salt, low-fat fare as the "special" diet for all prescriptions;

- little or no regard for portion control, to ensure that inmates receive adequate amounts of food;

- pots and pans rinsed with a hose and without detergent because dishwashers are either broken or were never installed;

- unsanitary containers and vehicles used to transport meals from kitchens to inmates;

- containers that do not maintain adequate temperature control, possibly exposing inmates and staff to bacteria or food poisoning;

- deteriorated facilities that make proper sanitation and safe food handling all but impossible.

- generally unsanitary conditions in kitchens during food preparation;

- containers used to transport meals that emanated foul smells and did not hold food temperatures effectively;

- vehicles transporting meals that were infested with cockroaches;

- kitchen facilities not only infested with roaches but also with flies;

8

Civil No. 79-4 (PG)

• AOC should adopt and follow industry standards for all aspects of its food service operations;

• the director of Food Service and Nutrition has only one employee to help her oversee a food service operation that prepares meals for about 17,000 inmates and 8,500 corrections workers three times a day, 365 days a year.

• The Director of Food Service and Nutrition and a regional dietitian make up the central program staff, although only the director is located in the central office. The regional dietitian is located in the southern region but works under the director's supervision.

• Central Food Service Staff simply do not have the resources needed to manage such a complex and decentralized operation. AOC's kitchen supervisors should be accountable to unit wardens for operating kitchens in line with adopted industry standards. The director of Food Services and Nutrition would continue to oversee AOC's overall food service operations, but her role would change somewhat. The director would serve as a contract manager for the arrangement resulting from AOC's effort to outsource the management of its facility food service operations. She also should continue working . . .to prepare nutritionally sound menus and ensure that special diets prescribed by medical personnel meet the appropriate guidelines.

9

Civil No. 79-4 (PG)

Finally, the director would be charged with ensuring that all AOC kitchens prepare food based on the nutritional guidelines required by industry standards.

• One of the biggest hurdles facing the Food Service and Nutrition Program is its inability to control its own budget. . . . [I]f program personnel wish to make a decision that involves an expenditure, they must make a request through the director, who forwards it to AOC's Budget Office. The program must then wait, often for months, for an answer to its request, and the eventual answer often is "no."

• Food Services and Nutrition does not have a planning process for its equipment, budgetary or facilities needs. This is a recipe for disaster. It has saddled the program with inadequate or broken equipment and an unsafe, unsanitary environment. AOC should . . . . plan for future budget and equipment needs.

After rendering its detailed assessment on the AOC's Infrastructure and Management, the technical advisor was released from duty. (Docket No. 8322).

In January of 2003, Defendants requested that the Court fund the technical advisor in a new capacity, as a management consultant to the AOC for the implementation of its recommendations. (Docket 8368). Upon Plaintiffs' acquiescence

10

Civil No. 79-4 (PG)

(Docket 8369) the Court acceded to this request (Docket 8382, 9052, 9068).  That arrangement has since been terminated.  All the efforts described, which were meant to be comprehensive, apparently never had any noticeable effect on the provision of food services, as can be seen below.

A few months after the technical advisor in this case became a management consultant to the AOC, in December of 2003, Plaintiffs filed a Motion for Order to Show Cause why Defendants should not be held in contempt for failure to comply with the compliance plan regarding the delivery of adequate food services.  (Docket No. 8582).  This Motion was not opposed by Defendants and evidentiary hearings were held on the matter. (Docket No. 8715-21, 8726-28, 8744-47, 8752.)

In October 2004, the Court found that unconstitutionally inadequate food services continued to be the norm at the AOC. (Docket No. 8764.)  At the hearing, the Secretary of Corrections had testified before the Court that four attempts to outsource the delivery of food services through the state's bidding process had been unsuccessful and an emergency order had to be issued in order to execute a contract between the AOC and Canteen Correctional Services, a private food service provider. (Id.)  The contract between Canteen and the AOC was completed before the Court entered an order of the matter, and as a

11

Civil No. 79-4 (PG)

result, the Court did not hold the Secretary in contempt regarding that issue but required the he submit a report within 30 days on the progress with respect to the delivery of adequate food services as well as a report establishing an oversight and supervision program regarding the services provided by Canteen. (Id.).

It was not long before Plaintiffs had filed a Motion to Order Defendant Secretary of Corrections Hon. Miguel Pereira Castillo to Show Cause Why He Should Not Be Held in Contempt of Court arguing that unconstitutional conditions still prevailed in the area of food service and safety at AOC institutions (Docket No. 8790, 8816, 8819). Since the AOC was then in the process of making the transition to a contracted food service provider, Defendants requested that the Court's consideration of the contempt motion be held in abeyance (Docket No. 8816), and the matter was never litigated before the Court.

On 8 February 2010, plaintiffs filed a <u>Motion to Order Defendant Hon. Carlos Molina Rodríguez to Show Cause Why He Should Not Be Held in Contempt for Failure to Comply With the Court's Orders Regarding Food Services</u> (Docket No. 9720) (hereinafter "Motion for Contempt,") which is the subject of this Opinion and Order. In that motion Plaintiffs denounced the continued deficiencies in food services, averring that food

Civil No. 79-4 (PG)

service at the AOC did not pass constitutional muster. This Court set the matter for a hearing (Docket No. 9729). Despite requesting (Docket No. 9726) and being granted (Docket No. 9732) an enlargement of time in which to file their response to Plaintiffs Motion for Contempt, Defendants later purposefully opted to not file any response (Docket No. 9740) a move which was opposed by Plaintiffs (Docket No. 9741). This generalized paralysis in mounting any kind of serious defense to the contempt motion continued throughout the hearing (Tr. Day 5 at 87-90) which overwhelmingly established the unconstitutional conditions complained of.

Prior to the hearing the parties attempted to reach a negotiated stipulation which would address the various area of noncompliance. (Docket No. 9777). These negotiations were unsuccessful. (Tr. Day 1). Evidence was thus heard on the matter on May 4, 5, 6, 7 and 10, 2010. At these hearings, Plaintiffs presented the testimony of 13 witnesses, including inmates currently in the custody of the Administration of Corrections, Luis Quiñones Santiago, Alex Agosto Perez, Carmen Iris Alicea Rivera, Luis Rivera Rivera, Carlos Martes Morales, María Noriega Hostos, Emilio Fuentes Santana, Peter Jiménez Hernández, the Secretary of the Corrections Department, Carlos Molina Rodríguez, the Administration of Corrections' Director of

13

Civil No. 79-4 (PG)

Food Services, Frances Cruz Rosado, two members of the Correction Department's bid board, María Marcano Guerra and Esdras Vélez Rodríguez, and an expert in nutrition, diets and food security, Elba López Pérez, and submitted voluminous documentary exhibits demonstrating the extent of Defendants' violations of this Court's orders, and their knowledge of and deliberate indifference to constitutional violations in the areas of food services and safety.

Defendants presented two witnesses, Carmen Ortiz Luna, the Administration of Corrections' Dietician Services Coordinator, and José Luis Mercado Valle, a monitor of the Administration of Corrections' Office of Compliance and Operational Review.

### THE CURRENT STATE OF FOOD SERVICES AND  SAFETY AT THE ADMINISTRATION OF CORRECTIONS

In spite of the detailed orders, stipulations, plans, programs, manuals, systems, trainings, policies, procedures and timetables implemented throughout the thirty year history of this case, adequate food is still not supplied to the Plaintiff Class and food service continues to represent an unreasonable risk to the health of its members. (Tr. Day 5 at 85-86). One of the reasons for this is that, despite investing in the time and effort to create a Food Services Manual, a comprehensive manual which was designed by the AOC pursuant to the orders of

14

Civil No. 79-4 (PG)

this Court (Docket No. 8271, 8278), the AOC does not bother to follow it (Ex. 7 & 37, Tr. Day 4 at 80-81).  The AOC also does not comply with its Evaluation and Compliance Plan (Ex. 1, Tr. Day 2, 89-96, 108-110, 128-129, Day 4 80-81), also designed pursuant to the orders of this Court (Docket No. 8764), which would allow it to effectively supervise compliance with the food service contract between the AOC and Canteen.

In reaching these conclusions the Court relies heavily on the report and testimony of Plaintiffs expert, Ms. Elba López Pérez, a nutritionist who was qualified as an expert in nutrition, diets and food security.  Ms. Elba López Pérez has a bachelors degree in nutrition dietetics and has additional education experience in food service training, hospital food service and clinical nutrition from Puerto Rico's Department of Health, and over twenty years of experience as a nutritionist and dietitian.  (Ex. 36, Tr. Day 4 at 45-46).  She has a license from the examining board for health professionals of the Commonwealth of Puerto Rico.  (Ex. 36, Tr. Day 4 at 45).  She has ample experience in food service in institutional settings, specifically hospitals, and in the development of food service procedures, guidelines, protocols and regulations.  (Ex. 36, Tr. Day 4 at 46-56, Ex. 36).  She also holds a private practice since 1999 up to the present day.  (Ex. 36).

Civil No. 79-4 (PG)

Ms. López' inspections of AOC kitchens were carried out between October of 2008 and June of 2009. Despite the Secretary's protestations that food service has significantly improved during his tenure (Tr. Day 2 at 32, 53, 68), Ms. López Perez's findings during visits made in June 2009 were essentially consistent with her findings months in late 2008 (Ex. 37). Moreover, based on her evaluation of the testimony presented at the contempt hearings, Ms. López Pérez opined that the conditions which she found when she visited AOC institutions were still present. (Tr. Day 4 at 104). She further opined that said conditions, existing both at the time of her visits and at the time of the contempt hearings, jeopardize inmate health (Tr. Day 4 at 81-82, Day 5 at 85-86).

Ms. López Pérez' testimony in this regard was essentially uncontested.[1] Other than making some generalized and conclusory assertions to the contrary, Defendants presented no expert testimony and no other evidence that the state of affairs was anything other than consistent with the picture painted by Ms. López Pérez. In fact, Defendants barely mounted any Defense at all. (Tr. Day 6). Defendants did present evidence that in the

---

[1] Defendants presented the testimony of AOC nutritionist Ms. Carmen Ortiz Luna to oppose some conclusions of the Plaintiffs Class' expert nutritionist. Ms. Ortiz, however, was not qualified as an expert by the Court. Her testimony, therefore, cannot be given any relevant weight as an opposition to the well founded expert opinions of Ms. Elba López Pérez.

Civil No. 79-4 (PG)

weeks preceding the hearing they had made a large purchase of
new serving equipment for AOC's food service operations and some
repairs (Tr. Day 2 at 23-24, 87-88, Day 6 at 67-78, Ex. C),
evidence which is discussed and considered below.   While these
are  not  insignificant  developments,  recent  improvement  is
essentially  the  only  "defense"  that  was  presented  for  the
Court's consideration.   The Defendants intimated that they had
developed a remedial plan to address food service deficiencies.
No  evidence  of  this  remedial  plan  was  presented  and  its
existence was only referred to in the most oblique and general
terms.  (Tr. Day 2 at 69-70, Day 5 at 89-90).  As a result, this
Court  cannot  conclude  that  the  supposed  "plan"  in  any  way
mitigates the findings made here.   We are left then, with the
purchase  of  serving  equipment  and  some  recent  repairs  as
defendants' only defense.   As will be seen below, serving a
penal  population  of  over  12,000  inmates  involves  many  aspects
other  than  equipment.   Defendants  fell  very  short  of  opposing
the  Plaintiff  Class'  evidence  pinpointing  deficiencies  in  all
areas of correctional food service.

   **Food Receipt and Storage**: Beginning with each institution's
receipt  of  food,  no  procedure  is  in  place  for  inspecting  food
received,  ensuring  that  it  is  delivered  to  the  AOC  at  adequate
temperatures,  cataloguing  it  and  labeling  it  to  reduce  the  risk

17

Civil No. 79-4 (PG)

of inadvertent spoilage or passing of expiration dates. (Ex. 37, Tr. Day 4 at 91-94, Day 5 at 6, 23-25). Almost uniformly, foods are not appropriately labeled to identify expiration dates, and so, when the food is used there is no way to know if the food has expired (Ex. 33, 37, Tr. Day 4 at 79). At times the food stored in AOC's food storage areas is already expired (Tr. Day 2 at 31-32, 37-38, Ex. 2, 33, 37) and in one case, Plaintiff's expert witness discovered that the institution actually received the food after it had expired. (Ex. 37, Tr. Day 4 at 79, 97-98).

Food storage is itself inadequate, as refrigerators, freezers and dry storage areas are in disrepair and fail to comply with temperature and humidity requirements. (Ex. 30(2-4)(8), 31(14)(21-24), 33, 37, Tr. Day 4 at 79, Day 5 at 20-23).[2] This has the potential to spoil or reduce the useful life of food. (Ex. 28(15), 37, Tr. Day 4 at 83). Dry foods are stored on wooden platforms, which are prohibited by the AOC's own Food Services Manual since those platforms encourage infestation with insects and the growth of bacteria which can cause food to spoil. (Ex. 28(25), 37).

---

[2] The parties stipulated the photos taken by the Plaintiff Class to reflect conditions as of October 2009.

Civil No. 79-4 (PG)

Food is placed in storage areas without rhyme or reason, often contributing to the ruining of food. (Ex. 27(26), 31(26)(28)(29)). Once stored, there is no system in place to ensure that food is used within a reasonable period of time in order to avoid food spoilage or deterioration prior to use. (Tr. Day 4, 79, 94, Day 5 at 24-26, 86). This lowers the quality and nutritional value of the food. (Tr. Day 5 at 6).

All of the above would be a less serious problem if it merely resulted in waste, but spoiled foods actually reach the inmate population for consumption: moldy bread and cheese, "greenish" chicken, ham and hot dogs, fermented canned fruits and apple sauce, and foul smelling meats are actually served to the penal population. (Ex. 37, Tr. Day 3 at 71). The Secretary of Corrections himself testified that he had observed food with expired dates being served to inmates at AOC institutions he had visited. (Tr. Day 2 at 31-32, 37-38, Ex. 2).

**Adequate Temperatures**: There is no monitoring of cooking temperatures (Tr. Day 4 at 78, 84-85), so food often arrives to the penal population frozen, raw or undercooked. (Tr. Day 3 at 58-59, Day 4 at 15, Day 5 at 10-11, Ex. 11, 16, 17, 37). In the case of raw or undercooked animal products this is considered potentially hazardous since adequate cooking temperatures are required in order to kill or eliminate viruses, bacteria,

19

Civil No. 79-4 (PG)

parasites and other toxins which can cause food borne illnesses. (Ex. 37, Tr. Day 3 at 69-72, 81-83)

Hot food items should be maintained at 135° F or more and cold food items should be maintained at 41° F or less up to the time that they are actually served for consumption in order to destroy and inhibit the growth of microorganisms which cause food borne illness.[3] (Ex. 33, 37, Tr. Day 3 at 69-72, 81-82, Day 4 at 82-83, Day 5 at 9-10, 50-51). The AOC's Food Services Manual requires that the AOC's food service adhere to the Food Code of the Food and Drug Administration which contains this requirement, and independently requires that hot food items be maintained at 135° F or more and cold food items should be maintained at 41° F or less (Ex. 7, Tr. Day 6, 52-56). However, the AOC does not actually measure the temperature of food at the time it is served to the consumer and those temperature requirements, in fact, are not complied with. (Ex. 37, Tr. Day 4 at 11-13, 78, 95-97, Day 5 at 58-62, 64-78).

One of the reasons that temperature requirements are not complied with is that equipment which is used to maintain food temperatures such as thermoses, insulated trays, thermal carts,

---

[3] One of Defendants' witnesses, Ms. Carmen Ortiz Luna, who, as mentioned, was not qualified as an expert, argued that it was acceptable to serve foods within four hours of having been at these required temperatures but provided no evidence to support this contention. (Tr. Day 6, 38-46, 52-56)

Civil No. 79-4 (PG)

and steam tables have been either unavailable or damaged so that
food is not maintained at adequate temperatures.  (Ex. 33, 37,
Tr. Day 4 at 94-95, 98-99, Day 5 at 29-40).  This was true until
a very recent purchase of such equipment by the Secretary of
Corrections.  (Tr. Day 2, 23-5, 87-88).  The sequence of events
in this matter follows a typical pattern:  A particular
longstanding problem is suddenly acknowledged and the Defendants
make some grand gesture which is superficially directed at the
problem but which does not comprehensively and squarely address
it.  Such efforts often come at the eleventh hour, in an effort
to avoid liability under a contempt motion made by Plaintiffs.

Despite stating that the sad state of affairs in AOC food
service was a priority to him (Tr. Day 2 at 23), the Secretary
of Corrections who was appointed in January of 2009 (Tr. Day 2
at 22) did not undertake to replace this equipment until almost
a year later (Tr. Day 2 at 23-24, 26, 87-89), in spite of the
fact that the lack of appropriate equipment has been an enduring
problem[4] which predates his tenure as Secretary of Corrections.
(Tr. Day 2 at 122-123, 125-128, Ex. 5B, 5C, 9A, 37).  It may be
no mistake that the purchase of the new equipment roughly

---

[4] The evidence on record establishes that, prior to this purchase, the need to
replace and repair food service equipment and implements were understood and
reported to the AOC's central office for years without any help being
forthcoming. (Ex. 37, Tr. Day 2 at 122-123, 125-128).

Civil No. 79-4 (PG)

coincides with the filing of Plaintiffs contempt motion. (Tr. Day 2 at 22-28, 87-89, 123, Day 3 at 89).

As mentioned, the lack of such properly functioning equipment prevents the maintenance of safe food temperatures and increases the risk of contamination and lack of adequate sanitation. (Ex. 37, Tr. Day 5 at 40-43). Without this properly functioning equipment, thermal carts are tied with rope because their latches do not close properly. (Ex. 37, Tr. Day 4 at 79). Insulated trays without covers get covered with the bottom of another tray so that a stack of trays is formed with only one cover on top. (Ex. 37, Tr. Day 5 at 40-44). In some cases the trays, carts and thermoses have been so deteriorated that their insulation is exposed and becomes polluted with food residue, dirt and humidity, which, aside from making them foul smelling, increases the likelihood of contaminating the foods and beverages placed in them. (Ex. 15, 17, 25-31, 37, Tr. Day 4 at 79-80). The lack of sufficient utensils, insulated trays and cups (Ex. 33) being provided to inmates results in such implements being shared amongst several people, cleaned only by rinsing in the showers of the living areas between uses, without soap or adequate sanitizing cleanser. (Ex. 37, Tr. Day 3 at 91, Tr. Day 4 at 28-30). The Secretary of Corrections' observation that this type of equipment was "not in the best of conditions,

Civil No. 79-4 (PG)

that the cleaning of that equipment was not the best" (Tr. Day 2 at 23, 78-79) is clearly a colossal understatement.

Even at the time of hearing, the AOC had still not received all of the equipment it had ordered, specifically the insulated trays, in anticipation of managing the food services issue even though this type of equipment is usually received within six to eight weeks after being ordered. (Tr. Day 2, 24-25, 27-28, 87-89). Moreover, the AOC failed to purchase any new steam tables (Tr. Day 5, 84-85) which were identified at hearing as crucial for maintaining adequate food temperatures. (Ex. 37, Tr. Day 4 at 79, Day 5 at 29-31, 40-43, 66, 69-70). Apparently there is no plan to purchase these. (Tr. Day 2 at 142-143).

Although the recent purchase of new equipment should assist the AOC in ameliorating some of the problems with food service, the replacement of these damaged items can be only part of the solution. (Tr. Day 4 at 22-23). In the first place, the AOC's inability to maintain adequate food temperatures is not solely attributable to the lack of proper equipment. Such equipment, even when it is in good working order, must also be used properly to maintain adequate temperatures, and it is not. (Tr. Day 5 at 40-44, 52-53, 67-68).

Moreover, the inability to maintain proper food temperatures is also caused by the fact that only a handful of

23

Civil No. 79-4 (PG)

kitchens, now fourteen (14) in total, service all AOC penal
institutions (Tr. Day 6 at 7), with over 12,000 prisoners.  (Tr.
Day 2 at 66, Day 4 at 22-23).  Food must be taken from kitchens
to many different dining areas and inmate living areas (Ex. 37,
Tr. Day 3 at 47-48, 66, 78, 87, 92-93, Day 4 at 25-26, Day 5 at
52-53).  Due to this and to poor planning, as well as the lack
of proper equipment, long delays between the time that food is
prepared and the time the food actually reaches the inmates'
hands contribute to the inadequate maintenance of food
temperatures.  (Ex. 37).  Carmen Ortiz Luna, the AOC Dietitian
Services Coordinator testified that the goal is that food be
delivered "as fast as possible," specifying that food should be
delivered within two and three hours from the time it is served.
(Tr. Day 6 at 35-36).  This goal, however, is based on the
assumption that the food does not actually have to be maintained
at adequate temperatures during this time (Tr. Day 6 at 38-40),
which is contrary to the expert evidence presented in the case.
(Ex. 37).

     More to the point, the onetime purchase of new equipment,
like the one time repair of refrigeration or other equipment
(Tr. Day 6 at 76), does nothing to prevent this issue from
arising again in the not so distant future.  The evidence in
this case is that much of the shortage of equipment and damage

24

Civil No. 79-4 (PG)

to the equipment has been longstanding (Tr. Day 2 at 123, Ex. 5B, 5C, 9A, 37) and that the recent purchases of new equipment were undertaken in anticipation of litigation on the issue by the Plaintiffs (Tr. Day 2 at 22-28, 87-89, 123, Day 3 at 89). The Court was particularly struck by the testimony of the AOC Director of Food Services when she thanked God in open Court that, finally new equipment "could" be purchased.  (Tr. Day 2 at 128).

    Based on the history of this case and even on the very evidence presented at the hearing, this Court finds that the problem of hopelessly damaged equipment going unaddressed is highly likely if not inevitable without Court action.  The new equipment will doubtless suffer wear and tear, especially if it is not handled properly.  In particular, the Court is mindful of the fact that several of the dishwashing machines in the AOC kitchens do not work or do not work properly.  (Ex. 9A, 37). If, as has been done in the past, the AOC resorts to cleaning these items "however they can" on the floor with a water hose, or worse, requiring inmates to clean them in showers (Ex. 37, Tr. Day 4 at 28-30), they are sure to deteriorate more quickly (Ex. 25(5)(9), 27(25), Tr. Day 3 at 72-73, 88-91, Tr. Day 4 at 4-5).  Without any system in place to ensure that damaged or missing equipment is replaced on a regular basis, it is almost

Civil No. 79-4 (PG)

inevitable that the same thing will happen again after a period of time.

   **Cleaning**:   The   conditions   already   described   would unacceptably increase the likelihood of food borne illnesses even under clean conditions.  Clean they are not.  (Tr. Day 4 at 98-102, Ex. 37)

   Kitchens themselves and food storage areas are unclean. (Ex. 27(14)(15), 28(9), 30(1), Tr. Day 5 at 4-5).  Hot running water is not available for proper hand washing for food handlers.  (Tr. Day 5 at 79-80).  Without adequate access to hot running water or adequate dishwashing equipment (Tr. Day 4 at 98-101, Day 5 at 78-81) AOC kitchens resort to "cleaning," really rinsing, their wares with water hoses between uses, which inadequately sanitizes them for use.  (Ex. 37, Tr. Day 3 at 68-73, 88-89, 101, Day 4 at 100).  Employees are not aware of how to take apart the component pieces of certain equipment for washing, resulting in residue remaining in parts of this equipment which are exposed to food.  (Ex. 17, 37, Tr. Day 4 at 98-99).  As already mentioned above, cracks and exposed insulation in damaged thermoses, insulated trays and thermos carts causes the trays to essentially become permanently contaminated, causing these to remain smelly and unclean, increasing the risk of contamination and bacterial growth.  (Ex.

Civil No. 79-4 (PG)

37, Tr. Day 4 at 98-99).  At any given mealtime, food residues from the previous meal can be found in the trays, demonstrating the lack of appropriate dishwashing and sanitation.  (Ex. 15, 17, 19JJ-19LL, 37, Tr. Day 3 at 68, Day 4 at 99).

Vehicles used to transport food are not properly cleaned, sanitized or fumigated.  (Ex. 37, Tr. Day 4 at 80, 101, Day 5 at 18-19).  They are also not appropriate for transporting food, since they are not fitted with belts to stabilize thermal food carts.  (Ex. 37, Tr. Day 4 at 101-102).  As a result food becomes mixed and spills into the carts or on the floor of the vehicle, increasing the risk of future contamination as well as the likelihood of infestation by rodents and insects.  (Ex. 37, Tr. Day 4 at 4-5, 102).  On occasion, food containers are placed directly on the dirty, rusty floor of the vehicle also causing food to be spilled with the attendant risk of making this equipment unsanitary and increasing the likelihood of infestation.  (Ex. 37, Tr. Day 4 at 4-5, 80, 102).

As a result of all of the conditions described above flies, cockroaches and worms might be found near food serving areas and equipment or actually in food served to inmates.  (Tr. Day 3 at 96, Day 4 at 12, 15, 101-102, Day 5 at 4, 19, Ex. 5B, 17, 19, 37).  This problem is clearly exacerbated when long periods go by without adequate fumigation.  (Ex. 33).  The increased

27

Civil No. 79-4 (PG)

likelihood of contamination also leads to pieces of glass, wire and paper being found in food.  (Ex. 37).  Faced with inadequate food, members of the prison population can either eat it as is or go hungry.  (Tr. Day 3 at 96).

**Portions & Nutrition**: Even above and beyond the inmates who, despite their hunger, cannot find it in themselves to eat spoiled or contaminated food (Tr. Day 3 at 96), the Court specifically finds that the AOC is systematically underfeeding the inmate population.  (Ex. 33, 37).  The lack of proper guidance from the central office in the form of standardized, uniform recipes and training regarding portion control results in noncompliance with the portion requirements established by the AOC's own food cycle.  (Ex. 37, Tr. Day 4 at 79). The failure to provide adequate portions is particularly true about protein sources and there seems to be some consensus that certain kinds of foods, are particularly susceptible to this problem, such as menus containing chicken parts, which contain more chicken bones than chicken meat and different types of soups, which contains more broth than actual pieces of food. (Ex. 37).  In fact, the quantity of small and sharp chicken bones in food is so extreme as to be considered physical contamination, which constitutes a potential food security problem.  (Ex. 37, Tr. Day 4 at 85).

Civil No. 79-4 (PG)

Commercially prepared single portion foods such as hamburger patties and hot dogs do not comply with the food portions established in the AOC's menu cycle (Ex. 37, Tr. Day 4 at 85), so that every time these foods are served, those who consume them are shortchanged.   Other foods such as rice, stew and vegetables are prepared in insufficient quantities resulting in significantly smaller portions being served (Tr. Day 4 at 85-87, Ex. 17) and leaving the last group to be served to simply go without food because there is not enough to go around.   (Ex. 37, Tr. Day 4 at 15, 24-25, 26-27, 79, 87-88).   This information was confirmed by kitchen personnel as well as by correctional officers.   (Ex. 37, Tr. Day 4 at 87-88).   Some correctional officers even reported that they felt obligated to share their food with the inmates who were left without a meal.   (Ex. 37).

The menu cycle established in the AOC's own Food Service Manual is meant to comply with minimum nutritional standards. (Ex. 7, Tr. Day 6, 8-12).   The consistent failure to comply with the quantities stipulated in the menu cycle, means that these minimum requirements are not being met.   Going without sufficient food for a day or two can be quite painful, but when this goes on for months or years, malnutrition must become a serious concern.   See generally, Hutto v. Finney, 437 U.S. 678, 686-87 (1978) ("[T]he length of confinement cannot be ignored in

Civil No. 79-4 (PG)

deciding whether the confinement meets constitutional standards.
A filthy, overcrowded cell and a diet of 'grue' [providing 1000
calories a day] might be tolerable for a few days and
intolerably cruel for weeks or months.")

Menu changes are not documented and are made without the
adequate supervision of dietitians.  (Ex. 37, Tr. Day 2 at 118-
121).  In particular, the menu changes observed by Plaintiffs'
expert tended to lessen the amounts of vegetable portions and to
generally lessen the variety of the food served, undercutting
the nutritional adequacy of the food provided over time. (Ex.
37).  Moreover the observed practice of overcooking food (Tr.
Day 4 at 84-85, Ex. 16, 17, 19, 37), not to mention the serving
of spoiled food, affects its nutritional content (Tr. Day 5 at
6) as well the palatability of the food provided to those
confined in AOC institutions.  (Ex. 37).  Even the Secretary of
Corrections recognized on one of his visits that the quality of
the food that he observed was so poor, that he authorized the
food to be sent back.  (Tr. Day 2 at 37, 39).

**Medically Ordered Diets**: The food which is available for
the provision of medically ordered diets is not adequate to meet
medical orders.  (Ex. 33 at 25).  The line personnel who prepare
modified diets clearly do not have the knowhow to follow medical
orders with respect to special diets.  (Ex. 5C, 9A, 37, Tr. Day

30

Civil No. 79-4 (PG)

3 at 69-72, 79-84, Day 4 at 6-7, 79-80, 88-89, Day 5 at 15-16).
This is particularly true with respect to diabetic and renal
diets in which portion control is a key issue. (Ex. 37, Tr. Day
4 at 88-90, 104, Day 5 at 15-17). Moreover, medically ordered
diets are not promptly made available to inmates who need them
and often do not reach the inmate correctly prepared which often
results in the patient going without food for that meal. (Ex.
33, Tr. Day 3 at 71-72, 80-81, Day 4 at 6-7, 32-33). The
failure to follow such diets places these types of medical
patients at increased risk of serious health complications.
(Ex. 37).

On the other hand, it appears that in order to save time,
AOC's correctional kitchens follow a one size fits all
specialized diet menu where there is one low fat, low sodium, no
irritant meal which is given to all inmates with a medical diet
order. (Ex.37, Tr. Day 4 at 32-33, Day 5 at 12-13)

Other special diets, such as diets designed to accommodate
religious dietary restrictions are also not provided. (Tr. Day 4
at 32-33). A Muslim prisoner testified regarding his experience
with food service. Muslims do not eat pork. This would seem a
simple enough dietary restriction to accommodate. Upon
referring the matter to the AOC, he was served a low sodium, low
fat diet. On attempting to correct the situation, he was taken

31

Civil No. 79-4 (PG)

off the "special diet," and now receives the same food as all
other members of the penal population, even when pork is on the
menu.  For those meals, he must simply make do with what he can
from the other items on the menu.  (Tr. Day 4 at 32-33).  This
is emblematic of the robotic and inflexible quality of the
problem solving ability of the AOC.  It may also be a symptom of
an overburdened kitchen which simply does not have the capacity
to meet even the most basic food service needs of the huge
population that it serves.  (Tr. Day 4 at 32-24, Tr. Day 2 at
108).

     At the end of 2008, upon the initiative of the AOC's
Dietitian Services Coordinator, a pilot program was begun at one
AOC institution to ensure that medically ordered diets were
properly complied with. (Tr. Day 2, 112-115,  Ex. 5A).  This
commendable effort apparently enjoyed some success, and it was
planned that it should be implemented at other institutions
within the AOC.  However, no credible evidence regarding the
continued utilization of that program or its implementation at
other institutions was presented by Defendants.   (Tr. Day 2,
112-118, 130-132, Ex. 5B, Tr. Day 4 at 88-89, Day 5, 29-31).

Civil No. 79-4 (PG)

Employees are poorly trained[5] if they are trained at all and are given inadequate guidance and supervision from the central office. (Ex. 5C, 37, Tr. Day 4 at 80-81, 89-91, 105). They do not correctly receive and store food, prepare sufficient quantities, ensure that they are serving appropriate quantities, clean food equipment, or prepare medically ordered diets. (Id.).

Prison line personnel are either utterly dismissive or openly hostile to prisoners' complaints and grievances regarding food service matters. (Ex. 11C, 11E, 11I, 11L, 14C, 15O, 17E, Tr. Day 3 at 96-100, Day 4 at 15-16, 24-25). One inmate was told that he was not in a luxury hotel in response to his grievance that he had received undercooked (still frozen) meat. (Ex. 11L). In another case an inmate was placed in segregation for repeatedly filing grievances relating to food service. (Tr. Day 3 at 62-63). Another inmate submitted a grievance complaining that food trays used to serve food were filthy and was told to talk to his fellow inmates who were the ones who were charged with cleaning trays. (Tr. Day 3 at 68-69). In another instance an inmate in charge of distributing food was

---

[5]  With respect to training and training materials, Plaintiffs expert was advised by kitchen personnel that employees participate in monthly "chats". From the materials she was able to review none of these cover topics germane to the quality of the food service or to food safety. For example, one of the monthly topics was how to answer telephone calls correctly, and another was related to employee motivation. (Ex. 37).

Civil No. 79-4 (PG)

disciplined because his fellow inmates refused to accept trays
to be washed in living area showers and reused for food service.
(Tr. Day 4 at 28-29, Ex. 35).   The Court is hesitant to
attribute such spiteful responses to cruelty or sadism; rather,
these responses reveal what must be unmitigated frustration and
desperation in dealing with the same incessant complaints and
situations, over and over again, several times a day, every day
of the week, for months on end, without receiving any kind of
useful support from the prison officials with the capacity to
bring about a solution.

It was brought to the Court's attention during the hearing
that recent government layoffs left AOC kitchens without
adequate supervisory personnel, and although it has already been
recommended that personnel be trained to take over those
supervisory duties, that recommendation has yet to be accepted.
(Day 2 at105-108, 139-140).   This is a recent development,
postdating Plaintiffs' expert inspection of the kitchens.  (Id.)
Should this problem remain unresolved, it is likely that the
lack of appropriate kitchen supervision will further aggravate
the AOC's food service operations.

**The Actions of the Secretary of Corrections**: While
Defendant Carlos Molina Rodríguez initially appears to have
taken some preliminary steps to address the abysmal state of

34

Civil No. 79-4 (PG)

food service in the AOC by informing himself on the state of AOC
food service and investing in some new equipment and repairs,
his efforts fall short of the type of categorical action that
the situation truly requires considering the considerable health
risk posed by the food services conditions at the AOC.

Although the Secretary pays lip service to a great urgency
and concern regarding the state of food service (Tr. Day 2 at
23-24, 38-40, Ex. 2), upon closer examination he seems decidedly
disengaged from the problem.  For example, the Secretary, who is
also the Administrator of Corrections, is not familiar and has
little contact with the AOC staff involved in the agency's food
service operations, including the AOC's Food Services Director.
(Tr. Day 2 at 29-31, 74-77).  In fact, after requesting that a
report be generated evaluating food service throughout AOC
institutions (Tr. Day 2 at 33-40, 71-74), he did not forward the
report resulting from that exercise to the Director of Food
Services,[6] who was never even made aware that the evaluation had
taken place until she heard testimony about it in open Court in
the course of these hearings (Tr. Day 2 at 86-87).  The results
of that evaluation were also not forwarded to the AOC Dietitian

---

[6] At time the Director of Food Services herself seems decidedly uninterested
in the challenges presented by food service at the AOC. For example when
asked, she was not aware of how many inmates were served by several of the
AOC kitchens. (Tr. Day 2 at 107). She also testified that there were thirteen
functioning AOC kitchens although all other witnesses agreed that there were
fourteen. (Tr. Day 2 at 105).

Civil No. 79-4 (PG)

Services Coordinator.  (Tr. Day 6 at 61).  These are the only two dietitians in the employ of the entire agency for a population of over twelve thousand inmates.  (Tr. Day 2 at 85-87, 132-133).

The Secretary was keen on sharing with the Court that he had imparted particular "instructions" to unidentified AOC personnel regarding various food service related matters (Tr. Day 2 at 24-25, 32-34), yet there was no evidence of how these instructions were given, when or to whom, nor of how the Secretary planned to follow up on those instructions to ensure their implementation.  As this Court has previously recognized, there is no doubt that in an agency the size of the AOC matters should be delegated, but this sort of delegation cannot function properly without accountability and clear standards and procedures.

**The privatization of food service**: In August 2004, Canteen Correctional Services Corporation was contracted to deliver food services for the Administration of Corrections in the hopes that food service would thereby be improved.  (Docket 8816).  Clearly, this change has not improved the quality of food services in the correctional system.  The Secretary declares that a new food services contract, either with Canteen Correctional Services Corporation or with another service

36

Civil No. 79-4 (PG)

provider, should be put in place in order to improve food service. According to the Secretary, the agency wants to include controls to ensure compliance through sanctions, an inspector who can carry out inspections within the system, a requirement that more dietitians be involved in food service and the inclusion of preventive maintenance to equipment in the contract. (Tr. Day 2 at 33, 41, 45-46, 68, 72, 80).

But the Secretary's desire to execute a new food services contract clearly predates his assessment of the state of the AOC's food services. (Ex. 21, 2). Moreover, his subsequent actions, as they relate to this goal, have not been directed to improving the quality of food service to the inmate population.

The Secretary's first request for proposals relating to food service, RFP-09-0001 was issued in March of 2009 (Ex. 21), just a month after his confirmation as Secretary of the Commonwealth's Department of Corrections and Administrator of Corrections, (Tr. Day 2 at 22). In August of 2009, the Secretary issued a letter to the bids office explaining that based on his visits to AOC kitchens, he had concluded that there was an "urgent need to make substantial changes in the providing of the food services," and stating that "substantial changes" would be made to ensure that the administration's public policy

Civil No. 79-4 (PG)

is complied with.   (Ex. 2).   RFP 09-0001, was therefore
canceled.

     During this time, however, Canteen's contract with the AOC
was slated to automatically renew for another year in March of
2010.   (Ex. 22).   The Secretary could easily have notified
Canteen in writing of its intent to terminate the contract with
it 90 days prior to March 31, 2010 for the purpose of opening
the contract to other bidders according to the terms of the
contract, (Tr. Day 2 at 46-47, Ex. 22).   He did not, however, do
so (Tr. Day 2 at 44, 47-52), thereby creating tremendous
uncertainty as to the legal feasibility of terminating the
contract with Canteen[7] in order to be able to contract with
another party.   (Tr. Day 1 at 6-12, 15-20, Tr. Day 2 at 41, 52-
55).

     As mentioned RFP 09-0001, was cancelled, presumably on the
basis that there were going to be major revisions to the RFP
directed to improving the quality of food service.   (Id.)
Nevertheless the RFP issued by the Department of Corrections in
December 2009, RFP 09-0042, is virtually identical to RFP 09-
0001 (Ex. 22, 23) even to the point that the latter mistakenly

---

[7] Although the Secretary sustains that Canteen has participated in the new
requests for proposals as evidence that they were aware of the AOC's intent
to refuse to renew the contract (Tr. Day 2 at 81), this fact does not in any
way guarantee that Canteen will not contest the legality of the AOC's
termination of its contractual obligations.

Civil No. 79-4 (PG)

contains dates corresponding to the former. (Tr. Day 3 at 13-17, Ex. 21, 22, 23). The new RFP did not contain any changes designed to address existing food service deficiencies as the Secretary claims.

The revised RFP did, however, divide AOC correctional institution into regions, to allow several contracts to different bidders to be awarded to different regions. (Ex. 22). This last bid was adjudicated in March 2010 (Tr. Day 3 at 28-9, Ex. 3) and later cancelled in April 2010 because the budget for the contract was not complete. (Tr. Day 3 at 19-20, 24-27, Ex. 23, 34). No one thought to wait to adjudicate the bid until budget was approved because those involved understood that there was "time pressure" (Tr. Day 3 at 26), presumably the pending motion for contempt filed by Plaintiffs. In a matter of days, the Secretary declared a state of emergency which permits him to bypass the bid process altogether in awarding another contract. (Tr. Day 3 at 37-39, Ex. 24).

The proposition that a new contract is necessary or would even be helpful in attaining a sustainable level of constitutionally adequate food service was not properly substantiated by any evidence and is a self-serving assertion on the part of Defendants. The AOC has a perfectly good Food Services Manual which is comprehensive, covering many if not all

Civil No. 79-4 (PG)

of the basic food standards which were set out at the hearing. (Ex. 7). This Manual adopts explicitly and by reference industry standards such as the American Correctional Association standards governing food service, the National Research Council of the Food and Nutrition Board of the National Academy of Sciences, as well as the Food Code promulgated by the Food and Drug Administration (which has also been adopted by Puerto Rico's Department of Health as a regulation governing food service operations on the island). (Ex. 7). The Manual also incorporates by reference many of the orders of this Court. (Id.). Canteen Correctional Services Corporation is required to abide by the Food Services Manual. (Ex. 7).

Moreover, the AOC has an Evaluation and Contract Compliance Plan which sets forth in detail the manner in which the AOC supervises Canteen and ensures contract compliance. (Ex. 1). The AOC already has an "inspector," who is supposed to regularly visit AOC kitchens in order to demand compliance with Canteen's contractual obligations and with the minimum standards set out in the Food Services Manual; it is the Director of Food Services. (Ex. 1). Canteen is already required to repair most kitchen equipment. (Ex. 1 & 7). The problem is not Canteen's contractual obligations with the AOC, it is the AOC's utter failure to enforce those obligations.

Civil No. 79-4 (PG)

The Director of Food Services apparently disavows any responsibility for visiting AOC kitchens, meeting with Canteen personnel, scrutinizing menu changes, requiring daily inspections, etc. as set out in the Compliance Plan (Ex. 1, Tr. Day 2 at 108-110, 114-122, 128-129). Likewise, the requirements of the Food Services Manual are not taken seriously by the AOC such as requiring adequate dishwashing equipment, sanitation and cleaning, adherence to food temperature requirements and observance of the food cycle menu and food service schedules. (Tr. Day 2 at 102, 141-142, 144-145, Tr. Day 3 at 52-55, 61, Day 4 80-81, 110, Ex 7, 33, 37).

The Court finds that the Secretary's efforts to change the currently existing food service contract at this time are largely peripheral to the issue of providing constitutionally adequate food service. Neither evidence nor arguments have been presented by Defendants to show that the currently existing structure, including the current contract with Canteen Correctional Services, cannot generate the changes necessary to create constitutional conditions of food service or are otherwise unworkable in some concrete way. If the AOC feels that it will somehow serve its needs to change the currently existing food service contract, it is its prerogative to make such a change, and that prerogative must be exercised with due

41

Civil No. 79-4 (PG)

consideration of its contractual and other legal obligations and
of the significant expenditures of time, money and effort
attendant on such changes.  It should not, however, use its
obligations under the U.S. Constitution and in this case as a
pretext for making such changes.

### CONCLUSIONS OF LAW

The State has an affirmative duty to adequately provide for
the basic human needs of inmates:

> When the State by the affirmative exercise of its
> power so restrains an individual's liberty that it
> renders him unable to care for himself, and at the
> same time fails to provide for his basic human needs
> - e.g. food, clothing, shelter, medical care and
> reasonable safety - it transgresses the substantive
> limits on state action set by the Eighth Amendment.

DeShaney v. Winnebago County Dept. Of Social Services, 489 U.S.
189 (1989); see also Helling v. McKinney, 509 U.S. 25, 32 (1993)
("When the State takes a person into its custody and holds him
there against his will, the Constitution imposes upon him a
corresponding duty to assume some responsibility for his safety
and general well-being. . . . Contemporary standards of decency
require no less."); Estelle v. Gamble, 429 U.S. 97, 102-104
(1976) ("The infliction of . . . unnecessary suffering is
inconsistent with contemporary standards of decency as
manifested in modern legislation codifying the common law view
that 'it is but just that the public be required to care for the

Civil No. 79-4 (PG)

prisoner, who cannot, by reason of the deprivation of his liberty, care for himself.'") (citations omitted).

Various conditions of confinement may establish an Eighth Amendment violation even when each would not do so alone, when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need, such as food. Wilson v. Seiter, 501 U.S. 294, 304 (1991); Rhodes v. Chapman, 452 U.S. 337, 346-7 (1981) ("Conditions . . ., alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities.'").

Under the circumstances proven in these hearings, this Court concludes that the conditions described, taken together, produce the deprivation of adequate food to the Plaintiff Class.

It has long been established law that "[T]he State must provide an inmate with a healthy habitable environment [which] includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it. French v. Owens, 777 F.2d 1250, 1255 (7th Cir. 1985); Robles v. Coughlin, 725 F. 2d 12, 15 (2d Cir. 1983); Ramos v. Lamm, 639 F.2d 559, 570 (10th Cir. 1980), cert. denied 450 U.S. 1041 (1981).

Civil No. 79-4 (PG)

The findings of fact outlined above demonstrate that the food being provided to the Plaintiff Class is not nutritionally adequate because it is not provided in sufficient quantities:

> The sustained deprivation of food can be cruel and unusual punishment when it results in pain without any penological purpose. . . . [I]nmates rely on prison officials to provide them with adequate sustenance on a daily basis. The repeated and unjustified failure to do so amounts to a serious depravation.

Foster v. Runnels, 554 F.3d 807, 814 (9th Cir. 2008) (citations omitted). A systematic failure to provide food in sufficient quantity to maintain normal health violates the Eighth Amendment. See Phelps v. Kapnolas, 308 F.3d 180, 187 (2d Cir. 2002) (inmate alleged he had been placed on nutritionally inadequate restricted diet for fourteen days); Reed v. McBride, 178 F.3d 849, 853-56 (7th Cir. 1999) (alleged deprivation of food was sufficiently serious and prison officials' deliberate indifference was obvious); Simmons v. Cook, 154 F.3d 805, 807-09 (8th Cir. 1998) (inmates were deprived of four consecutive meals); Robles v. Coughlin, 725 F.2d 12, 15-16 (2nd Cir. 1983) (deprivation of meals for twelve days during a fifty-three day period); Cunningham v. Jones, 567 F.2d 653, 660 (6th Cir. 1977) (remanding for consideration of whether one meal per day which was provided was nutritionally adequate to maintain normal health); Dearman v. Woodson, 429 F.2d 1288, 1290 (10th Cir.

Civil No. 79-4 (PG)

1970) (refusal to provide food during a fifty and a half hour period).

Moreover, this Court notes that menu substitutions and inadequate portion measurement result in inmates receiving less quantities of certain particular types of aliments, specifically vegetables and proteins, than required. (Ex. 33, 37). This Court finds that the resulting failure to provide sufficient quantities of those foods over a sustained period of time results in a nutritionally inadequate diet. See e.g., Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir. 1996) (prisoner stated a cause of action under the Eighth Amendment by claiming "not just 'ransid food' [sic], but also a 'nutritionally deficient' diet"); Rust v. Grammer, 858 F.2d 411, 414 (8th Cir. 1988) (diet without fruits and vegetables might violate Eighth Amendment if it were regular prison diet); LeMaire v. Maass, 12 F.3d 1444, 1455 (9th Cir. 1993) (evaluating nutritional content of food provided); Cunningham v. Jones, 567 F.2d 653, 657 (6th Cir. 1997) (taking in consideration nutritional content in finding an Eighth Amendment violation).

In addition, "[f]ood served to inmates is deficient under constitutional standards, even when nutritionally complete, if it is prepared under conditions so unsanitary as to make it unwholesome and a threat to the health of inmates who consume

Civil No. 79-4 (PG)

it."   Toussaint v. McCarthy, 597 F.Supp. 1388 (1984).   In evaluating the conditions under which AOC food is stored, prepared and served, this Court has considered the applicable Food Code standards pointed out by Plaintiffs' expert, as well as the AOC's own Food Service Manual.   Such codes, while not establishing "constitutional minima" are relevant in making a finding regarding the constitutionality of existing conditions." Ramos v. Lamm, 639 F.2d 559, 570 (10th Cir. 1980), cert. denied 450 U.S. 1041 (1981).

The storage, preparation and service of food at the AOC are sufficiently unsanitary as to implicate the Eighth Amendment. Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996) ("Food that is spoiled and water that is foul would be inadequate to maintain health."); French v. Owens, 777 F.2d 1250, 1255 (7th Cir. 1985) (finding unsanitary kitchens and food storage areas to be unconstitutional); Ramos v. Lamm, 639 F.2d 559, 570 (10th Cir. 1980), cert. denied 450 U.S. 1041 (1981) (noting that the failure to adequately store foods and maintain adequate food temperatures contributes to conditions that constitute Eighth Amendment violation.); Lightfoot v. Walker, 486 F.Supp. 504, 524 (S.D. Ill. 1980) (improper food storage, inadequate dishwashers, untrained personnel, the failure to provide a special diet for those who need it found to be unconstitutional).

Civil No. 79-4 (PG)

Moreover, the AOC deprives inmates with special medical conditions of proper medically ordered diets in violation of the Eighth Amendment, placing these inmates at very grave risk of serious medical complications.  Byrd v. Wilson, 701 F.2d 592, 594-95 (6th Cir. 1983) (low sodium, high protein diet); Massey v. Hutto, 545 F.2d 45 (8th Cir. 1976) (stomach ulcers); Woulard v. Food Service, 294 F.Supp.2d 596 (D.Del. 2003) (diabetes and Crohn's disease); Kyle v. Allen, 732 F.Supp. 1157 (S.D. Fla 1990) (ulcers); Balla v. Idaho State Bd. Of Corrections, 595 F.Supp 1558 (D.Idaho 1984) (diabetes & Crohn's disease) ("There is simply no penological justification for depriving inmates with serious medical problems of their duly prescribed diets"); see generally, Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000) ("[a] medical need is serious if it is one that has been diagnosed by a physician as mandating treatment . . ."); Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990) (same).

The failure to maintain any consistent program for providing special diets also causes the failure to honor diet restrictions imposed by an inmate's religion implicating Plaintiffs' First Amendment free exercise rights.  Kahane v. Carlson, 527 F.2d 492, 495-6 (2nd Cir. 1975) ("[P]rison

Civil No. 79-4 (PG)

authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples.")

In order to establish liability under the Eighth Amendment a prison official must "know[] of and disregard[] an excessive risk to inmate health or safety," specifically, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). The Eighth Amendment's state of mind requirement, "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842-3. It is not necessary that a prison official be aware of the precise consequences, but that the official be aware of "facts from which the inference could be drawn that a substantial risk of harm exists." Smith v. Brenoettsy, 158 F.3d 908, 912 (5th Cir. 1998).

Despite his characterization of the food services problem as "critical" and "emergent," Secretary Molina testified that he does not believe inmate health to be at risk. (Tr. Day 2 at 64-67). This testimony is simply not credible. Where a substantial risk of serious harm is "'longstanding, pervasive, well-

48

Civil No. 79-4 (PG)

documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued has been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant official had actual knowledge of the risk.'" Id. (citations and quotations omitted).

There can be no doubt in this case that the failure to provide adequate food service and medically prescribed diets and their potential damaging effects on inmate health are just such "longstanding, pervasive, well documented" risks which have been "expressly noted" and brought to the attention of all prison officials who have participated in this case in the past. The problems noted in this opinion are not new, they have existed for many many years. A report, commissioned by Secretary Molina in August of 2009, and issued in September of 2009, the results of which were submitted to him, drew a dismal system wide compliance rate of 67%, with several items drawing compliance of 0%. (Tr. Day 2 at 71-72, Ex. 33). The record is clear that Secretary Molina is, not only aware of the condition of AOC food service, but that he has observed it first hand and has received reports from his staff about such food service which painted a grim picture of food service at the AOC.

Civil No. 79-4 (PG)

Moreover, the risk of food borne illnesses from consuming contaminated food prepared and served in unhygienic conditions is obvious. The Secretary clearly has had sufficient information to be aware of an unreasonable risk to inmate health from inadequate food service. He cannot now hide behind an excuse that he was unaware of such an obvious risk. See Brice v. Virginia Beach Correctional Center, 58 F.3d 101, 105-106 (4th Cir. 1995) ("intentionally contrived obliviousness," meets the deliberate indifference standard under the Eighth Amendment.)

The reasonableness of a prison official's response to such risks is a question for the trier of fact. Smith v. Brenoettsy, 158 F.3d 908, 912 (5th Cir. 1998). As already mentioned, Secretary Molina has taken some action in response to the poor food service conditions he knows to exist at the AOC. Above all, he should be commended for his efforts to inform himself of the conditions of the AOC's food services operations and for the purchase and repairs of equipment which will begin to address some of the deficiencies noted. Despite these modest efforts, however, this Court finds that the Secretary of Corrections' actions fall far short of the type of action required if meeting constitutional standards in food service is the goal. Despite his awareness of the problems, there are many actions the Secretary failed to take to address these conditions: (1) the

50

Civil No. 79-4 (PG)

Secretary never used the tools at his disposal to require that Canteen Correctional Services correct deficiencies (i.e. the Food Manual and the Compliance Plan); (2) he did not claim to have attempted to confer with Canteen Correctional Services to insist that it comply with its obligations under its contract and under the Food Service Manual; (3) he never met and coordinated with his own Director of Food Services (a) to address existing food services deficiencies, or (b) to evaluate why AOC kitchens and food service fail to comply with the AOC's Food Services Manual or (c) to determine why the Director of Food Services is either unwilling or unable to comply with the Contract Compliance Plan in order to supervise Canteen's execution of the contract with the AOC. These are all basic, common sense, rather inescapable measures which were not undertaken, even in the face of well known and obscene conditions which clearly place inmates at unreasonable risk of serious harm from malnutrition, medical complications, and food-borne illnesses. This Court therefore concludes that Secretary Molina's response to the food service issue is insufficient, and that he has acted with deliberate indifference to the risk of harm to Plaintiff Class.

Based on all of the above, the Court finds that there is a current and ongoing violation of federal law, specifically, that

Civil No. 79-4 (PG)

food service conditions at the AOC violate the Eighth Amendment of the U.S. Constitution in that they create an unreasonable risk of malnutrition, food-borne illness and medical complications with respect to the Plaintiff Class.

## REMEDY

The Court has now spent thirty years in this case, examining the conditions of confinement in the AOC and attempting to remedy them. As this Court takes stock of the matters which are now before it, it cannot help but consider the long and tortuous history of this case, marked as it is by occasional, sometimes even encouraging improvement, but dominated by backsliding, wasted energy, neglect, misdirection, contemptuous disregard and frustration.

As early as 1974, the Supreme Court made the following observations about the role of the federal judiciary in the context of prison administration:

> Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of

Civil No. 79-4 (PG)

>    resources, all of which are peculiarly within the
>    province of the legislative and executive branches
>    of government.  For all of those reasons, courts are
>    ill equipped to deal with the increasingly urgent
>    problems of prison administration and reform.
>    Judicial recognition of that fact reflects no more
>    than a healthy sense of realism . . . . But a policy
>    of judicial restraint cannot encompass any failure
>    to take cognizance of valid constitutional claims
>    whether arising in a federal or state institution.

Procunier v. Martinez, 416 U.S. 396, 404-405 (1974).

This Court can attest to its own, "healthy sense of realism," with respect to its role in this case.  To be sure, this Court has never attempted to usurp AOC authority, even though it has acquired a significant education on correctional administration through its participation in this case throughout the last thirty years.  On the contrary, this Court's remedial orders in this case have been characterized by the Court's repeated deference to the wishes of prison authorities every time that they have demonstrated a desire to address constitutional wrongs, by its willingness to call upon the most knowledgeable and experienced experts in assisting AOC prison officials to improve conditions of confinement at the AOC and by its restraint in withholding some of the more intrusive and aggressive remedies which it might otherwise have imposed.

This approach stemmed from the Court's deep desire to see the AOC solve its own problems, not only out of judicial

Civil No. 79-4 (PG)

deference, but because, as trite as it may sound, this Court had been convinced that in order to effect lasting change, that change had to borne from the prison system itself, from the people who have to be present day in and day out, working within that system. Without wholeheartedly dismissing such an approach as hopelessly naive, this Court nevertheless cannot help but note that, in spite of some limited success, this approach has by no means brought about the sort of fundamental systemic change which would allow the Court to extricate itself from the case, at least not anytime soon.

At around the same time that this litigation began, Justice Brennan, in his concurrence in the <u>Rhodes v. Chapman</u> case, made the following observations regarding institutional reform litigation in the prison context:

> [I]ndividual prisons or entire prison systems in at least 24 States have been declared unconstitutional under the Eighth and Fourteenth Amendments, with litigation underway in many others.  Thus, the lower courts have learned from repeated investigation and bitter experience that judicial intervention is indispensable if constitutional dictates - not to mention considerations of basic humanity - are to be observed in the prisons.
>    No one familiar with litigation in this area could suggest that the courts have been overeager to usurp the task of running prisons, which as the Court today properly notes, is entrusted in the first instance to the legislature and prison administration rather than a court. . . .
>    Public apathy and the political powerlessness of inmates have contributed to the pervasive neglect of

Civil No. 79-4 (PG)

the prisons. . . . Thus, the suffering of prisoners,
even if known, generally 'moves the community in only
the most severe and exceptional cases.'  As a result
even conscientious prison officials are 'caught in the
middle,' as state legislatures refuse "to spend
sufficient tax dollars to bring conditions in outdated
prisons up to minimally acceptable standards."  After
extensive exposure to this process [one court] came to
view the "barbaric physical conditions" of Rhode
Island's prison system as "the ugly and shocking
outward manifestations of a deeper dysfunction, an
attitude of cynicism, hopelessness, predatory
selfishness, and callous indifference that appears to
infect, to one degree or another, almost everyone who
comes in contact with the [prison]."

Under these circumstances, the courts have
emerged as a critical force behind efforts to
ameliorate inhumane conditions. . . .

Rhodes v. Chapman, 452 U.S. 337, 353-354 and 358-359 (1980).

This Court too has been witness to the dysfunction,
cynicism, hopelessness, apathy, and to the frustration, which
pervades and dominates any effort to change and correct
unconstitutional conditions of confinement at the AOC.  Due to
the manner in which this case has operated, the AOC often sees
in the Court a resource for making capital improvements to the
correctional system and for enlisting the aid of private persons
or companies which participate in different aspects of
correctional operations.  Much to the dismay of the Court, such
investments of time, resources, energy and good will, all too
often vanish into thin air.

Civil No. 79-4 (PG)

In the food services context, in particular, the Court believes that it has been solicitous, perhaps to a fault, of Defendants' proposed solutions, particularly in recent years in which the AOC recruited a well established and experienced company to run its food service operations, designed a Food Services Manual and developed a specific compliance plan to oversee the execution of the food services contract. Nevertheless, many of the same problems which have existed for years in the case continue to exist despite all of these efforts because once these solutions are designed, detailed and written out, Defendants feel free to ignore them and to abdicate their duties under the Constitution.

During most of the long history of this case, it has been neither the lack of funding nor the lack of expertise which has allowed many of the unconstitutional conditions which were first noted thirty years ago to continue unabated. The crucial missing ingredient is the desire and the determination to actually implement the solutions which will address ongoing unconstitutional wrongs. This Court has no doubt that in a case in which the unconstitutional conditions of confinement have proven so recalcitrant and intransigent, it has authority to appoint a receiver as an independent party empowered to ensure that its orders are actually carried out. See generally, Plata

Civil No. 79-4 (PG)

v. Schwarzenegger, 603 F.3d 1088 (9th Cir. 2010).  Receivership
has been common since the reign of Queen Elizabeth I, and was
seen as a means of protection when the Court doubted that a
party in possession would obey a Court's injunction.  12 Charles
Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal
Practice & Procedure § 2981 (2nd ed. 1997), page 7.  There is
suitable justification for the establishment of a receivership
in this case for the purpose of comprehensively addressing the
case as a whole, including food service as one component.

     The remedial order imposed by this Court below, requires
the implementation of critical food safety practices and will
permit the oversight and implementation of those practices.
(Tr. Day 4 at 80-81, Day 5 at 11-12).  The Court finds that this
remedy, based specifically on the evidence presented by the
parties during the hearing of this matter, due consideration
being given to the history of this case, is narrowly drawn,
extends no further than necessary to correct a violation of
federal rights, and is the least intrusive means of doing so.

     The remedial order of this Court will not adversely impact
public safety.  On the contrary, maintaining adequate standards
with respect to food service and safety is likely to positively
impact the health of AOC staff who are also exposed to AOC food
and public health generally.     There is also no reason to

Civil No. 79-4 (PG)

believe that this order will negatively impact criminal justice operations.

After long and careful consideration the Court ORDERS the defendants within the next forty-five days to submit an itemized list of what they will do in terms of creating the positions and staffing to implement the prior orders of this Court.  Law 7 and any other local legislation shall not be deemed an excuse to fulfill this obligation by not later than April 15, 2011.  The callous disregard of hygiene with which the Administration of Corrections feeds plaintiffs and their own staff must stop.


**IT IS SO ORDERED**.
In San Juan, Puerto Rico, December 2, 2010.




                              S/ JUAN M. PEREZ-GIMENEZ
                              JUAN M. PEREZ-GIMENEZ
                              U.S. DISTRICT JUDGE.